## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
## SENTENCE BY A PERSON IN FEDERAL CUSTODY

| **United States District Court** | District Southern District of New York |
|---|---|
| Name (under which you were convicted): <br> Mark Mazer | Docket or Case No.: <br> S2 11 cr. 121 (GBD) |
| Place of Confinement: <br> Allenwood L,S.C.I. White Deer, PA | Prisoner No.: <br> 644270054 |
| UNITED STATES OF AMERICA <br><br> v. | Movant (include name under which you were convicted) <br><br> Mark Mazer |

### MOTION

1. (a) Name and location of court that entered the judgment of conviction you are challenging:
   U.S. District Court for the Southern District of New York (Manhattan)

   (b) Criminal docket or case number (if you know): S2 11 cr. 121 (GBD)

2. (a) Date of the judgment of conviction (if you know): 4/28/2014

   (b) Date of sentencing: 4/28/2014

3. Length of sentence: 20 years

4. Nature of crime (all counts):

   Count 2: Wire Fraud, 18 U.S.C. Sec. 1943;
   Count 5: Bribery Conspiracy, 18 U.S.C. Sec. 371;
   Count 6: Bribery Involving Federal Program, 18 U.S.C. Sec. 666(A)(1)(B);
   Count 8: Travel Act Conspiracy, 18 U.S.C. Sec. 371;
   Count 12: Money Laundering Conspiracy, 18 U.S.C. Sec. 1956(H)

5. (a) What was your plea? (Check one)

   (1) Not guilty ☑    (2) Guilty ☐    (3) Nolo contendere (no contest) ☐

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count
   or indictment, what did you plead guilty to and what did you plead not guilty to?

6. If you went to trial, what kind of trial did you have? (Check one)    Jury ☑    Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?  Yes ☑  No ☐

8. Did you appeal from the judgment of conviction?  Yes ☑  No ☐

9. If you did appeal, answer the following:

(a) Name of court: U.S. Court of Appeals for the Second Circuit

(b) Docket or case number (if you know): 14-1397 (L)

(c) Result: Affirmed; rehearing and rehearing en banc denied (03/22/2016)

(d) Date of result (if you know): 11/30/0205

(e) Citation to the case (if you know): U.S. v. Mazer, 631 Fed. Appx. 57 (2d Cir. 2015)

(f) Grounds raised:

Insufficient evidence to support wire fraud conviction; Bribery related convictions must be vacated for failure to prove Mazer was an agent of the City under 18 U.S.C. Sec. 666(d)(1); Insufficient evidence and bad jury instructions on Travel Act; Money Laundering cannot stand either bribery or fraud convictions were vacated; Illegal sentence; joinder with co-defendants' issues.

(g) Did you file a petition for certiorari in the United States Supreme Court?  Yes ☑  No ☐

If "Yes," answer the following:

(1) Docket or case number (if you know): 15-1528

(2) Result:
Writ Denied

(3) Date of result (if you know): 1/23/2017

(4) Citation to the case (if you know): 2017 U.S. LEXIS 851 (January 23, 2017)

(5) Grounds raised:

Whether the statutory definition of "agent" requires a nexus between defendant's authority to act on behalf of federally funded entity and defendant's authority to affect control and expenditure of the entity's funds or if Sec. 666 can be constitutionally applied of defendant had no authority to act as to use of the entity's funds.

10. Other than the direct appeals listed above, have you previously filed any other motions,

petitions, or applications concerning this judgment of conviction in any court?

Yes ☐  No ☑

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or

application?    Yes ❑  No ✔

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or

application?    Yes ❑   No ✔

(7) Result:

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your

motion, petition, or application?

(1) First petition:    Yes ❑   No ✔

(2) Second petition:    Yes ❑   No ✔

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**GROUND ONE:**

Ineffective assistance of counsel: pretrial, trial, sentencing, appeal

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

There are multiple parts to this Ground One and many facts supporting the claim. The claim is broken down into the parts and the supporting facts are set forth in the attached Addendum filed with ths motion form.

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

Ineffective assistance of counsel claim required record development and is properly brought in 2255.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑ No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: N/A

Name and location of the court where the motion or petition was filed:

N/A

Docket or case number (if you know): N/A

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

N/A

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWO**:

Unconstitutional Sentencing Error (and Ineffective Assistance of Trial and Appellate Counsel)

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

There are multiple parts to this Ground in which Movant contends the Court made a series of unconstitutional sentencing errors and that defense counsel was ineffective in connection with the sentencing as well. This is addressed in detail in the attached Addendum.

(b) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

Record development was required and ineffective assistance of trial and appellate counsel.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐   No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: N/A

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐   No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐   No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐   No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

N/A

## GROUND THREE:

Prosecutorial Misconduct (and ineffective assistance of trial and appeal counsel for failing to address)

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

There are several examples of prosecutorial misconduct that violated Mr. Mazer's 5th and 6th Amendment rights and Mr. Mazer's trial and appellate counsel were ineffective for failing to address the same at trial and on appeal. The issue is discussed in detail in the Addendum.

## (b) Direct Appeal of Ground Three:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

Needed record development and ineffective assistance of counsel.

## (c) Post-Conviction Proceedings:

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐   No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: N/A

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

N/A

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FOUR**:

Mr. Mazer's conviction cannot stand in light of McDonnell v. U.S. and related decisions

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Under this Ground, Mr. Mazer contends that his conviction his constitutionally infirm and that the jury instructions given at trial did not comport with the law. He also claims ineffective assistance of trial and appellate counsel in connection with this issue. This Ground is discussed in detail in the Addendum.

(b) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☑ No ☐

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was raised to some degree on direct appeal; developments in the law make it ripe here.

## (c) Post-Conviction Proceedings:

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:
N/A

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

N/A

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13. Is there any ground in this motion that you have not previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

The Grounds raised in this motion have not been raised in full in any other forum, primarily because each issue involves a claim of trial and appellate counsel ineffectiveness in violation of the 5th and 6th Amendments and such issues are properly raised on collateral review in a 2255. Other reasons include the need for record development and subsequent developments in the law. Mr. Mazer also raises ineffective assistance of counsel as the cause for not raising certain of the issues earlier. One issue was raised in part on direct appeal, but subsequent developments in the law make it ripe here as explained in the attached Addendum. Mr. Mazer raises additional grounds and subparts to these grounds in his Addendum due to a lack of space on this form. He raises trial and appellate IAC on all.

14. Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the judgment you are challenging?     Yes ☐ No ☑

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:

Gerald L. Shargel, Winston & Strawn LLP, 200 Park Avenue, NY, NY 10166

(b) At arraignment and plea:

Same

(c) At trial:

Same

(d) At sentencing:

Same

Case 1:18-cv-00279-GBD Document 47 Filed 01/22/18 Page 11 of 265

(e) On appeal:

Henry Mazurek, 152 52nd Street, 8th Floor, NY, NY 10019

(f) In any post-conviction proceeding:

David Schoen, 2800 Zelda Road, Suite 100-6, Montgomery, AL 36106 (this Motion)

(g) On appeal from any ruling against you in a post-conviction proceeding:

N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?     Yes ☑ No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?     Yes ☐ No ☑

(a) If so, give name and location of court that imposed the other sentence you will serve in the future: N/A

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?     Yes ☐  No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

   This motion is timely filed.

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

   A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —

   (1) the date on which the judgment of conviction became final;

   (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

   (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

   (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

AO 243 (Rev. 09/17)

Therefore, movant asks that the Court grant the following relief:

Vacate Judgment of Conviction and Sentence

or any other relief to which movant may be entitled.

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on ——

(month, date, year)

Executed (signed) on    1/22/18    (date)

Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

Page 13 of 13

## TABLE OF CONTENTS FOR MARK MAZER §2255 ADDENDUM

PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
RELEVANT FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    The City Time Project and the Office of Payroll Administration ("OPA"). . . . . . . . . 3

A SYNOPSIS OF THE GOVERNMENT'S CASE AGAINST MAZER. . . . . . . . . . . . . . . 31

ADDITIONAL RELEVANT BACKGROUND THAT MUST BE CONSIDERED. . . . . . 35
    City of New York Office of Comptroller Financial Audit. . . . . . . . . . . . . . . . . . . . . . . 35
    City Time Assessment Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

SUMMARY OF THE GROUND FOR THE MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

GROUND I: INEFFECTIVE ASSISTANCE OF COUNSEL - GENERAL OVERVIEW. 45

    Defense Counsel was Ineffective for the Failure to Investigate
    or Call Material Exculpatory and Impeachment Witnesses. . . . . . . . . . . . . . . . . . . . . 48
        Mark Page. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
        Mohamed Hafeez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
        Brian Newson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
        Sarah Gurjal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
        Edwin Towell. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
        Warren Ruppel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
        Valerie Himelewski. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
        Joel Bondy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
        The Court's Exchange with Shargel Highlights this Ineffectiveness. . . . . 170
        Failure to Consult with or Call Expert Witnesses as Requested. . . . . . . . . 175
        Failure to Argue that the Sentence was Unreasonable. . . . . . . . . . . . . . . . 179
        Concealment of a Mental Impairment. . . . . . . . . . . . . . . . . . . . . . . . . . . . 185
        Overriding and Denying the Wish and Right to Testify. . . . . . . . . . . . . . . 191
        The Court Must Consider the Cumulative Effect of the Ineffectiveness. . . 197

GROUND II: UNCONSTITUTIONAL SENTENCING ERROR. . . . . . . . . . . . . . . . . . . 199

GROUND III: PROSECUTORIAL MISCONDUCT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
    Perjured Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209
    Brady Violation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

GROUND IV: THE JUDGMENT MUST BE VACATED BASED ON
        *MCDONNELL V. U.S.* AND RELATED AUTHORITY . . . . . . . . . . . . . . 221

GROUND V: THE CUMULATIVE EFFECT OF ALL ERRORS REQUIRES
        VACATING THE JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236
CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

## ADDENDUM TO PETITIONER MARK MAZER'S MOTION UNDER 28 U.S.C. §2255

Petitioner, Mark Mazer, by and through the undersigned counsel, hereby moves this Court, pursuant to 28 U.S.C. §2255, to vacate, set aside, or correct the judgment of conviction and sentence entered in this case. Mr. Mazer raises herein several constitutional claims in support of the relief he seeks. This Addendum is intended to set out in greater detail the claims identified in the attached 2255 form required by the Court and he asks that the Addendum be incorporated in full with the motion form. Mr. Mazer also respectfully requests that the entire file in his criminal case be made a part of the record in these Section 2255 proceedings.

In the pages that follow, Mr. Mazer will set forth the procedural and substantive background of the case, with the assumption that this Court, having conducted the trial in the case, already is familiar with the underlying facts.

After providing the background, Mr. Mazer will directly address each claim that he makes in this Motion, explaining the claim, identifying and describing the facts in support of his claim, and referring the Court to other factual record support that is provided in a comprehensive Appendix to be separately filed.[1]

---

[1] This Court, in contrast to other district courts, requires that a Sec. 2255 motion be filed in hard copy. [Standing Order 15 MISC 131, 5/11/2015; Amended Standing Order 15 MISC 131, 3/7/2017]. The Clerk's office then apparently scans the hard copy and opens a new civil case. In other districts, the practice is to file the Sec. 2255 motion electronically in the underlying criminal case and then the Clerk's office opens a new civil case and transfers the electronically filed Sec. 2255 motion to the newly opened civil case. It is not feasible to file the voluminous Appendix by hard copy in this case and then ask a member of the Clerk's office; moreover, under this Court's Individual Rules and Practices, Sec. III. B., courtesy copies with the ECF stamp must be provided and that would be impossible to do simultaneously with the filing if the Appendix were filed by hard copy with the motion. Therefore the Appendix will be filed electronically once the new civil case has been opened and ECF filing is available. References to pages in the Appendix are as follows: "A" references are to documents from the direct appeal Appendix; "SA" references are to pages from the direct appeal Supplemental Appendix; "B" references are to additional documents in the Appendix.

## **PROCEDURAL BACKGROUND**

On June 17, 2011, Mazer was indicted on six counts of twelve-count superseding indictment ("S-2-Indictment), in a multi-defendant case. Petitioner was charged with:

(1) Conspiracy to Commit Wire Fraud and Wire Fraud (Counts one and two);

(2) Conspiracy to Commit Federal Program Bribery and Federal Program Bribery (Counts Five and Six)

(3) Conspiracy to violate the Travel Act (Count eight); and

(4) Conspiracy to Commit Money Laundering (Count twelve)

His trial began on October 16, 2013 and the jury returned guilty verdicts on all counts on November 22, 2013. Mr. Mazer was represented at trial by Gerald Shargel.

On April 28, 2014, this Court sentenced Petitioner to concurrent terms of 20 years imprisonment. Petitioner also entered a conditional consent Agreement with the government to forfeit specific real properties in an amount of approximately $4,325,000 and money seized in the amount of $28,651,815; a total amount well in excess of what the government originally claimed was paid to Petitioner by staffing firms on the City Time Project.

On November 30, 2015 a panel of the Second Circuit denied Petitioner's appeal of his conviction and sentence was entered on April 29, 2014. On January 13, 2016, Petitioner filed a Petition for Rehearing and Rehearing en banc. On March 22nd, 2016, the Second Circuit issued its order denying Petitioner Mazer's Motion for rehearing and rehearing en banc.

On June 22, 2016 Petitioner filed a writ of certiorari with Supreme Court and on January 23, 2017, Supreme Court denied Mazer's petition for writ of certiorari. (B1492)

## RELEVANT FACTUAL BACKGROUND

### The City Time Project and the Office of Payroll Administration ("OPA")

The City Time Project was born out of the necessity to modernize an outdated system of manual timekeeping that still utilized archaic methods of time recording, such as manual punch cards and data storage on paper tape.

The objective of City Time was to record, track and reconcile employee time, attendance and leave data; provide enhanced support for the collection and approval of this information, and submit the timekeeping data to the City's Payroll Management System for processing.

During the project, OPA was overseen by a two-member board of directors; one selected by the Mayor Mark Page and one by the Office of City Comptroller, Warren Ruppel and Michael Spitzer (GX 750-20 A1201-1202; GX 750-21 A1203-1206) The Comptroller's Office is responsible for reviewing and registering all contracts and amendments between City agencies and vendors. (Tr.3452:19-22 B44:19-22; MM 72 B1406; MM 81 B1588:21-1589:3, B1640:3-5)

The Office of Payroll Administration had its own management structure. It was run by an Executive Director, who for most of the relevant period was Joel Bondy.

He was assisted by Deputy Executive Directors Mohamed Hafeez and Edwin Yowell as well as Assistant Executive Director Sarah Gurjal.

OPA had several sub-divisions, including Administrative, Budget, Contract, City Time Project and Payroll Operations. Notably, none of the OPA chiefs or their deputies testified at trial.

3

The City's efforts to automate began in 1995 when OPA issued a Request for Proposal ("RFP") for the "Design, Development, Implementation and maintenance of City Time." (GD 2273 B664). Three years later, in April 1998, OPA engaged MCI System House Corp. ("MCI"), the first of several general contractors to work on the project. MCI agreed to implement a standard, Microsoft-based commercially "off-the-shelf" (COTS) software application program for use by City agencies. (GD 2273 B662-681.) The agreement was a five-year, $63 million "fixed price" contract to design, develop and implement system Citywide. The contract also included provisions for the City at its option to execute three three-year renewals. The purpose of intent of those renewals was to provide for ongoing support of that system, and again, that would be at the City's option...That was the initial scope and terms of the contract. (GD 2273 B665; MM 81 B1616:7-1617:22; MM 58 B862:10-12)

"The Initial phase of that effort was to do a Citywide analysis of the requirements of all 80 City agencies that were supposed to be within the scope of that contract for Citywide timekeeping purposes to then design and program the customizations that would be necessary to the off-the-shelf package and then to test that. The Second phase would be to do a pilot of that system for five agencies that represent a pretty wide variety of varying requirements, to assure that the system was going to meet the needs of all City agencies, and then after the pilot to roll that out". (MM 81 B1618:8-20)

"In August 1998 OMB issued Certificate to Proceed (CP) for $19.7 million to cover completion of Phase 1 - Pilot implementation at five agencies (OPA, FISA, LAW, DOC, and the Staten Island precincts of NYPD). This was expected to take two years to complete. The remaining $36 million was to implement City Time at all remaining City agencies. No estimated

4

timeline was provided for full implementation; it was to be determined as Phase 1 drew to a close.

The original project scope for the aforementioned budget included, in addition to basic timekeeping and reporting, a workforce management system for uniformed agencies." (GX 451 B159)

The original contract called for the design to be completed in September 2000 and development and testing of the Pilot deployment to be completed in December 2003 (GX 750-3 A1086 §1.)

OPA's work with MCI was extremely short-lived. When the contract was first amended in 1998, MCI assigned its rights and obligations under the contract to a company named Paradigm4. (GX 100-2 A733-738). Paradigm4, however, also was unable to complete the contract. (MM 81 B1621:6-1623:18)

In January 1999 OPA requested an additional $10.4 million to re-platform the application from two tier client-server architecture to a 3-tiered web-based architecture, and included the introduction of digital hand-readers for identification. It was noted that Phase 1 implementation was scheduled for completion by April 2001. (GX 451 B159; MM 81 B1618:21-1619:23)

Joel Bondy testified in front of the NYC City Council on December 18, 2009, that "the project at City Time had become and the system that was envisioned when City Time began are not the same. Originally, the plan was to implement already programmed, commercially available software. It was customized for each agency to meet what they needed to do. But

majority, based on the RFP process and the software that was selected, it was expected that this software would be able to meet most of the City's needs."

"The consultant team that was brought at that time, I'm sure was commensurate with that plan of development, which was just to customize around the edges. Basically, tweaking around the edges of a commercially available package. As the analysis phase of the project started… they went to every City agency to discuss how time keeping works at those agencies and what their needs are. What they discovered was the amount of customization that was being identified and documented, exceeded the amount of capability that was within these off the shelf packages. When that decision was made and that change in direction, was undertaken, the number of consultants involved in the development of the software rose dramatically. About half of the team at its maximum was in the development portion of the project." (MM 58 B867:9-868:19).

According to Bondy's testimony in front of the NY City Council on May 8, 2008:
"The City made a decision that it wanted to implement a web-based solution, as opposed to a client server solution.

The City directed the contractor to do an analysis to determine what the scope of the change would be to convert the package that was selected from the client server to web-based package. The company that was providing the selected off-the shelf software product was not interested and was not planning to convert their software package to web based. The City decided, OPA decided, that and negotiated with the contractor at the time, that we would rather than implement the off-the shelf package, and there's another reason for this decision, which was that, it turned out that the level of customization that was turning out to be required

6

was almost greater than the amount of programming that was in the initial off-the-shelf package. City needed more changes to the package that actually turned out to be reasonable, that we agreed with the contractor to have a custom-developed system that would then meet the City's needs that would-be web-based. That resulted in the first amendment to the contract which increased the contract amount by approximately $10 million. And that was in 2000." (MM 81 B1619:20-1620:24; GX 750-3 A §3.; MM 58 B867:9-868:19)

Finally, in July of 2000, the City contracted with Science Applications International Corporation (SAIC) who took over the project under the original MCI contract. (Amendment 2, GX 100-3 A739-741; Tr.330:2-23 B3:2-23). By the time OPA engaged SAIC, it had become increasingly apparent that the original strategy of deploying an off-the shelf software program for use by 80 different agencies, each with its own needs, might not be viable. Accordingly, the City decided to engage one of the world's leading IT research and advisory companies, Gartner Consulting, to analyze the City Time Project's concept and sustainability. (GX 750-5 A1123 – 1142; MM 72 B428).

Gartner issued its first report on City Time in September 2001. Although Gartner estimated that the City already had "sunk" costs in the project of about $110 million, Gartner also determined that future cost savings were worth the investment. (GX 750-5; A1132) Gartner therefore recommended that the City proceed with a new "multi-phase implementation approach" of the system, including the development of a "pilot" program that could be deployed in a limited number of City agencies. (A1128; MM 81 B1630:10-1632:4)

The City accepted Gartner's recommendations for what was effectively an entirely different project. Instead of implementing an off-the-shelf software product, the City

concluded it needed much more.  It sought a custom-designed program to fit each agency's needs. OPA adopted the Gartner recommendations to take a "more iterative approach" and develop a "pilot" software for five City agencies, rather than a complex "big bang" roll-out to all 80 agencies at once. (GX 750-5 A1138; Tr.432:24-433:9 B11:24-12:9; MM 81 B1631:2-1632:4; MM 44 B798-799)

Because the project took on an entirely different approach and involved an entirely different product, the terms of the contract evolved accordingly. As OPA ACCO, Himelewski confirmed in her testimony "...fixed-price was a model under the theory of an off-the-shelf system. The shift away from fixed-price actually appears to have started in 2002 with Amendment 3, when the structure of the City Time was switched to a custom model/platform. The beginning of the shift from fixed-price to LOE (Level of Effort) started at that time and then fully expanded by Amendment 6." (3531-3 B402)

In 2001, OPA contracted with Spherion to provide quality assurance services for the City Time Project.

In 2002, Spherion's contract was amended by the City to include the services of Subject Matter Experts (SME's), individuals who would assist the City in analyzing and managing the Citytime developer's services and other implementation activities.

(MM 72 B1402)

"In 2002, the SAIC contract was amended to re-platform the application from agency based two-tier, client-server architecture to a 3-tiers web-based architecture and add smart-card based access control-technology for NYPD and Law Department" (GX 451 B158; GX 750-3 A1086  §4.)

8

In April 2002 , in Amendment 3 ", in recognition of all design and so forth, the City decided to excise the first three-year renewal to give SAIC additional time to perform the scope." (MM 81 B1635:18-22; GX 100-4 A742-47)

In Amendment 4, executed in October 2002, SAIC and OPA agreed upon the terms for implementation of the "pilot" and authority for the City to make changes to the scope of work under the contract. (GX 100-5, Articles 27 and 41). This enabled the City to make demands of SAIC to perform work that was not originally contemplated under the contract's not-to-exceed budget and enabled SAIC to adjust the price based on any extract work done. (GX 100-5, Article 27.2(a).) (A759 – 763)

The terms of the contract also changed from a fixed-price to an amount dependent on what functions OPA decided it needed to be developed in the software. (Tr.428:12-22  B7:12-22).

In addition, the City replaced the Project Schedule, Bills of Material, Payment Schedules and incorporated Labor Rates into Work Order/Bill of Material section. (Arts. 14, 15, 16 and 17 A790-796)

Amendment 4 re-affirmed the City's commitment to a multi-phase approach for development and implementation of the City Time System. The same multi-phase approach was applied to Phase 1 for Pilot development and deployment. (A797)

The Bill of Material became the Implementation Document and was maintained via work order process (A762-63)

The Total budget for this new project was nearly double from $63 million to the new $100 million. And of course, Mr. Mazer had nothing whatsoever to do with any of this increase or change in approach.

The "contract changes" provision was the precursor to the City Time contract's eventual change from an absolute fixed-price contract to a "fixed-price-level-of-effort" (FPLOE) contract in Amendment 5 and 6. (MM 81 B1631:25-1634:21)

OPA Management created a Project Status Report that was used to report project progress and milestones.

In the Project description Gurjal confirmed " The implementation will be done in three phases: A Pilot phase, Citywide rollout phase and Services and Support phase.

The initial Pilot phase included five City Agencies, and comprised of approximately 15,000 City personnel. A Citywide analysis of the policy and procedure, including contracts will form the bases of the detail design. The customized timekeeping application will be developed and implemented in these Agencies. The Pilot will enable the City to ensure the viability of the system. The Milestones and Schedule was adjusted to reflect Project Technology and Strategy changes."

Specifically, Development completion was rescheduled from 3/3/2000 to 6/30/2003. The report was for June 2002. (MM 82 B1780-1786).

In 2003 development of the first prototype was completed and used by OPA in production. (GX 451 B158)

According to Bondy's testimony "..SAIC conducted an internal assessment of the City Time software (R1A) and determined that the software package was not acceptable for the

10

City's requirements and would not be acceptable for supporting the anticipated number of users. SAIC subsequently proposed to develop a new technological framework capable of meeting the City's needs at no additional cost to the City. SAIC called this a "technology infusion" program and commenced a redevelopment of the system based upon a new software architecture" (3574-5 B578; MM 75 B1433; MM 59 B1777) "The City decided in early 2003 to change City Time from a client/server-based application to a web-based application due to concerns regarding the extensibility and scalability of the originally intended client/server architecture. And, with the completion of City Time Release 1A in spring 2003, it was apparent to both the City and SAIC that City Time would benefit from being upgraded both technically and functionally...This change in technology direction added approximately 28 months to the schedule." (GX 750-3 A1086 §4.)

The City's decision described above happened in April 2003 and cause the project to change strategy again. It is important to remember that this was 16 months before Mazer was hired to work on the project.

In April 2003, with the City's approval, SAIC began the design effort for the next version of the software (R1B). During the initial kickoff meeting with the City, SAIC reviewed/updated the Technical baseline, established a requirements gathering group and a configuration control board. At that time City and SAIC reached an agreement to update the contract end date to incorporate results from schedule baselining activities. The City began Amendment 5 discussion with SAIC at that time. (MM 59 B941-942)

In May 22, 2003, the City and SAIC agreed that the " the City Time contract as it currently stands is difficult to interpret, cumbersome to work with and in a dysfunctional state"

" It was also confirmed that the City Drafted Amendment 5 and provided to SAIC on 5/1/2003 for review" (MM 59 B943).

In June 20, 2003, it was confirmed that per the City's request, SAIC developed, reviewed with the City and implemented the Operational Support concept, which called for SAIC to provide operational personnel on the Fixed Price Level of Effort bases (FPLOE) to assist the City in conducting system operations of City Time during the Pilot Agency Group 1 and 2 Implementation Phase. This agreement was included in Amendment 5. (MM 59 B944; GX 100-6 A799 Art 3.7-3.9)

On November 23, 2003, the initial version of the custom-design application (R1A) was installed in OPA (first Pilot Agency).

The second Pilot Agency FISA was not ready to implement the R1A version of the software and decided to exit Pilot Implementation and wait for the next more improved version (R1B) of City Time software to be developed by SAIC. (MM 59  B1778-1779)

This was an important fact and confirmed that the City was utilizing the work order process as it was authorized in Amendment 4 in requesting SAIC to provide staff to the City on FPLOE bases in June 2003 and not in 2006 in Amendment 6 as government was alleging in the Mazer indictment (A93-94,§§16, A97, 19c).

In fact, this was all 14 months before Mazer was even hired to work on the project.

**Amendment 5: City Time changes from "Fixed Price" to FPLOE Contract in December 2003**

In December 2003, the OPA and SAIC executed Amendment 5, which changed the Agreement from a "fixed price" contract to an FPLOE contract (GX 100-6 A798-806). Specifically, in April 2003, the developer, with the approval of the OPA, began to design and

build new applications based on a different platform. According to OPA Officials in 2003, the developer agreed to re-platform the package at no cost. If successful, in exchange, the City would restructure the developer's contract to FPLOE contract.[2]

Payments under a "level-of-effort" contract are based on team size and duration rather than on fixed deliverables, as had been the case prior to this change, as discussed in September 10th, 2010 Audit Report on page 13 (MM 72 B1413)

In Amendment 5, SAIC and the OPA created a new system in which the product development and implementation would be determined by OPA requested "work-orders". (Id.) Under this process, the OPA set the specifications for each phase of each of the five agencies' software "pilots", and also identified the number and type of personnel needed to complete each "work-order's" objectives. (Id., Art. 3.8 – 3.9, 41). This iterative "work-order" process was used throughout the remainder of the project and gave the City increased oversight and the ability to monitor and authorize expenditures on a rolling basis. (Tr.428:12-22 B7:12-22).

In 2004 the application design was modified to reflect an enterprise architecture. The development strategy was changed to a framework-focused initial development effort followed by a series of releases designed to add functionality and increase deployability. The development strategy was modified to match the software release plan. The contract was amended to add smart-card based access control technology for FDNY.  (GX 451 B158; GX 750-3 A1086 §5)

---

[2] A "level-of-effort" is used to define the amount of work to be performed within a period of time and is measured in man-days or man-hours per day, week and/or month.

In Amendment 5 OPA continued to request from SAIC "personnel to assist the City to conduct system operations of the CityTime during the Pilot Agency Group 1 and 2 Implementation Phases." The staffing work order was agreed on FPLOE bases.

The Total contract price was increased to $114,617,045 as of 12/05/2003 (A799 Art 2.4, 3.7-3.9; GX 100-6 A798-806)

Consider this important and indisputable fact:  In Amendment 5, the contract budget was $114,617,045 of which OMB only issued from 8/1998-10/2003 CP Approvals for $72,596,084 for SAIC contract and $4,476,917 for the Spherion contract for a total of $77,073,001.

And OPA actually spent only $45,446,286. (MM 61 B1025-1034; MM 82 B1820-1829, B1829)

The City's desire eventually to create a custom-designed City Time Program for use in all City agencies was communicated as early as February 2004 when OPA began negotiations with SAIC on Amendment 6. (DM 6 B683-692; MM 59 B945).  These negotiations commenced only two months after the parties first agreed to Amendment 5. Naturally, the city's decision to buy SAIC's "R1B" program (the name given to the custom-designed product) was dependent upon successful "pilot" runs in the five agencies.[3]

OPA renamed Citytime Pilot Implementation to Deployment Release 1 (DR 1.0) Workforce Management (WFM) Pilot installation into the Lab was named (DR 2.0) (MM 59 B1769-1770).

---

[3] The development of "R1B" required SAIC to invest its own capital into the project. The trial record revealed that SAIC incurred a total of $58 million of expenses – not funded by the City – to design the "R1B" prototype. Tr.331:22-25 B4:22-25).

On April 29, 2004 Bondy was appointed as OPA Executive Director. His responsibilities included managing City Time Project for the City of New York and reporting to the OPA Board of Directors. (GX 6000-4 B238-239)

Because Bondy was working on the City Time Project as Spherion SME since 2002, he was aware of the entire project's history and its challenges, as well as all outstanding issues. Therefore, he was able to perform his City Time Project Management duties without any delays. (3574-5 B578)

Immediately, Bondy joined his deputy Edwin Yowell in Project status meetings with SAIC and continued the Amendment 6 negotiation process. Starting on May 17, 2004 as part of the Amendment 6 negotiation with SAIC, Bondy began discussions on revisions to the program's Pilot composition and completion criteria that would revise agency implementation approach. (MM 59 B946). It was also confirmed that " Bondy was providing the needed leadership and was a stakeholder with key agencies to drive R1B into production" representing the City. (MM 59 B947-950)

Changes in implementation strategy were based on Gartner's 2001 recommendation that the City adopted in 2002 to continue the Multi Phase approach in software development and implementation of City Time through a series of Deployment Releases.

It was also documented in GX 750-3 A1086 §5. Specifically, " A much greater understanding of City Time deployment challenges resulted from development and deployment than a phased incremental development and deployment of Release 1. As a result, OPA decided that a phased, incremental development approach is the most effective method to deploy City Time. This approach is described via Amendment 6 to the contract. As detailed in

the Amendment, the Full Implementation of City Time is allocated into seven Deployment

Releases."

Again it is a vitally important and directly relevant fact that re-planning for the agency's

implementation/deployment approach was introduced by Bondy as early as May-June 2004.

This was two months before Mazer was even hired to work on the project.

During the duration of the City Time Project, SAIC conducted internal monthly project

review meetings and created status reports documenting project status, milestones, status of

contract amendment negotiations with the City and project risks.

In a January 14, 2005 report, SAIC documented their Amendment 6 negotiation results

with the City which began February 6, 2004. Specifically: Confirming agreement with the City to

establish SAIC Services to the City for Maintenance of the City Time would be provided on Fixed

Price/Level of Effort basis.

- Establish Pilot System Acceptance earlier; Future releases accepted on incremental basis.

- Establish a lower risk approach to future system software development

- Allows flexibility in deployment to 80 City Agencies.

- OPA Executive Director continue to provide the leadership necessary to move the project

forward successfully. (MM 59 B949-950)

In May 13, 2005 report, SAIC confirmed the Amendment 6 negotiation agreement with the City.

It provided specifically, that the City agrees to:

- Relieve SAIC of current contract warranty liabilities.

- Future acceptance will be conducted for software releases rather than for Agency

Implementation.

- Acceptance of Deployment Releases of the software at the City Agencies will take place on FPLOE bases.

- With OMB approval OPA approved staffing Work Orders (WO) that were negotiated on the FPLOE bases, WO 50,

  WO 51, WO 52 and WO 54. In WO 51 OMB and OPA included funding to pay for dedicated City Time project team space.

- Bondy continued to provide the leadership to move the project forward successfully. (MM 59 B951-952)

The information presented above confirms the following indisputable facts:

1. By relieving SAIC of software warranty liability the City confirmed that it took responsibility for Project Management and Software quality. It also confirmed again that Deployment Releases of software would be done on FPLOE basis.

2. When in January-April 2005 City approved several staffing work orders that were negotiated on FPLOE bases, it confirmed that the City was utilizing contract available funding for after the post Amendment 6 work including software development of future deployment releases for post Pilot implementation agencies.

3. The approval of funding for dedicated City Time Project team new space confirmed that the City was aware that the project staffing would increase dramatically based on OMB approved Staffing Plans, and the City needed to find space to house expended project staff. (GX 750-27 A 1210 – 1212).

These incontrovertible facts contradict the government allegations in the indictment that "Mazer increased the staffing of the project after amendment 6 was signed."

Specifically, the indictment charged, "Following the 2006 contract Amendment, staffing on the City Time project expanded dramatically." (A94 §17)

"Mazer ...recommended that contract amendment described above--which caused the City not SAIC to observe the cost of overrun on City Time---was necessary to the successful completion of City Time and was in City's interest" (A 97 § 19c)

In Mazer's indictment and during the trial, the Government framed their case on the primary assertion that the signing of Amendment 6 by the City precipitated the overspending by the City on the City Time Project.

It is critical to note that this was not at all the case. As is demonstrated throughout this petition and the indisputable, objective evidence to which it refers, City Time did in fact exist in Deployment Releases DR1; 1A; 1B and DR2. These custom software releases functioned well enough to fulfill the SAIC contractual obligations documented in contract amendment 3, 4, and 5 from April 2002 – December 2003.

This confirmed what was clearly outlined in Amendment 6 itself. Amendment 6 was a continuation and expansion of the custom development effort that began in April 2002 based on Gartner's 2001 recommendations to the City, and not the beginning of the project based on Mazer's 2005 – 2006 recommendation as claimed by the Government.

The City and OPA were operating the project in multi-phase implementation mode since June 2004 and not after Amendment 6 was signed as government alleged.

The City began approving Staffing Work Orders on FPLOE bases since June 2003 through November 2005 and not after Amendment 6 was approved.

The City approval of funding for City Time project dedicated space to house new consultants confirmed that City anticipated increase of new staff and planned for staffing increases in 2005 and not after Amendment 6 was signed.

Once again, the record unequivocally demonstrates that Bondy was managing the City Time Project for the City" and "Bondy was providing leadership necessary to move the project forward successfully" not Mazer, as government alleged. (MM 59 B948, B951-960, B1770, B1776).

After SAIC completed the development and installation of the "pilot" software at City Agencies as SAIC was required to do under the terms of Amendment 5, nothing more was owed to the City by SAIC (GX 100-6 A 798-806). At that point, the original City Time Pilot Project contract was completed. The City received the full benefit of the bargain, which was a working prototype of the software that was running at "pilot" agencies. It was up to the City to decide whether they would use a newly created web-based software that was working in the Pilot agencies to expand its functionality to support the remaining 76 City Agencies.

City Time's Pilot Implementation was completed on July 5, 2005. To put things in perspective, it took the City from April 1998 when the original contract was signed till July 2005 when the R1B Pilot was completed in 87 months. Out of $144 million budget that was approved in Amendment 5 on 12/05/2003 the City actually spent $70 million dollars. (MM 82 B1820-1829, B1829) $32 million was spent on Hardware and Network Equipment that was needed to install the system. (MM 80 B1464-1468)

OPA was finally ready to access the viability of the system that took so long to develop and install.

19

The City again engaged Gartner Consulting to evaluate SAIC's new product. In a report issued in July 2005, Gartner's approval was overwhelming and concluded that:

"[SAIC's ]" application of core technologies and application architecture are fully capable of scaling to the City's projected use, based on the number of users and user agencies."
GD 3526 A1447; MM 81 B1646:6-1647:12; MM 72 B428; MM 78 B1445-1460)

According to Bondy's testimony in front of the City Council on May 8, 2008:

"In terms of assessment, we did an assessment prior to the implementation of Amendment Six, again by Gartner Group. I have to get into some of the details on what some of the changes to the development and implementation strategy were, if you don't mind. I mean that would put that assessment into a context.

Part of the change in the strategy was that rather than trying to develop and test a system that's going to meet every requirement of every agency, before rolling it out to any single agency which was a strategy akin to what I prefer to as trying to boil the ocean, what we did was, based on the analysis where we went to every agency and documented what their requirements were so in the knowledge of what the requirements of all the agencies are we would build a system in stages and roll it out in stages to agencies as we have the system developed to meet the needs of those agencies.

So, it allowed for development and rollout of the system as it was being developed instead of waiting for it to all be done.

The reason for wanting, the original thinking behind wanting to develop the system as a whole first was how do we know it's going to meet the needs of all the agencies, if we don't do that first and test it.

So what we did was we took what we call a framework which had the flexibility, scalability and possibility of being able to meet the need of all the agencies and fill out that framework as we go forward. "

"We had our contractor design that framework, we had them develop within that framework the pay rules for those employees in the City who were covered by the Citywide agreement, which represents 85 percent of the Civilian workforce, and then to meet the business rules of OPA, FISA, DOITT, the first wave of Agencies that we proposed to implement (Pilot Implementation), and then we had Gartner Group come in and assess that framework ..in the way, in sort of a construction kind of metaphor, not only come in and take a look at the blue print, but take a look at the build to say did we build it in the way we said we were going to build it, and was it going to be able to do what we expected it to do?

So, their recommendation -- well, the result of their assessment was that it would, that we picked the right products, that we had used those products the right way. They had some warnings, for us, in terms of pitfalls for us to watch out for as we moved forward, which we built into our going forward strategy.

So, that assessment, was done in 2005. And based on that, that was how we got the agreement, the blessing to move forward." (MM 81 B1644:24-1647:12; MM 78 B1445-1460)

Only after Garner Consulting issued its recommendations confirming that the software architecture would support 160,000 of the City's users, the City completed its due diligence planning process that included:

(1) Selecting the most beneficial to the City "Contracting Strategy Going Forward" that would allow the City to do incremental development and implementation of the

new City Time System at the time when OPA did not have a complete set of the

functional requirements from the remaining 76 City Agencies to be included in the

new City Time System. (GX 400-4; A 908; A 910; MM 60 B963.

(2) Developing the "City Time Funding Plan," identifying anticipated cost projection to

complete new City Time Project in 4 years (GX 400-8 A 917-58) including

a) proposed development schedule (A920 – 26),

b) Methodology and assumptions how project cost projections were calculated

(A927 – 35)

c) Funding Detail and Staffing Rationale with justification identifying the estimated

increases in staffing needed to complete City Time system development and

deployment based on the 4-year plan (A936-44; A1170-72; GX 750-18 A1177-

1200).

At that point OPA and OMB came up with a specific cost estimate of $575 million for

the next 4 years. (MM 72 B420; GX 400-8; A 917-58).

The following reflects Bondy's testimony in front of the City Council on May 8, 2008, after the

City approved The City Time Project going forward said:

"In 2005, we did an assessment of the process of the project and development and
implementation plans that were being followed, as a result of the project and we made changes
to the development strategy and to the implementation strategy and also to the project and
contract management approach.

We approached --- I approached the Board, the OPA board with these proposed changes
in strategy, and then based on the approval of the Board, we approached OMB with these
proposed changes of strategy and included in those proposed changes of strategy were very
specific costs of what it was going to actually take to implement City Time on a City wide basis,
that these proposals and costs were accepted, were reflected in modified capital plan for the
City Time Program and along with the acceptance of those strategy and management changes

22

and plans, another management approach was put into places which was that the funding for the ongoing development and implementation of the City Time Program would be reviewed on annual basis, and contractual authority would not be put into place for the completion of the entire program at that time, but only for the next fiscal year at a time, and that the actual funding to accomplish that would be issued on a six-months basis, to keep a very tight rein on what was going on with City Time within OPA". (MM 81 B1637:12-23; MM 72 B1420)

And when Chairperson James asked, "At that time was there concern about cost?"

Bondy replied, "There was concern about the fact that this program had gone on for years and that the costs were going up and they wanted to know what was it really going to cost and how long was it really going to take?" Bondy replied, "We provided these answers and based on those answers the capital plan was adjusted and the management program that I was just describing was put into place.

Based on those plans and those processes, Amendment Six to City Time --- to the SAIC contact was executed. That was in February of 2006, and what that did was it codified in the contract then the change to the development and implementation and management approaches that we were undertaking from that point forward."

"We also at that point were at the end of the three-year renewal that we had executed back… so it had to be 2003. So, within Amendment Six we also proposed to execute the second three-year renewal.

At that time, we were advised by the Comptroller's Office that a renewal was not the appropriate process that we should be using if we were extending the time period under which, or during which the contractor was to accomplish the scope, that that's an extension, not a renewal. The purpose for the renewal was for maintenance, post-implementation and development. And, so, under advice of the Comptroller's Office, we rescinded the previous

23

renewal and we extended the scope to August of 2009" (MM 81 B1636-1639; MM 72 B1420;

MM 48 B804-805)

Bondy further testified " The original contract had no penalty for an untimely

performance. The payments were based on the acceptance of the deliverables and so the late

payment was the only penalty that was provided for in original contract.

   In the revised contract Amendment six service level agreements were agreed upon between

SAIC and OPA The service level provided for withholding of portion of payments." (MM 81

B1640:10-1642:10).

In July 2005, the City convened a City Time Steering Committee consisting of OPA, OMB,

SAIC, Spherion Consulting, and members from the "pilot" City agencies, to discuss City-wide

deployment of SAIC's "R1B" program.  This new Committee, which would continue to monitor

the City Time throughout the remainder of the project, concluded that the City should move

forward with City-wide deployment. (GD 3716 A1456-1457;Tr.4810:5-4811:18 B45:5-46:18; GX

400-42 A1039-1066).

It is noteworthy that the City with the approval of OPA Agency Chief Contracting Officer

Brian Newson and pursuant to Procurement Policy Board (PPB) Rules and Section 4-03 (b)

utilized a system of Amendments to existing contracts to modify, and expand after contractual

obligations in the ongoing City Time Project. This contractual process was used as opposed to

entering into a new contract each time changes were made to avoid having to re-bid a new

"RFP" every time NY City changed its contract business requirements (GX 750-3 A 1088).

This new product purchased for use City-wide was also authorized by top officials from

OMB and the Offices of the Mayor and Comptroller before OPA was given approval to complete

negotiations of Amendment 6 and to enter into a new contract with SAIC for full deployment of "R1B" (Tr.4810:5-4811:18 B45:5-46:11; A1456-1457; MM 59 B1771-1772; MM 64 B1213-1222) . In sum after two years of negotiations and over 30 drafts, Amendment 6 was finally executed in January 2006 (Tr.417:20-418:24 B5:20-6:24; A1394-1395).

In short, the Government's theory of the case against Mazer was not just wrong; it was impossible!

Bondy further testified that" Amendment 6 did not have costs associated with it. Amendment 7 was the amendment to provide the funding for the following fiscal year. Actually, it provided funding for a fiscal year and a half. It started in January. It provided the funding from January 2006 through the end of the following fiscal year, so it was an 18 month funding amendment, which increased the cost to $224 million."

"That was a $110 million increase, which was within the capital plan that we agreed upon in 2005 for the completion of City Time Program." (MM 81 B1641:7-23; MM 49 B806; MM 59 B961-962, B1773-1775)

"...The capital plan that was agreed upon in 2005 was more than just the following fiscal year. And so amendment number 8 which is in 2007, provided funding for the subsequent fiscal year, which ends this June. And the contract amount was increased to $345 million, which was another $125 million."   (MM 81 B1643:20-1644:2)

"The original scope when it was extended was extended till August of 2009. Our current ...plan that we have been working to and had committed to in 2005, and instituted in the contract amendment in 2006, called for the end of the period that we refer to as the period of peak development programming of the system to end in June of 2009. And it was referred to as

the peak development because as with any system, once it's done you need to continue to

maintain it, you can continue to enhance it.. you still have to care and feeding the system to

deal with it on an ongoing basis."

" The expenditures that we are incurring and have been incurring have been in the

capital plan since 2005. The capital side of the City Time program has been in capital budget.

We have been executing within the planned amounts for the capital ..part of the program."

" So again, within the capital plan that was agreed to in 2005, with increases in the pending, in

process funding amendment for next fiscal year would raise the contract amount to $489

million. That's another $150 million, not all of which is capital, some of it is expense because it

increased, the $6 million is in there so its $144 million capital and six of expense...

It's been there since 2005." (MM 81 B1650:12-1652:9)

In addition, Bondy was asked to explain how this project that "started out as something

about $60 something million dollars and now we're talking about $400 …million.

What was the main cause that it had to be escalated so high to the point where now

there is no sign of ending that is going to be let's say $500 million…?" (MM 81 B1669:19-25) .

And Bondy replied, "Well, first, I've described the progression of the contract or the project

from the beginning until now, changes of the technology, changes of scope in terms of

agencies, changes in approach. Part of it was the expectation on the part of the City to a system

that was going to be sufficiently flexible to be able to automate all of the varied work rules that

have been negotiated either with our union and with the 240 different collective bargaining

units, or with 80 agencies that are being implemented that the expectation of how much the

system should be automated has gone up over years.

26

So, the City's expectations and requirements have gone up. And so, what we did was we changed the scope to match the City's expectations. So, the system that has been developed is unprecedented in terms of flexibility, and scope and potential and automation potential.

As far as no end in sight, there is a very defined capital program… We have been working to that capital plan since 2005. We have not exceeded that capital plan since then, we have been hitting every milestone that we've set since then. And, so, I believe that at this point in time we can say that we do know what it's going to take to do this. We're demonstrating that we can hit targets and milestones since 2005 on this program and this is on track to doing what it's supposed to do, in the time frame it's supposed to do it, and within the budget that has been established for it in 2005, when the project was re-planned." (MM 81 B1670:9-1671:21).

Bondy further testified and confirmed to the City Council a complete City Time Project History and Facts, consistent with what has been explained here and completely irreconcilable with the Government's theory and claims against Mr. Mazer. (MM 81 B1616:9-1636:16).

The process for approving and receiving funds in connection with the City Time Project was multi-layered and required multiple reviews by several different people.

Before the OPA could receive funds to make payments under any City Time "work orders" there was a second OMB review process called "Certificate to Proceed" ("CP") process. OPA would have to make six months of funding requests to OMB ("CP Request") identifying to OMB the specific scope of work to be completed during the next six months under the approved four-year project plan and contract.

Each "CP Request" included a detail staffing component that would be required to complete planned project work. Specifically, it included staff role, labor categories, budgeted

hours and individual hourly rate per Labor category. Each "CP Request" was extensively reviewed by OMB (DM 210C A 1560-1566).

On a monthly basis Bondy, Gurjal and Hafeez were meeting with OMB Staff to review OPA compliance with the work commitment plan.  (GX 750-2 A1074-84; MM 65 B1223-1257; MM 66 B1258-1296); (GX 400-7 A911-16; GX 400-14 A 959-970; GX 400-17 A971-981; GX 400-29 A 1003-1020; GX 400-31 A1021-1038).

Bondy further testified and confirmed to the NYC City Council during December 18, 2009 hearing. Specifically, Bondy said the following:

"I report to the Board of the Mayor and Comptroller and they both oversee the way that I am running the agency and I report to them on monthly basis…"

" I have never had a meeting with the Mayor or Comptroller. I meet with their delegates, their representatives. Their Directors are appointed to my Board" … They review the (cost) numbers at a very high level…. At a very detailed level, I meet every month with OMB to go over the numbers…

Chairperson James: As it relates to City Time?

Mr. Bondy: As it relates to City Time, Yes.

Chairperson James: And each and every time that you've met with OMB, and the representatives of the Mayor of the City of New York, they are fine with these numbers?

Mr. Bondy: Yes

Chairperson James: They're not concerned at all?

Mr. Bondy: I wouldn't say they're not concerned. The reason why they review the numbers with me monthly is to make sure that I'm sticking within the budget and the program that we

defined and agreed upon in 2005 and instituted in contract in 2006. I would say that while they probably are not necessarily comfortable with the overall magnitude that we have come to they are comfortable with the fact that we have stuck within that budget and we have stuck to the plan that we had put in place at that time.

Chairperson James: What about the Comptroller of the City of New York?

Mr. Bondy: "Through my Board of Directors, the Comptroller is aware and all of the feedback, I have gotten, comfortable with what we have done. Also, our contracts are registered by the Comptroller's Office and I believe get an extra degree of scrutiny whenever we register an amendment and whenever we register a CP, a certificate to proceed, which is done on an every six months basis. We are requested for extremely detailed documentation of what constitutes towards the makeup of that spending and funding, and meet with them to discuss this before those items are registered." (MM 58 B890:12-892:3; GX 750-2, A1074-84, MM 65 B1223-1257; MM 66 B1258-1296; GX 400-7 A911-16; GX 400-14 A959-970; GX 400-17 A971-981; GX 400-29 A1003-1020; GX 400-31 A 1021-1038).

In other words, City maintained budgeting oversight of City Time through numerous overlapping controls including:

(1) weekly OPA status meeting (DM 203 B703-711; Tr.2652:25-2653:25 B1684:25-1685:25);

(2) monthly OMB staffing and budget reports (GX 750-2 A1074-1084; MM 65 B1223-1257; MM 66 B1258-1296)

(3) quarterly City Time Steering Committee meetings (DM 132 A1512-1523; Tr.2627:12-2627:22 B1682:12-1683:22);

(4) biannual OMB funding reviews; and

 (5) annual City Counsel budget approvals. (Tr. 3450:12-24 B42:12-24).

The City performed these latter annual reviews to approve each year's City Time budget through the subsequent Amendments 7 – 11, and only released funds every six- months through the aforementioned CP Request process.

In Summary, the City Time Project was completed in June 2011, which provided an automated timekeeping program for 160,000 employees at 80 unique municipal agencies that generated a tremendous cost savings for the City – of at least $300 million in annual savings. (See GX 750-5 A1138; Tr.3305:19-24 B41:19-24; Tr.2661:19-24 B1686:19-24; MM 72 B1423)

Ray Orlando, OMB Executive in his email to the Mayor's Office from December 22nd, 2010 after Mazer was arrested, summarized and confirmed the undisputed facts that **"The best people in the world evaluated what we were doing and said keep on you're getting what you are paying for - and this letter is in fact evidence that the City did monitor this project including the best and most independent folks available and City Time is now working and paying 100,000 City employees every two weeks - yes it was expensive and yes it took a long time but City Time works."** (MM 53 B811-812) [Emphasis added]

The true objective evidence in this case, referred to herein and more, showed that Mark Mazer was not involved in any of the decisions attributed to him by the Government.  Indeed, most of them were made by City officials years and months before Mark Mazer even began working on the project. Mazer was not a City Official, was not a member of the City Time Steering Committee, was not invited to their meetings, and did not participate in the OMB and Office of the Mayor and Comptroller Meetings. (Tr.2628:19-23  B1683:19-23)  He had neither

the authority, opportunity, nor the ability to make or influence the decisions attributed to him by the Government in the indictment and at trial. The Government's case against him was at all times based on false premises and an unfair, misleading, and false presentation of the evidence and it stood up because Mr. Mazer suffered from the ineffective assistance of counsel which, among other major prejudicial deficiencies, failed to understand the case or learn the true facts and failed to marshal the readily available evidence to show those true facts to the jury.

## A SYNOPSIS OF THE GOVERNMENT'S CASE AGAINST MR. MAZER

The Government's case against Mr. Mazer, as alleged in the second superseding indictment was first, that Mazer conspired with others to inflate the cost of the City Time contract from $63 million to approximately $700 million in order to complete the project. Based on his recommendation, the Government charged, in 2005 and 2006 the City changed SAIC's contract from "fixed price" contract in which SAIC bore the responsibility of absorbing cost overruns to a "fixed price, level of effort" contract so that the City and not SAIC would largely become responsible for future cost overruns. As the Government theorized the change in the contract was a massive and elaborate scheme to defraud the City by over-billing in order to illegally enrich themselves. As noted above, this was not only false; it was impossible both for timing reasons and based on Mazer's position, role, and lack of authority when he did finally come on board.

Secondly, the Government alleged that Mazer was given responsibility to run the City Time Project for the City of New York; specifically, Mazer was the "Top Guy" given unrestricted authority to manage the project, including approving requests for payment submitted to the

City, and to negotiate contract terms and labor rates. This too was false, preposterous, and unequivocally contradicted by testimony and documents cited herein, and never used by Mazer's trial counsel. Shame on the Government as well though for knowingly presenting a theory of the case and "evidence" in support of it which it knew did not tell a true story.

Thirdly, the Government alleged that Mazer committed wire-fraud by engaging in a scheme to falsely report working hours submitted on consultant time-sheets to increase his share of "kickback(s)" from sub-sub-contractors in which he had a financial interest. This too was false; but even if *arguendo*, the Government were to be believed, the magnitude of this alleged time-sheet fraud, by its own records, could have affected no more than eleven consultants, nineteen total work weeks and $32, 501 profit of consultant payments.

The Government was able to "prove" their case against Mazer by relying exclusively on testimony provided by low-level City employees and consultants who had limited knowledge of the City Time Project, who held no position of authority, and who were never involved in the decision planning process concerning any and all aspects of the project.

What makes the Government's approach particularly disgraceful is that the Government actually did conduct extensive interviews with several top City executives [which was verified through the Government's 3500 material] who played an instrumental role in all strategic and tactical decision[s] including all contract negotiations, technological design and implementation process, and provided further oversight for all financial cost and required staffing schedules for the duration of the project. In other words, the Government well knew that its theory and "evidence" against Mr. Mazer was false and painted a picture that it well knew from extensive

witness interviews and from sworn testimony (described in detail hereinbelow) could never be reconciled with its claims against Mr. Mazer. But that did not stop these overzealous and misguided prosecutors and defense counsel only too willingly refrained from exposing the false theory and "proof."

Any objective review of the 3500 material and other discovery in this case reveals why the Government failed to call-on any of these top City executives as witnesses even though most of them were on the Government's witness list. What is inexplicable from any strategic or other legitimate perspective, is why defense counsel failed so dismally to use the available witnesses and material on behalf of Mr. Mazer, both to confront the Government's witnesses and to affirmatively put on a defense that would have been more than amply supported by compelling, available evidence.

Simply put, as provided in the written statements and other sworn testimony given in front of various oversight committees and controller audits, by the executives who actually were at the heart of all decision making related to the City Time Project, as will be addressed hereinbelow in detail, there was more than abundant, competent, available, even overwhelming evidence that could have and should have been put forward on Mr. Mazer's behalf that would have truthfully and convincingly disproven the Government's theory of the case as to Mark Mazer.

Indeed, an exchange at the end of the trial is perhaps most revealing; for it exposes not just defense counsel's failings, but even his own recognition of the supreme failure to even minimally fulfill his role his performance had been and his efforts at trying to deflect the blame

for what he had failed to do.  The Court might recall even today when defense counsel, Shargel, requested special instructions to the jury as to why the top City executives were not called to testify at trial, suggesting that it was the Government's duty alone to call them.  This will be discussed later in this Addendum.

In truth, of course, the Government should have called them, consistent with its duty to pursue the truth and not suborn a false theory of prosecution, let alone affirmatively put one forward.

But it was defense counsel's role as well in this system of advocacy, to use the resources readily available to him to both impeach the Government's witnesses and its entire theory of the case and to put on the readily available evidence from those in a position to really know the facts and who would have completely exculpated Mr. Mazer.  This is based not on supposition, but on reference to actual sworn testimony and investigative material we know and show herein actually existed and was available to Mazer's defense counsel at all times.

This Court recognized that Shargel had completely dropped the ball, but now had to suffer from his repeated failures to act and from his own missed opportunities.  This Court refused Shargel's requested instructions and then admonished him for his failure, reminding him that he had had every opportunity to subpoena each City executive in order to present their testimony to the jury.  Had Shargel taken just this minimal step in defense of Mr. Mazer, these witnesses would have compellingly provided the jury with a clear understanding of the actual process that transpired, Mr. Mazer's absence in fact and lack of authority to act, with respect to the decisions and actions wrongly attributed to him by the Government.

These key people who Shargel failed to call as witnesses, despite his opportunity to know just how very helpful they would have been, had he reviewed the discovery and 3500 material were the ones actually responsible for all of policy decisions and approvals during the duration of the City Time Project. They knew better than anyone else that the Government's theory as to Mr. Mazer's purported role and actions was false from start to finish and their prior testimony and information they had earlier provided to the Government should have made any alert defense attorney see this and commit to using it for the Defendant to save his life. In short, this testimony would have proven that Mark Mazer was not guilty and could not have been guilty of the charges against him.

## ADDITIONAL RELEVANT BACKGROUND THAT MUST BE CONSIDERED

### CITY OF NEW YORK OFFICE OF COMPTROLLER FINANCIAL AUDIT

(Audit Report of the Office of Payroll Administration's monitoring of the oversight of the City Time Project, September 28, 2010)

The OPA's Audit Report of September 28, 2010, expressly reflects that "To obtain an understanding of the history of City Time and OPA's monitoring of its agreements with Spherion "…the auditors "…interviewed OPA's Executive Director [Bondy], Deputy Executive Director [Hafeez], Director of Management review and Analysis [Newson], and Assistant Executive Director of Development [Gurjal] (MM 72 B1406). These, of course, are the very people Shargel failed to call at trial for Mr. Mazer.

Through their testimony before Mr. Mazer's trial, the Audit confirmed the historical City Time Project facts critical to Mr. Mazer's defense, including that the study conducted in

2003 revealed that, "...the technology used since 2000 was unable to meet the needs of the City." The report concluded, "The software constitutes a fragile system that will be prohibitively expensive to maintain and to extend. Subsequently the developer [SAIC] with the approval of OPA began to design and build a new application based on a different platform. According to OPA officials, the developer [SAIC] agreed to re-platform the package at no cost [to the City]. However, in exchange the City would restructure the developer's contract to a level-of-effort contract." (MM 72 B1413).

After the assessment and cost projection were presented, the City gave its approval and a major escalation of the project followed. As a result, the developer's contract was amended to allow for a level-of-effort contract instead of a fixed deliverable. Those facts from the audit contradict the very premises of the charges presented in the indictment against Mr. Mazer and presented by the Government against him at the trial.

Again, specifically, the Government charged that "...In or about 2005 and 2006, after the City already paid to the SAIC approximately $85 million for its work on City Time, Mark Mazer...advocated for an amendment to the SAIC City Time contact." Specifically, "he recommended that the City change SAIC contract from a "fixed price level of effort" contract in which SAIC bore the responsibility of absorbing cost overrun to a "Fixed price level of effort" contract so the City and not SAIC would largely become responsible for future cost overruns. The City ultimately Amended the SAIC contract as Mark Mazer... had recommended" (A 93-94, 97 ¶16; 19c).

But the Audit confirmed that, "[B]efore the City gave its approval to modify the

contract and continue the Project, an assessment of scalability of the new system architecture had to be conducted. Additionally, the City also had to give approval of the cost associated with the change in technology   and in contract strategy." (MM 72 B1413, B1420-21).

This is important because the Government's allegation that Mazer influenced the City into accepting a level-of-effort contract would have been impossible, because the SAIC Agreement with OPA that was documented in the Comptroller Audit (MM 72 B1413) and Amendment 5 (A 798-806) took place in December 2003, 9 months before Mazer was hired as Subject Matter Expert (SME) consultant in August 2004.

Obviously, Mazer could not have "recommended" this evolution of the contract as it was charged in the indictment (A 93-94, 97 ¶16; 19c) because he had yet to be hired. And Mazer surely could not and did not "recommend" to the City this Contract Agreement "in 2005 and 2006" because the City and SAIC agreed to it in December 2003.  Defense Counsel's failure to elicit this fact was irretrievably prejudicial and constitutionally ineffective by any standard.

It was also documented in the Spherion City Time Contract with OPA and confirmed in the Comptroller Financial Audit that the SMEs' [such as Mazer] project responsibility and authority was to "provide technical and project management advice as requested by the OPA Assistant Executive Director [Gurjal]" and "assist the City in analyzing and managing the City Time Developer's services and other implementation activities." His authority also included helping "to … ensure the timely and successful completion of the City Time Project."

Mazer had no such authority as was attributed to him by the Government and both the contract and actual practice proved this.

37

Further, it was also Spherion "SMEs' [such as Mazer] responsibility to provided OPA with advice and recommendations based upon its expert analysis and that final decisions regarding City Time shall be made by the City." (GX 125-1 Sec. 2.1 B76)

The contract provided that Spherion's SMEs (including Mazer) would report directly to the OPA Assistant Executive Director for City Time [Gurjal]. It also confirmed that SMEs had no authority to make decisions on behalf of the City.

In other words, Mazer's authority was limited to Project level responsibilities only, contrary to the government's allegations that "Mazer was given responsibility to run it [City Time Project] for the City of New York" and [Mazer] "was the City Top Guy" and managing the CT Project at the NYC Oversight level. (Tr.4836:9-11 B47:9-11; Org Chart MM 74 B1432; MM 72 B1426-1427; GX 150-1 A875-880; GX 150-3 A881-894). These repeated failures to investigate and present evidence to the jury were prejudicially case-determinative. And of course the Government's role in knowingly putting forward a theory of prosecution and evidence in support of it which it knew to be false and misleading was unconscionable.

Brian Newson submitted the OPA Official response to the referenced Audit and confirmed the following facts:

a) OPA with the approval of the City established the new City Time Project Strategy (MM 72 B1420).

b) OPA and the City selected the most beneficial contracting strategy to the City that would allow the City to retain Management Control over incremental development

and implementation of New City Time System at the time when OPA did not have a complete set of business requirements (A 908; GX 400-4 A 898-910; MM 71 B1504).

c) OPA with approval of OMB established a capital plan which included a "very specific cost of what it was going to actually take to implement City Time on a City-wide basis. (MM 72 B1420, B1428-1429).

Newson also explained, in OPA's response, cost discrepancies and project delays. As he testified, "The Cost Projections was an OPA document produced in 2005 that was used to re-balance the budget and schedule of the project…"

"One factor not anticipated in the planning process was the degree to which agencies would, when it came time to implement City Time, articulate new requirements of the system not presented at the beginning of the project. Some of these requirements were deemed critical to the acceptance of the system by the requesting agencies, and were therefore approved. This led to additional software development that, although planned to coincide with the implementation plan, also led to extending the duration of the implementation. This Project risk was noted by Spherion repeatedly in its reports to OPA and was neither the fault of the Developer (SAIC) nor Spherion. The Implementation process was documented throughout the duration of the Project and impacts on the Project budget and schedule were considered unavoidable. The other cost not recognized in the September 2005 Projection was the cost of the developers who support the production in operation. These two costs combined accounted for the underestimation." (Cost Projections; MM 72 B1428-1429; GX 750-2 A1074-1084;).

Newson also confirmed "The City Time System works, works well and performs above expectations. (MM 72 B1423).

The undisputed facts presented by OPA and documented in above the audit explicitly show that Mazer had no influence or control over cost discrepancies and project delays, virtually destroying the theory of the case that Mazer delayed the project to enrich himself.

## CITY TIME ASSESSMENT SERVICES

In March 2007, the OPA with approval of the OPA Board and OMB retained the services of outside advisor, Keane, to perform an independent objective assessment of the City Time Project, including a consideration of the validity of the City Time strategy, identifying project risks and giving advice as to how well the project is progressing in achieving the project business objective and its compliance with the OMB approved work plan. Keane received a 3-year contact and was required to issue assessment reports on a quarterly basis. Keane's assessment staff reported directly to OPA Executive Director Bondy.

This is an important point because it confirmed that Bondy was the City Time Project Manager, "City top guy" and "running the project for the NYC" and not Mazer as the Government alleged in the indictment and during the trial. ((GX 750-4 A1117-1122; GX 400-19 B145; GX 400-34 B151-154).

Keane evaluated the Implementation/Deployment area that was managed by Mazer and recognized it as well managed. Specifically, Keane noted that the "Process for non-uniformed agency deployments appears well defined and optimized" (A 1119); "Keane

believes that the NYPD Implementation Phase of the City Time Project is currently being effectively directed, managed and supported." (A 1121). Keane also validated and approved OPA and OMB strategy to continue City Time Project in an effective manner "The ability to make and accept difficult decisions by the project stake holders [OPA, OMB, Mayor's Office and other oversight agencies]. Such as the delaying of the work force management functionality, and breaking down deployment releases into manageable sizes demonstrates a management approach having a sensitivity towards making this phase of the project successful ". 1121).

The undisputed facts presented by Keane explicitly show that Mazer had no authority to make project decisions. These decisions were made by "stake holders" at the NYC oversight agencies at the City level, (MM 74 B1432), and Mazer had no controls over project delays, virtually voiding the Government's theory of the case. Moreover, in the Project level areas in which Mazer actually did work and to which his authority was limited, he did an excellent and honest job at all times and well served the Project.

**SUMMARY OF GROUNDS FOR THE MOTION**

**GROUND I**: Mr. Mazer's constitutional right to the effective assistance of counsel was violated in many ways, each of which individually severely prejudiced him and led to a denial of his fair trial rights as well. The cumulative effect of these examples of ineffective assistance of counsel surely created a constitutional violation as well and created overwhelming prejudice. Mr. Mazer contends that his constitutional rights to the effective assistance of counsel and related fair trial rights were violated at every stage of the proceedings in this case, from investigate, pre-trial, trial preparation stage through trial, sentencing, post-trial, and on direct appeal.

The following are some examples of the ineffectiveness that he raises and supports in greater detail hereinbelow:

Petitioner's Defense Counsel's performance was constitutionally ineffective for the failure to call at least eight key witnesses who were City employees who worked on the City Time project and had first-hand knowledge of how the contracts, and all amendments to the contract, were negotiated. All these witnesses gave extensive interviews and sworn testimonies to the Government prior to trial which provided exculpatory evidence that would have exonerated the Petitioner (Mazer) from all criminal wrongdoing.

Defense Counsel's performance was further constitutionally ineffective for failure to consult with and call at trial expert witnesses, including, a contracting expert witness who would have explained to the jury the entire review and approval process of the City Time project contract and all Amendments that would have explicitly disproved the Government's theory that the Petitioner (Mazer) corruptly influenced the contract negotiation which allegedly allowed him to receive inflated rates, and an expert forensic accountant and a sentencing expert, as explained in detail hereinbelow. The Addendum then focuses on counsel's sentencing ineffectiveness.

Defense Counsel's performance was constitutionally ineffective at sentencing in a variety of ways including, but not limited to, where Counsel failed to request that the Court put on the record a clear and concise statement of the reason as to why the Court imposed a 20-year sentence which would have allowed the Court of Appeals an accurate review of the record that would have assisted the Court in determining whether the District Court had made any substantial error(s) during the sentencing phase. Defense Counsel further failed to object to the

pre-sentence report that designated Mazer as a leader/organizer and other sentencing enhancements that the Court adopted during sentencing. Defense counsel failed to put on evidence of readily available statistics that would have demonstrated how far outside the norm the sentence imposed on Mr. Mazer was based on the loss amount involved and other relevant factors.

Another ineffectiveness claim arises from what Mr. Mazer believes was a progressively degenerating mental impairment for defense counsel. Upon information and belief, defense counsel was suffering under a mental disability that adversely affected his ability to provide effective assistance of counsel and he concealed this disability at all times. Mr. Mazer was severely prejudiced by this.

Defense Counsel's performance was further Constitutionally ineffective where he deprived the Petitioner (Mazer) of the right to testify on his own behalf. This issue is raised both as an ineffective assistance of counsel issue and as a denial of the constitutional right to testify.

The Cumulative effect of all of the ways defense counsel was constitutionally ineffective deprived the Petitioner of his right to a fair trial provided by the Fifth and Sixth Amendments to the United States Constitution.

**GROUND II**: Petitioner respectfully contends that the Court made some unconstitional errors at sentencing as described below.

**GROUND III:** Petitioner presents several prosecutorial misconduct claims which individually and cumulatively deprived the Petitioner of his right to a fair trial provided by the Sixth Amendment to the United States Constitution. These claims also include a specific claim that the

prosecution withheld substantial and material exculpatory evidence from the Defense that unfairly affected the outcome of the trial in violation of the decisions in *Brady, Kyles, Giglio, Wearry,* and their progeny.

**GROUND IV**: The Court gave erroneous Jury instructions as clarified in a recent Supreme Court decision in *McDonnell v. United States* 136 S. Ct. 2355 (2016) and other related decisions discussed hereinbelow. This error denied Mr. Mazer due process of law and a fair trial. The issue also raises an additional example of ineffective assistance of counsel for the failure by defense counsel to adequately pursue the defenses supported not just by *McDonnell* and the other cases discussed in this section below, but by authority that predated the decision and on which the cases cited below relied.

**GROUND V:** In addition, Mr. Mazer respectfully submits that all of his claims must be considered cumulatively, in the aggregate as well and that regardless of whether the Court finds any individual claim to require vacating the judgment of conviction and sentence, a consideration of the cumulative effect of the errors absolutely requires vacating the judgment.

In the pages of this Addendum that follow, Mr. Mazer will explain each of his claims in greater detail and will refer the Court to abundant factual support for each. Much of the factual support is set out in his separately filed Appendix for the Court's ease of reference.

Mr. Mazer respectfully requests an evidentiary hearing on his claims and discovery that is directly relevant to his claims, as will be addressed more specifically when ripe, following the Government's response to his motion and an indication as to the nature of the Government's opposition to the claims made.

## GROUND I:  INEFFECTIVE ASSISTANCE OF COUNSEL – GENERAL OVERVIEW

A claim of ineffective assistance of counsel generally is analyzed under the two-part test set forth in *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *See United States v. Hernandez,* 242 F.3d 110, 112 (2d Cir. 2001). Under *Strickland,* a petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. 466 U.S. at 688, 694.

As the Court in *United States v. Arteca, 411 F.3d 315, 321 (2d.Cir. 2005)* explained: "A successful claim that counsel rendered ineffective assistance requires an affirmative showing that 1) counsel's performance fell below an objective standard of reasonableness according to prevailing professional norms, and 2) it is reasonably likely that prejudice occurred - i.e., that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-96." *See also McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999)*.

Mr. Mazer respectfully submits that the facts attending defense counsel's representation in this case readily satisfy both *Strickland* prongs.

"The question of whether a defendant's lawyer's representation violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact ....." *United States v. Triana*, 205 F.3d 36, 40 (2d Cir.) (quoting  *United States v. Blau*, 159 F.3d 68, 74 (2d Cir. 1998)), *cert. denied*, 121 S. Ct. 378 (2000); *see also United States v. Stantini*, 85 F.3d 9,

16 (2d Cir.) (same), *cert. denied*, 519 U.S. 1000 (1996). *United States v. Hernandez*, 242 F.3d 110, 112 (2d Cir. 2001).

**The First Strickland Prong**

The performance inquiry is contextual; it asks whether defense counsel's actions were objectively reasonable considering all the circumstances. *See Strickland*, 466 U.S. at 688.

The performance of counsel described below cannot be said to be objectively reasonable under any standard, nor can there be any articulable strategy behind such actions and omissions. The facts set out below surely satisfy the first *Strickland* prong.

**The Second Prong Of Strickland**

The second prong of the *Strickland* test requires that the defendant must show that he suffered prejudice as the result of his counsel's deficient performance, to a reasonable probability. *Strickland v. Washington, 466 U.S. at 687, 104 S. Ct. at 2064*.

"[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068*; accord, e.g., *Wiggins v. Smith, 123 S. Ct. at 2542*. The phrase "reasonable probability," despite its language, is not the equivalent of "probable" or "more likely than not." *Strickler v. Greene, 527 U.S. 263, 289-91, 119 S. Ct. 1936, 1952-53, 144 L. Ed. 2d 286 (1999)*[1]; *Kyles v. Whitley, 514 U.S. 419, 434, 115 S.*

---

[1] As Judge Souter explained in his opinion in *Strickler v. Greene*, *supra at 297*-298 (Souter, J., concurring in part and dissenting in part on other grd's.): "Before I get to the analysis of prejudice I should say something about the standard for identifying it, and about the unfortunate phrasing of the shorthand version in which the standard is customarily couched. The Court speaks in terms of the familiar, and perhaps familiarly deceptive, formulation: whether there is a 'reasonable probability' of a different outcome if the evidence withheld had been disclosed. The Court rightly cautions that the standard intended by these words does not require defendants to show that a different outcome would have been more likely than not...

Ct. 1555, 1565-66, 131 L. Ed. 2d 490 (1995); *Nix v. Whiteside, 475 U.S. 157, 175, 106 S. Ct. 988, 998, 89 L. Ed. 2d 123 (1986)*: "[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under Strickland." "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome. "*Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068*. The phrase "reasonable probability" therefore describes a fairly low standard of probability.

Indeed, as the Third Circuit held in *Thomas v. Varner, 428 F.3d 491, 502 (3d Cir. 2005)*: "Strickland does not set a high bar with respect to the prejudice inquiry," and the threshold is not "stringent... [t]he prejudice component requires Thomas to show 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' Strickland , 466 U.S. at 694. He 'need not show that counsel's deficient performance 'more likely than not altered the outcome in the case'- rather, he must show only 'a probability sufficient to undermine confidence in the outcome.' *Jacobs v. Horn*, 395 F.3d 95, 105 (3d Cir.), *certiorari denied*, *Jacobs v. Beard,* 546 U.S. 962 (2005), (citing Strickland , 466 U.S. at 693-94). **'This standard is not a stringent one.**' *Id*. (internal quotations omitted)... **[S]trickland does not set a high bar with respect to the prejudice inquiry.**" (emphasis supplied)

---

Despite our repeated explanation of the shorthand formulation in these words, the continued use of the term 'probability' raises an unjustifiable risk of misleading courts into treating it as akin to the more demanding standard, 'more likely than not.'"

## DEFENSE COUNSEL WAS INEFFECTIVE FOR THE FAILURE TO INVESTIGATE OR CALL KEY MATERIAL EXCULPATORY AND IMPEACHMENT WITNESSES

Defense counsel, Gerald Shargel was constitutionally ineffective for many reasons. First Mr. Mazer will explain why he was constitutionally ineffective for his wholesale failure to investigate, interview, or call at trial, key known material witnesses whose testimony would have been not at all speculative, given reams of prior testimony and other material that made it indisputably clear that they would have completely exculpated Mr. Mazer and destroyed the Government's theory of its case in both its premise and its application as to Mr. Mazer.

Each witness will be presented in the pages that follow and a detailed explanation of what their testimony would have been is presented. There is nothing speculative about any of this and the failure to investigate of call them as witnesses cannot be justified in any way, shape, or form as a matter of "strategy."

### MARK PAGE

Mark Page was NYC's Budget Director and a member of the Office of Payroll Administration's (OPA) Board of Directors representing the Mayor of NYC. Page was also the Executive Sponsor of the City Time Project and directed it since its inception in 1995 until its completion in June of 2011. OPA was overseen by two members of the Board of Directors; one member was representing the Mayor of NYC and the second member was representing NYC's Comptroller. Page represented the mayor on OPA's Board and reported directly to him on all matters concerning OPA and the City Time Project (3546-1 B544; B547).

Page was, of course, available as a witness at all times and, indeed, was initially on the prosecution's witness list. During the investigation and in preparation for trial, the Government

48

interviewed and took testimony from Page (see Government's 3500 material (3546-1 B544-567; 3546-2 B1297-1319). The testimony Page gave to the Government contained a great deal of clearly exculpatory information directly supporting Mr. Mazer's theory of defense.

Page's testimony would have presented critical facts explaining to the jury the specific City Time Project timeline of events from its inception in 1995 to its completion in June 2011.

Page's testimony to the Government prior to Mr. Mazer's trial corroborated the testimony of Ruppel, Bondy, Hafeez, Gurjal, Newson, Himelewski and Yowell, as described within this petition and confirmed the City Time Project historical events and decisions made by the City officials as outlined in the Statement of Facts section of this petition.

Page would have explained in detail that the initial strategy of investing $63 million in commercially off-the-shelf software was unrealistic to meet the City's business objectives; therefore, the decision was made, as it unquestionably had to be made, to create a custom design application software to accommodate 80 City agencies' time-keeping needs. (MM 67; 3546-2 B1315:17-1316:16). That decision of course pre-dated Mr. Mazer's involvement in the Project and had nothing whatsoever to do with Mr. Mazer by definition.

Based on Page's sworn testimony to the Government and other information we know that he provided to the Government during its investigation and prior to Mr. Mazer's trial, we know without question that had Page been called to testify at trial, he would have provided significant exculpatory and impeachment evidence fully consistent with Mazer's theory of defense and he would have dramatically undercut the Government's theory of prosecution as to Mr. Mazer. The following reflects a number of examples that demonstrate this point, with citations to the information Page provided to the Government:

Page would have confirmed that OMB agreed with Gartner's 2001 recommendation that the City should proceed with a new multi-phased approach of implementation of the system including the development of a pilot program that could be deployed in a limited number of City agencies. (A1128) (3546-1 B547).

Page would have testified that with the OPA Board's approval, OPA and SAIC negotiated new contract terms, which were laid out in Amendment 3 in April 2002 (GX 100-4 A742-749). This testimony by Page would have been critical to Mazer's defense because (1) the prior fixed-price contract was the model under the theory of an off-the-shelf system and (2) the shift away from the fixed-price contract actually started early in 2002 with Amendment 3, in which the structure of City Time was switched to a custom model/platform long before Mazer was hired by the City. Page would have further clarified that the shift from "fixed-price" to "fixed-price, level of effort" (FPLOE) started also in 2002, with Amendment 3 and then it fully expanded to a custom model/platform by Amendment 6. (3531-3 B402). Page's testimony in its entirety would have tellingly undercut the Government's case in chief by proving that Mazer could not have corruptly influenced the City by controlling the terms of the FPLOE contract when he had not yet been hired when the FPLOE contract was negotiated. (MM 72 B1413).

Page would have further explained to the jury that based on Gartner's recommendation that the City change to FPLOE contract, as opposed to fixed-price, was a necessary step for implementing the five pilot programs that allowed the City to make changes to the scope of the work under the City Time contact (GX 100-5; A750-97, Art. 27, 41) that would enable the City to make demands of SAIC to perform work that was not originally contemplated under the original contract's terms to not exceed budget and enable SAIC to adjust the price based on any extra

50

work done. (A760, Art. 27.2 (a)), Page was aware that those changes in the contract reflected reality. (3546-1 B555)

The above compelling testimony would have disproved the Government's theory that Mazer advocated for a FPLOE contract for the sole purpose to enrich himself under fraudulent pretenses or for any purpose. He could not have advocated for the FPLOE contract when he was not yet even involved with the Project when FPLOE was adopted.

Page also would have confirmed that as discussed in the Statement of Facts section that before the City gave its approval to modify the contract and continue the Project it had to assess the scalability of the new system based on the operational success of the five pilot programs. Gartner had concluded from these pilots, with overwhelming approval, that SAIC application core technologies and application architecture were fully capable of scaling to the City's project needs based on the number of users and agencies. (GD 3526 A1444-55; A1447). In addition, OMB and OPA developed very specific cost estimates of what it was going to actually take to implement City Time on the City-wide basis in 4 years using an appropriate contracting strategy and staffing plan. Again, Mazer was nowhere on the scene or in any way involved at the time. (MM 72 B1420; GX 400-4 A898-910; GX 400-8 A917-958).

Page would further have confirmed to the jury that OPA Executive Director Bondy was NYC's official City Time Project Manager responsible for managing the City Time Project on behalf of the City, and he reported directly to Page (A751; 3546-1 B549; B551-552). Page also relied on his OMB deputies Stu Klein, Roy Mogilanski and Tom Higgins – not on Mazer (B548; MM 43 B796-797; MM 44 B798-799; MM 48 B804-805; MM 52 B809-810).

Page would further have testified that all City Time Contract negotiations were exclusively done by Edwin Yowell and Bondy on behalf of the City – and not by Mazer (MM 58 B874:6-875:12; MM 70 B591-662; MM 28 B764-766; GX 750-27 A1210-1212). Page further confirmed that it was Yowell [not Mazer] who negotiated all contracts with SAIC with specific hourly rates for different labor categories (MM 70 B591-662). Yowell and Bondy – not Mazer - were able to negotiate 5-year labor rates with SAIC. After OMB reviewed and approved it, the Labor Rate Table was appended to Amendment 6. Mazer had nothing to do with it. (A1116) (GX 400-17 A971-981; GX 400-26 A982-1002; MM 58 B868:22-870:20).

Page would have made clear that it was Bondy, not Mazer, who he communicated with on a regular basis. (GX 6000-2 B221-222; GX 6000-3 B223-237; GX 6000-4 B238-239; GX 6000-5 B240; GX 6000-6 SA110; MM 18 B748-751; MM 21 B754; MM 22 B755; MM 23 B756-758; MM 24 B 759; MM 25 B760). Bondy and his deputies Yowell and Hafeez, were attending OPA Board monthly meetings with Page reporting on project status and critical issues(s) such as funding, contract amendments and other actions that required Board approval or Board (OPA Board minutes MM 60 B963-986). This, of course, shows (1) that the OPA Board was kept apprised of all relevant developments for the Project and (2) it was Bondy, Yowell, and Hafeez who were armed with all facts concerning the Project and who briefed the OPA Board. Mazer had no such role.

Page would have confirmed that as a member of the OPA Board of Directors representing the Mayor together with the Comptroller representative, they approved the City Time contract amendments and authorized OPA Executive Director Bondy to submit them to the Comptroller's Office for final review and registration, based on this information and

recommendations provided by Bondy and the others, and not by Mazer. ( MM 67 B1297-1319; GX 750-20 A1201-1202; GX 750-21 A1203-1206).  Page would confirm to the Jury that OMB approved the budget for the City Time Project, based on the information from Bondy and the others – not Mazer. This undisputed fact was also confirmed by the NYC Comptroller Financial Audit of OPA that:

in his testimony before the NYC City Council on May 8th, 2008, OPA's Executive Director [Bondy] stated "[w]e approached ….I approached the Board, the OPA Board with these proposed changes in strategy and then based on the approval of the Board, we approached OMB with these changes in strategy, and included in these proposed changes in strategy were very specific costs of what it was going to actually to take to implement City Time on a City wide basis, that these proposals and costs were accepted, were reflected in modified capital plan for the City Time program…"  The very specific costs the Executive Director was referring to was the cost projection presented to OMB on September 23, 2005.  These costs amounted to $209 million and were expected to cover the Project through 2012.

Page would have confirmed that as OMB Director he was responsible for the development and presentation of the NYC yearly budget to the NYC Council for their review and final approval. (MM 67 B1297-1319; MM 68 B1320-1330).  On June 7, 2010, the NYC Council during its yearly budget hearing questioned Page extensively on the City Time Project history, specifically why the City decided to build a custom developed software application called City Time and invest over $600 million dollars instead of buying an off the shelf system for $63 million as it was originally contracted for?  In his testimony Page provided detailed

justification and reason for his action and actions of the other City officials. This had nothing to do with Mazer.

Page testified of the then existing contract, that he did not know when to measure it. The idea was this was seen as a next step for building a reliable payroll system in New York City which was the mid 90's, the fact of the matter is that you could go out and buy a payroll system off the shelf for something in the range of $50 million or $60 million.

The problem with that is that payroll system would basically work for collective bargaining title in 1 agency. Because that's sort of the normal employer model that the off the shelf payroll system looks like. As work was done on this project as is not all that unusual in terms of trying to sort of bring order and the modern age to City functions, "there was a tremendous amount of learning and building the necessary information of what the actual practice is under contracts and agency systems so that the nature of the system that we have built and paid for here is basically entirely different from what was contemplated and you know looked in terms of current costs in the mid 90's." (MM 67 B1315:17-1316:16).

Page continued: "…and one of the problems that we have been up against here…has been that there are virtually no other single payrolls as large and elaborate as New York City's… And that's been a, you know, tremendous learning process among other things in order to get sort of your hands around it so that you can actually have a system that will do this for us." (MM 67 B1317:16-1318:4). Page focused on all legitimate Project based reasons and of course, again, this had nothing to do with Mazer.

Page testified: "City Time you can't cut the fact that we're already spent over $500 million on it. That's done. So, what we're talking about is an incremental $30 million in capital

in order to get the benefit of a system that we spent a tremendous amount of money and 10 years of work on putting in place. And I believe that it is an essential piece of New York City's governmental and management infrastructure and something that we owe to ourselves and our employees in 2010. (MM 67 B1319:4-14). After $500 million had been spent, Page still urged the Council to spend an additional $30 million. That had nothing to do with Mazer.

Page continued in his testimony: "In hindsight you can look back how this job has been done. You can question whether it should have cost as much as it did, whether it should have cost less, whether it should have cost more... The total capital cost up to this point is about $600 million. There's about $30 million to go. To contemplate turning off this system at this moment would be crazy. We have spent approximately $600 million in the City's capital to develop a serviceable, effective timekeeping system. When you talk to agencies where it's been implemented, everyone complains about any change that you instigated but actually this one has gone well. And it's an interface with every employee basically every day. It is a huge elaborate system and it works. And experience with it now one-third implemented is good. If we turn this off this afternoon are going to have to start exactly the same thing all over again. There is absolutely no chance that we are going to build another replacement system for $30 million." (MM 67 B1311:14-1312:15). Tellingly, after $500-600 million spent, Page touted it as having gone well and characterized the experience with the Project as good, with it being one-third implemented.

It is no wonder why the Government decided not to call Page as a witness, given its agenda against Mazer, since Page's testimony would have dismantled the Government's theory of the case as alleged in the indictment, which purported to charge Mazer with being

responsible for contact negotiations which charged excessively inflated rates and for hiring more staff than necessary for eliciting financial gain. (A93 – 94, 97, §16, 19c). The Government knew from Page (and others) that this theory of prosecution targeting Mazer was both untrue and completely unsupportable.

The following is additional factual information that Page would have testified to consistent with his statements to the Government:

a) Mazer was never a City Time Project Manager representing the City as a whole. Bondy was. (3546-1 B549; B551-552; GX 6000-1 B220; GX 6000-2 B221-222; GX 6000-5 B240; MM 21 B754; MM 24 B759; MM 25 B760).

b) Mazer never attended OPA Board meetings or reported to the OPA Board on the Project status to Page. Bondy did. (MM 60 B963-986)

c) Page never met Mazer and never spoke with Mazer on City Time Project issues or any other topics.

d) NYC never issued a written document empowering Mazer to be an "Acceptance Official" on behalf of the City or OPA as it was required to do by the City Time contract that was governing the project (A751).

e) Mazer did not have signatory authority, express authority or actual authority to represent the City and OPA in vendor negotiations. Bondy and Yowell did. (MM 70 B591-622).

f) Mazer did not sign any documents on the City's behalf binding the City

to a contract or any other commitments. Bondy did. (A.751; 3546-1 B549; B551-552; GX 100-8 A808; GX 100-9 A825; GX 100-10 A831; GX 100-11 A845; GX 100-13 A854; GX 750-3 A1112)

g)  Mazer did not have any authority that would impact the NYC Budget. Bondy did. (DM 2 A1501-07; GX 1465 A1304-12; GX 1418 A1292-93;

DM 3 A1508-09)

h)  Mazer never submitted funding requests to Page on behalf of the Project. Bondy did. (GX 400-7; A911-16; GX 400-14 A959-70; GX 400-17 A971-81; GX 400-26 A982-83; GX 400-29 A1003-1020; GX 400-31 A1021-1038).

i)  Mazer never attended OMB status review meetings. Bondy, Gurjal and Hafeez did. (GX 750-26 A1207-1209; MM 58 B890:12-892:3; MM 65 B1223-1257; MM 66 B1258-1296)

j)  Mazer did not participate in the establishing of OMB monthly work plans for OPA Bondy, Gurjal and Hafeez did. (GX 750-2; A1074-1084).

k) Mazer was a Subject Matter Expert (SME), not a City employee, working on the City Time Project level, managing implementation of the City Time System. (GX 125-1 Sec. 2.1 B76; GX 150-1 A875-880; GX 150-3 A881-894; MM 72 B1426-1427)

l) Mazer's authority was limited to the consultants working in the implementation area on the City Time Project Level. (MM 1 B714; Org. Charts

MM 73 B1431, MM 74 B1432; GX 6194 B251-252; GX 6195 SA111-112; GX 6196 B253-254).

m) Mazer's job was to follow and carry out OMB approved monthly work plans.

n) Page would confirm that he reviewed the Comptroller Audit Report with Bondy and agreed with the OPA Official response to the Audit. (MM 23 B756-758; MM 72 B1422-1430).

The Government would have not been able to contest or disprove any of the above testimony provided by Page. Shargel's failure to call Page as a witness was ineffective assistance of counsel that without question irretrievably (alone and when considered with the other uncalled witnesses and other examples of ineffectiveness, in the aggregate) prejudiced Mr. Mazer.

The Government's failure to call Page as a witness (or to bring his testimony to the Court's attention at trial or at sentencing), knowing that his testimony would exculpate Mazer (and would impeach Government witnesses and undermine the Government's theory of prosecution and sentencing) constitutes additional outrageous governmental misconduct that is anathema to the Government's well settled, unique role in this process to see that justice is done and that the process runs consistently with the rules and notions of fair play and due process.

**Mohamed Hafeez**

Mohamed Hafeez was an OPA Deputy Executive Director (DED) reporting to OPA Executive Director, Joel Bondy. Mr. Hafeez was responsible for OPA Administrative services including: Contract, Budget, Financial and Human Resources Offices. Mr. Hafeez was involved with the City Time Project from October 2005 until its successful completion in June 2011.

Hafeez was, of course, available at all times to testify as a witness and he was initially on the prosecution's witness list. We know also that during the investigation and trial preparation stages of this case, the Government interviewed Hafeez extensively and received sworn testimony from Hafeez (See 3580-1 B584-590).

If Hafeez had been called to testify, he would have had to corroborate the testimony of Page, Bondy, Gurjal, Newson, Himelewski and Yowell through his personal involvement in all relevant matters, arising from his administrative duties. These duties included attending all OPA monthly Board meetings with Page as the Mayor's representative and Spitzer as the Comptroller's representative. Hafeez's testimony, of course, would have exculpated Mazer both by showing conclusively who was involved in all relevant recommendations, authorizations, conclusions, and expenditures related to the Project – none of whom was Mr. Mazer.

Hafeez would have confirmed the City Time Project historical events and City decisions that were made by City officials as outlined in the Statement of Facts section of this petition. In the following portion of this section, details of the very specific and critically important ways in which Hafeez's testimony would have completely undercut the Government's theory of the case and would have exculpated Mr. Mazer are set forth.

59

First of all, Hafeez would have informed the Jury as to the true nature of Mazer's responsibilities and authority as it related to his work on the Project. Significantly, this would have included testimony demonstrating that Mazer was not a City employee, and he did not have any contractual relationship with OPA or the City. Mazer was effectively an independent contractor working on the Project through his own company, MS Creative Technologies Inc. (GX150-1 A 877 – 878 Art. 8; GX 150-3 A 886 Art. 3).

Mazer was one of the 38 Subject Matter Experts (SME) that OPA brought in from Spherion to assist OPA with the Project. As part of Mazer's SME responsibilities, he advised OPA Project Management Staff on software testing, training and deployment implementation methodologies to support OPA's mission to install City Time system in 80 agencies city-wide in 4 years (3574-5 B578; MM 58 B847:18-848:15). Even more importantly, Hafeez would have explained, consistent with information Hafeez provided to the Government, that Mazer did not participate in the software development effort for the City Time system; rather it was overseen by Gurjal. Hafeez's truthful testimony would have shown that it would have been impossible for Mazer to make any critical decisions that would have impacted the development timeline and inflated the cost to develop the system. Hafeez would have clarified that all Project consultant staff regardless what role and position they had within the Project organization, had an obligation to follow instruction(s) and carry out decision(s) issued by OPA City Managers - specifically, administrative policies and procedures, strategic management decisions, contracting, budget, fiscal and staffing decisions, which were all made at OPA Agency Level.

Clearly, Mazer never worked at the OPA Agency level. Mazer's position/role on the Project was always on the project level. Simply put, Hafeez would have established

unequivocally that Mazer's project level Authority was limited to (1) evaluating the completeness and accuracy of work performed by consultants under his supervision to ensure adherence to City Time Project standards and deployment strategy (GX 6194 B251-252; GX 6196 B253-254; GX 6195 SA111-112; GX 750-14 SA54-62; Tr.2695:18-2697:20 B1687:8-1689:20), and (2) implementing decision(s) that were made by NYC Executive oversight agencies and/or OPA Senior Management Team and that were communicated to Mazer by his OPA Agency Project Managers Gurjal, Bondy and Hafeez (See Org. Charts B1431; B1432; MM 8 B726; MM 12 B734-735; MM 30 B772-774; MM 32 B776-777; MM 33 B778; MM 36 B782-786; MM 37 B787-789; MM 38 B790-792; MM 40 B794-795).

Hafeez would have further testified that Bondy was the "Acceptance Official" representing the City's interest on the City Time Project in all project discussion(s) and contract negotiations (A751).

It was Bondy's [not Mazer's] responsibility to prepare Project Status reports and present them to the OPA Board describing project activities, upcoming development and implementation schedules, project budget priorities and funding requests, and to obtain Board approvals when required (See MM 60 B963-986).

Furthermore, through his actual participation in many OPA and OMB meetings, had he testified, Hafeez could have explained who and why the NYC Government and its executive officials made critical decisions to allow the cost of the project to increase to upward of more than $575 million dollars. (MM 72 B1420).

Specifically, on January 20th 2006, Hafeez, Bondy and Gurjal had review meetings with OMB senior staff. (GX 750-26 A 1207-1209). It was Page's and OMB's decision to allow each City Agency to dictate to OPA what program features SAIC would need to develop going forward.

To continue its planning process for a new CT Project, OPA and OMB drafted the "City Time Funding Plan." This plan identified anticipated cost projection needs for the CT Project over a four-year period. (GX 400-8; A 917-58). This detailed document gave the City and OMB a complete CT Project Road Map overview and understanding of what it would cost and what effort would be required on the City's part to develop and implement a new City Time System in 80 agencies over four years. It included a development schedule which was drafted and reviewed to determine what features were to be included in the various program releases based on each agency's needs and urgency of deployment (A 920-26). **It also set out in detail, that methodology and assumptions that explained how project cost projections were derived and calculated (A 927-35), as well as the "Funding Detail and Staffing Rationale" with complete justification identifying the estimated increases in personnel needs to complete City Time system development and deployment. (A 936-49; GX 750-18 A1177-1200).**

It was clear to OMB and OPA that the contemplated changes would require a significant expansion of the Project's scope, requiring more time and more money and an additional team of capable technical consultants. As a result, OPA Agency budget staff together with OMB staff assembled cost projections for a new City Time Project including labor rates and staffing allocations per year. These specific projections are based on the City's and SAIC's negotiated specific hourly rates for different labor categories. Consultants were assigned to labor categories depending on their area of expertise and experience level. Further those projections

were based on newly negotiated 5-year labor rates table from January 1, 2005 to December 31, 2010. (A1116; GX 750-26 A1207-09).

This above testimony by Hafeez would have completely undermined the Government's theory that Mazer, as a consultant, was charging the City exorbitant rates to enrich himself. The increase in cost was, in reality, based on the complexity of each agencies' specific individual software specifications. This was also documented in the Comptroller Audit Section of this petition.

Moreover, all costs and projections received multi-layered reviews having nothing to do with Mr. Mazer. Through the following examples of the areas on which Hafeez should have been called to testify (consistent with his pre-trial statements), Hafeez would have further exposed the Government's theory as to Mazer's role in any illegal activity as being completely contradicted by the true facts:

1.  OPA ([Represented by Yowell and Bondy]) did not negotiate the labor hourly rates it agreed to pay SAIC in the City Time Contract on the basis of the Contractor's underlying cost or what profit the contractor or its sub-contractors would earn.

2.  OPA was aware exactly how much profit SAIC was making on its labor rates. OPA and the City approved each sub-contractor who was working for SAIC. More importantly, as part of the review and approval process, SAIC provided to OPA copies of the sub-contract Agreements between SAIC and Technodyne, also SAIC and Ariel Partners. Those Agreements included specific hourly Labor Rates for different "Labor Categories". (GX 175-1 B107-119; GD 2719 A1412-1424; MM 71 B1566-1568)

3. OPA paid SAIC the same fixed price hourly rates for consultants regardless of whether the work was performed by an SAIC Employee, a Consultant hired by Sub-Contractor Ariel Partner or Technodyne, or sub-sub-contractors like DAS and many others.

This was critically testimony for the Jury to hear in direct rebuttal of the Government's misguided portrayal of Mazer's role and surely would have created more than a reasonable doubt for any reasonable Juror, about the Government's claims as to Mr. Mazer.

Hafeez would have further decimated the Government's theory of the case by clarifying to the Jury that Mazer was never a City Time Project Manager representing the City. Mazer never attended OPA Board meeting(s) nor did he report on the project status directly to Page. Those were Bondy's responsibilities. Hafeez would have confirmed that the City never issued any written authority empowering Mazer to be an "Acceptance Official" on behalf of the City or OPA as required by the contract that governed the Project (if he were to have any such role) (A 751) and of course there was never any authorization in any form so empowering Mazer. Nor did Mazer sign any documents on the City's behalf binding the City to any contract(s) or any commitment. Mazer did not have signatory authority, express authority, or any sort of actual, implied, or apparent authority to represent the City and City Time Project in any vendors negotiations or agreements.

Additionally, Mazer did not have any funding authority that would impact the City's budget or its funds as the Government had falsely charged Mazer with in the indictment and through false, unsupported, and unsupportable accusations throughout the trial, that Shargel let go without challenge, despite the readily available material to effectively do so from Hafeez

and others right at hand. Indeed, Hafeez addressed the matter of authority directly and in no uncertain terms when he told the Government prior to the trial that "the only City officials who were authorized to approve requests for payments for work completed on behalf of the City" were Bondy, Gurjal, Malave and Hafeez himself. Mazer had no such authority. (GX 200-1 B120-121; GX 200-51 B122-123; DM 303-16 A1585-1586; GX 301-34 B125; GX 301-52 B126; GX 302-39 B128; GX 302-103 B129; GX 303-18 B131; GX 303-20 B132; GX 304-36 B133; GX 305-2 B135; See also 3580-1 B584-590 generally).

Additionally, Hafeez would have confirmed that he (Hafeez) and Bondy executed the City Time Work Orders with SAIC on behalf of the City and OPA. Mazer had no such authority. (GX 360-1 B136; GX 360-2 B137; GX 360-3 B138; GX 360-5 B139; GX 360-6 B140; GX 360-7 B141; GX 360-8 B142; GX 360-9 B143; GX 360-10 B144).

Significantly, Hafeez informed Government investigators in his December 20, 2010 interview that previously Bondy told Hafeez that he wanted him to have the administrative role in the City Time Project, thus taking over the administrative responsibility from Sarah Gurjal. (Gurjal email MM 1 B714; 3580-1 B586).

Subsequently, Hafeez set up new procedures which previously were not in place and began conducting audits of all aspects of the Project. Specifically, Hafeez implemented enhanced work order(s) and invoice review(s) for consultant payments (MM 2 B715; MM 5 B720-721; Org. Chart MM 74 B1432) that were regularly reviewed and approved for payments during weekly meetings(s) by Hafeez, Malave, and his staff. (3580-1 B586-587). Attendance records for these meetings clearly establish that Mazer did not participate or contribute to any

of those scheduled weekly meetings nor did he receive any of these reports generated at those meetings (DM1; A1467-77; DM1A; A 1478 - 1500).

At the weekly meetings staffing Work Orders were also discussed, including managing the previously approved OMB staffing plan, reviewing projected staffing levels and labor rates tables (A1491-92).  From any objective perspective, Hafeez's testimony would have been directly contrary to the Government's allegations that Mazer approved payment submitted to the City for work performed. (GX 200-1 B120; GX 200-51 B122-123; GX 301-12 B124; GX 301-52 B126; GX 301-68 B127; DM 303-16 A1585-1586; GX 302-103 B129; GX 303-18 B131; GX 304-36 B133; GX 304-42 B134; GX 305-2 B135).

Mazer had neither the opportunity nor the authority to do so.  And in fact, from Hafeez it is certain that Mazer never even attended or participated in the multi-layered meetings where review and approval took place.

A review of all material available before and during the trial to Shargel show beyond any question that all work to review invoices and authorize payments to consultants was controlled independently by Hafeez and his staff and not Mazer as the Government alleged (A 96 ¶ 19(B)) in S-2 indictment.  There is no excuse of justification for Shargel's failure to use this invaluable information to Mazer's benefit by having Hafeez testify at trial.

Furthermore, Hafeez's testimony would have provided undisputed evidence that Edwin Yowell (who was the OPA's Deputy Executive Director reporting to Bondy and Valcich) was responsible for negotiating all contract amendments with SAIC on behalf of the City; and that Mazer played no role whatsoever in any of the contract amendment negotiations, and specifically had no role in negotiating labor rates, or staffing schedules (MM 39 B793; MM 70

66

B591-622; GX 6000-6 SA110). In fact, Hafeez had firsthand knowledge that during the W067 negotiation, Yowell and Bondy on behalf of the City re-negotiated labor rates and reduced them by 25 to 40 percent from the Amendment 6 adopted schedule (see comparison between the Agreed Upon Rates Schedule in Amendment 6 (A 1116) and those adopted in W067 (A1373; MM 58 B868:22-870:3).

Further, Yowell's SAIC contract negotiation clearly identified detailed staffing plans for OPA to follow, including the number of positions, labor categories, budgeted hours and when the positions authorized by OMB were to be filled. Yowell and Bondy developed a complete staffing plan from April 1, 2006 through March 31, 2009 (A1170-1172; GX 750-18 A1177-1200) which shows when the staffing level on the Project had to increase, based on City requirements and prior OMB approved needs, and when the staffing level would decrease. This staffing plan was budgeted and approved by OMB and it was OPA's administration who were responsible to manage this staffing plan for the Project (3529-19 B387-394). Mazer had nothing to do with it.

Hafeez would have clarified that it was Bondy and only Bondy who could approve authorization to SAIC to fill approved positions based on the Project schedule and needs (A 1566), thereby directly contradicting the Government's allegation that it was Mazer who hired unnecessary consultants to fill unneeded positions in order to enrich himself.

It is no wonder that the Government made a tactical decision not to call Hafeez as a Government witness based on all the information that he provided to authorities, as reflected in his 3500 material (3580-1 B584-590). The evidence Hafeez provided to the Government was clearly contrary to the Government's theory of the case. It is baffling and inexcusable that Defense counsel failed to call Hafeez as a witness at trial. Indeed, it is Mr. Mazer's

understanding that, notwithstanding all of this exculpatory and impeachment evidence provided by Hafeez to the Government, Shargel never even so much as interviewed Hafeez as a potential witness. Shargel clearly should have been aware that Hafeez's statements to the Government expressly undercut the Government's theory of the case and, indeed, exonerated Mr. Mazer from all criminal wrong doing; yet he did nothing to use this to advance his client's Defense. Shargel's conduct in this regard, is yet another example just how constitutionally ineffective his performance was and the irretrievable prejudice it caused to Mr. Mazer.

As set out in the Statement of Facts Section, Hafeez would have been able to explain to the Jury because of his personal participation in OMB's planning meetings how OMB approved project funding was distributed through the second review process to OPA Again, this was a multi-layered process and Mazer had no involvement or role in it. This next stage was called the Certification to Proceed or (CP). It required that before OPA could receive funds to make payments under any City Time "work-orders" OPA would have to make a six-month period "CP Request" to OMB identifying the specific scope of work that OPA planned to accomplish during the next six months under the approved contract.

Each "CP Request" included a detailed staffing component that would be required to complete planned work for the following six months which included staff roles, labor categories, budgeted hours and individual hourly rates per labor category that the City agreed to pay SAIC for services rendered based on the total six-month expenditures. (See GX 400-7 A 911-16; GX 400-14 A 959-70; GX 400-17 A 971-81; GX 400-26 A 982-1002; GX 400-29 A 1003-1020; GX 400-31 A 1021-1038). Explaining the "CP Request Process" would have provided critical testimony that Mazer had no role in any decision that would have inflated labor rates on

staffing to gain elicited profits for him as the Government has accused him of and that there were multiple levels of detailed review and approval every step of the way and, again, Mazer was not at all involved with that process. (DM 210C A1560-1566; MM 58 B890:12-894:3).

Further testimony that Hafeez would have provided that was explicitly contrary to the Government's misguided incriminating allegations include the following:

A) Mazer did not manage the City Time Project for the City, nor was he on the top of the organizational chart as a person who ran the Project for the City. Bondy was. (GX 6197 B255; GX 6000-2 B221-222; GX 6000-3 B223-237; GX 6000-4 B238-239; GX 6000-5 B240; GX 6000-6 SA110; MM 1 B714; MM 2 B715-717; MM 5 B720-721; MM 6 B722).

B) As a Spherion SME Mazer held no special role within any other City agencies, was not a member of the City Time Steering Committee and had no input in City funding, contract and other City-wide policies and discussions.

C) Mazer had no authority to act as a manager or representative of the City Government; only the City-wide local Governmental public officials did.

D) Mazer reported only to managers within OPA Gurjal, Bondy and Hafeez, and within OPA, Mazer had responsibilities specific to the CityTime project implementation area.

E) As an SME Mazer never functioned at the OPA Agency level. Mazer was well removed from significant OPA Agency level management and policy decisions. As an SME Mazer had authority only on the project level and was obligated to follow

instruction(s) and carry out decision(s) issued by the OPA Agency level managers. Specifically, administrative policies and procedures, strategic management decisions, contracting, budget, fiscal and staffing decisions were all made at the OPA Agency level. (DM 125 A1513-1515; MM 8 B726; MM 12 B734-735; MM 17 B745-747; MM 30 B772-774; MM 32 B776-777; MM 33 B778; MM 36 B782-786; MM 37 B787-789; MM 38 B790-792; MM 40 B794-795; MM 55 B815-818)

F) As an SME on the CityTime Project, Mazer's project level responsibilities were to advise the OPA management on technical issues related to getting the new CityTime system implemented at seventy six City agencies. Specifically Project level authority was limited to evaluating completeness and accuracy of work performed by consultants within Mazer's chain of command to ensure adherence to CityTime Project standards and deployment strategy.  That is very different from the role ascribed to Mazer by the Government at trial.

G) Mazer was explicitly instructed by OPA managers Gurjal and Hafeez to assist OPA management by signing Consultants' timesheets as a second level manager. Mazer signed as first level supervisor only when the first level manager was unavailable and with express approval from OPA management.

(DM 127 A1520; DM 136 A1524-1537; MM 9 B727-730; MM 11 B733; MM 13 B736; MM 19 B752; MM 31 B775)

H) Mazer did not have authority to impact any funds (local or federal) held by other agencies of the City Government (outside OPA), or by the City as a whole. In fact

70

Mazer's spending authority was even limited within the confines of OPA's budget. Authority to approve spending within OPA clearly was not extended to outside consultants like Mazer and rested entirely with OPA executives like Hafeez, Bondy and Gurjal. (DM-2 A1501-07; GX 1465 A1304-12; GX 1418 A1292-93; DM-3 A1508-09).

I) Hafeez would have confirmed that Mazer never approved requests for payments/invoices submitted to the City. Payment approval required multiple level of NYC officials' signatures. Their signatures confirmed that their review was completed and that invoice payments could be issued. Only City Officials: Bondy, Hafeez, Gurjal and Malave were authorized to review and approve requests for payments on behalf of the City. This would have expressly contradicted the charge in the operative indictment that "Mazer approved request for payments submitted to the City…" (A 96 ¶19(B)).  It also would have totally undermined the false and misleading information presented to the Jury during the trial. (GX 200-1 B120-121; GX 200-51 B122-123; GX 301-34 B125; DM 303-16 A1585-1586; GX 301-52 B126; GX 302-29 B128; GX 302-103 B129; GX 303-18 B131; GX 303-20 B132; GX 304-36 B133; GX 305-2 B135).

J) Hafeez would have clarified that Mazer did not have signatory authority, or any kind of actual, implied, or apparent authority to represent the City and City Time Project in any vendor negotiations or agreements: Bondy and Yowell did. (GX 6000-6 SA110; MM 39 B793; MM 70 B591-622; MM 58  B874:6-16).

71

K) Hafeez would have confirmed that Mazer did not sign any documents on behalf of the City, binding the City to any Contract. Bondy did. (GX 100-8 A808; GX 100-9 A825; GX 100-10 A831; GX 100-11 A845; GX 100-13 A854; GX 750-3 A1112)

L) Hafeez would have confirmed that He (Hafeez) and Bondy executed the City Time Project Work Orders with SAIC on behalf of the City and OPA, Mazer did not have such authority. (GX 360-1 B136; GX 360-2 B137; GX 360-3 B138; GX 360-5 B139; GX 360-6 B140; GX 360-7 B141; GX 360-8 B142; GX 360-9 B143; GX 360-10 B144).

M) Hafeez would have clarified that Mazer did not participate, advise or influence anyone in OPA or the City in contract selection, contract strategies, Labor Rate negotiations, contract terms and conditions in discussions between the City and SAIC. This would have directly contradicted the Government's allegations that Mazer acted with Denault to convince the City that it needed to "amend" the City Time contract from "fixed-price" to fixed price level of effort contract. This fact was also documented in NYC Comptroller's Audit section in this Brief.

N) And finally, it is noteworthy that Hafeez stated in his 3580-1 B584-590 material that he had no knowledge of any acts of fraud by Mazer as it relates to the City Time Project or any other time that he had worked with Mazer on other major City projects. Nor that the Controller Audit found any evidence of fraud during their review.

Once again, the above testimony would have been crucial for the Defense in disproving the Government's false accusations and false depiction of the facts that Defendant Mazer was an "official" or final policy maker or acted fraudulently in his effort on the City Time. The failure to call was prejudicially ineffective and case-determinative error.

72

`Nothing in this section is in any way speculative. It is all established point by point by Hafeez's statements given to the Government during the investigation of this case. Hafeez certainly was in a position to know the truth. It was constitutionally ineffective and overwhelmingly prejudicial to Mr. Mazer for Shargel to fail to interview Hafeez or to fail to call him as a witness (or to fail to call any of the other uncalled witnesses identified in this section of Mr. Mazer's submission.).

**BRIAN NEWSON**

Brian Newson was OPA's Agency Chief Contracting Officer ("ACCO") from 2000 through May 2007. In May 2007, Newson became OPA Director of Management Review and Analysis. Additionally, after OPA Executive Director Bondy appointed Valeri Himelewski as OPA General Counsel and Agency Chief Contracting Officer ("ACCO") from 2000, Newson continued working as Deputy ACCO due to his extensive procurement subject knowledge, specifically City Time Agreement historical facts. (3545-2 part 2 B1694:4-1695:12, B1696:13-22).

Newson was available as a witness to testify at the trial and he was on the prosecution witness list. During the City Time Project investigation the Government interviewed Newson twice and received sworn testimony under oath (3545-2 part 2 B1692-1761; 3545-3 B536-540). Additionally, during trial preparation, the Government interviewed Newson twice and received sworn testimony also. (3545-1 B525-530; 3545-4 B541-543).

Newson's testimony would have corroborated the testimony of Page, Hafeez, Gurjal, Ruppel, Himelewski, Bondy and Yowell referred to within this petition and would have confirmed City Time Project historical events and City decisions that were made by City officials outlined in the Statement of Facts section of this petition.

In testimony he gave to the Government before Mr. Mazer's trial, Newsom swore to the following:

That OPA was an Agency responsible for managing the City Time Project on behalf of the City. OPA's Executive Directors - Richard Valcich in 2000 and starting April 2004 Joel Bondy were NYC "Acceptance Official" and City Time Project Manager for the City as a whole reporting to the OPA Board of Directors. (A751; 3545-2 p.2 B1695:17-22, B1701:11-15; GX 6000-4 B238-239).

Newson testified that Valcich and Bondy were assisted by Deputy Executive Director (DED) Edwin Yowell and Sarah Gurjal, the Assistant Executive Director who was in charge of the City Time Project Division within the OPA Agency. Valcich, Bondy, Yowell and Gurjal were making all strategic and tactical decisions on the Project (3545-2 B1695:17-22, B1700:21-22).

Newson further testified that he was advising them on NYC Contract Administration requirements issues. Newson's main responsibility as OPA/ACCO was to ensure that the OPA City Time Agreement and its Amendments were prepared, reviewed and approved by NYC oversight agencies in complete compliance with NYC Procurement Policy Board (PPB) rules, NYC Charter Chapter 13, OMB Review and Approval Process (3545-2 B1696:1-8, B1698:24-1699:25, B1701:16-19; GX 6000-2 B221-222; MM 5 B720-721; MM 15 B740-742).

Newson confirmed that Valcich, Bondy and Yowell were responsible for the City Time Agreement and the negotiation of amendments to the Agreement with primary vendor SAIC. Contrary to the Government's allegations at trial, Mazer was not involved. (3545-2 B1697:5-18, B1698:2-9, B1702:16-19)

Newson testified that he received his work request and instructions for the City Time contract from Yowell and was not influenced by Mazer. (3545-2 B1699:19-25, B1700:23-1701:5, B1703:22-24; MM 4 B718-719; MM 5 B720-721).

Newson testified that he was reporting to OPA Deputy Executive Director Yowell (3545-2 B1696:23-1697:1) and after Yowell's retirement he reported to his replacement Mohamed Hafeez (3545-2 B1718:18-21; MM 5 B720-721).

Newson testified that Yowell drafted all City Time Agreements and Amendments to them. In addition, Yowell was responsible for conducting vendor negotiation on OPA's and the City's behalf, negotiating contracts terms, conditions, cost and Labor rates. Yowell was also responsible for reviewing contract amendments with the NYC Law Department and the Mayor's Office of Contracts, incorporating their comments and obtaining final approval. (3545-2 B1702:1-1703:6; MM 28 B764-766; MM 29 B767-771; MM 32 B776-777).

Newson further testified that after Yowell retired on June 30, 2005, Bondy hired Yowell as consultant to continue contract negotiation work on Amendment 6 of SAIC City Time Contract, Yowell continued reporting directly to Bondy who was supervising his contract negotiation activities. (MM 70 B591-622).

Bondy personally approved Yowell's invoices for his contract consulting services (MM 70 B607-608)

Newson confirmed that OPA gave Yowell excellent performance evaluations and extended his contract for another year. MM 70 B601-606).

Yowell continued his contract negotiation work on behalf of the City until May 2007 when OPA hired full time General Counselor Valerie Himelewski. (3545-2 B1703:9-21; MM 5 B720-721; MM 12 B734-735; GX 750-12 SA52-53)

Had Newsom testified at trial, he would have been able to provide critical testimony, consistent with the testimony he gave to the Government, as described herein, in support of Mr. Mazer's complete defense to the crimes charged against him, based on his senior executive position as OPA Chief Contract Officer (ACCO) and his first-hand knowledge from managing the City Time Contract Procurement Process. (GX 6101 B242-250; MM 4 B718-719; MM 5 B720-721; MM 15 B740-742)

Newson confirmed that every OPA Director/Manager with department responsibilities was required to submit Monthly Status Reports documenting activities performed by each department. Each section would be combined and included into the OPA Agency Monthly Status Report to be submitted to the OPA Board of Directors, Mayor's and Comptroller offices.

Newson testified that as OPA/ACCO he documented every action that was taken by his OPA Contract office in support of the City Time Project including:

- Status of Contract Amendment negotiations with City Time vendors

- Status of Contract Amendment documents preparation and submission to NYC oversight agencies for their review. (MM 83 B1884, 1887-1888, 1893-1994, 1898-1899, 1904-1906, 1909-1916, 1922-1924

- Status on responding to oversight agencies' questions that were asked of OPA during their review process.  (*Id.*)

- Status on Obtaining OMB, Law Department, Mayor's Office of Contract (MoC), Comptroller office and other oversight   agencies approvals, including the Comptroller office contract registration process (*Id.*).

**The evidence reflected in the Contract/ACCO section of the OPA Monthly Status Reports re-affirms that events and decisions that the Government attributed to Mazer "making" or "advocating" for actually took place years and months before Mark Mazer began working on the City Time Project. Decisions on Amendment 6 that the City finalized in January 2006 after Mazer joined the project were based on Amendment 6 negotiations that began in February 2004, 6 months before Mazer began work on the Project.**

Newson also confirmed that Mazer, working on the Project level, did not have any OPA Agency or City-wide authority.

Newson would have confirmed to the jury additional significant facts if he had been called to testify at trial, including:

(1) That "NYC Charter requires that all contracts or agreements between City agencies and vendors be registered by the New York City Comptroller. The Comptroller's Office of Contract Administration is responsible for reviewing all contracts, contract amendments, leases, and concessions between City agencies, and vendors to determine whether they should be registered." (MM 72 B1406; MM 71 B1530-1532).  Mazer had no role in that process.

(2) That "The Procurement Policy Board (PPB) is authorized to promote and put into effect rules governing the procurement of goods, services, and construction by the City of New

York under Chapter 13 of Charter of the City of New York (MM 71 B1369). Mazer had no role in that process.

(3) That NYC Government Contracts including the City Time Agreement (Contract) between OPA and SAIC (developer) were governed by NYC PPB rules (MM 71 B1493-1581; GD 2273 B672).

(4) That as OPA/ACCO, it was Newson's responsibility to ensure that all relevant sections of PPB Rules were followed and complied with in order to secure NYC Oversight agencies approvals (OMB, Law and others) and to obtain NYC Comptroller Contract Office approval and registration. This review, approval and registration process was done for every yearly contract amendment and every sub-contract on the project. (3545-2 B1695:6-15, B1696:1-22, B1700:20-1701:5). Mazer did not and could not have had any role in this.

(5) That Newson maintained official files of Procurement documents submitted to the Comptroller's Office for approval and final registration. (3545-2 B1715:14-23; GD 3734 A1458-1461).

(6) That it was OPA/ACCO's decision under PPB Sec. 2-03 to determine the type of contract which would be most beneficial to the City to be used on the City Time Project. (MM 71 B1504). It was critical for the City to retain management control over the City Time Project and to continue incremental development and implementation of the City Time System at the time when OPA did not have a complete set of business requirements from the remaining seventy-six City agencies. Because of the uncertainty of the scope of work required to complete the system based on each agency's business needs, the software

application needed to be custom-developed piece by piece and agency by agency. Under those circumstances a fixed price contract was impractical and unworkable.

(7) That on June 2nd, 2005, Bondy presented to the OPA Board a "City Time Going Forward Strategy" and obtained Board approval confirming that it would be finalized in Amendment 6 (MM 60 B963; GX 400-4 A898-910). It became apparent to Newson and all 'top level' City Officials that using a fixed-price level of effort type contract was "appropriate when functions and activities can't be fully scoped in advance". It was also understood that " the City would assume risk for delivery of working application" (A 908). It was also understood that "functionality scope/costs will be bound by requirement management. " (A910). The City was responsible for scope management. Only the City knew what functionality needed to be included in the new system. That is why the City relied on Gurjal to manage the most critical areas of the project: including scope management requirements, design and development oversight.

 Newson, Bondy, OPA Board, OMB, Law Department, Mayor's Office of Contracts, Comptroller Contract Office approved this contract strategy to be used on the City Time Project going forward. (GX 750-20 A1201-1202; GX 750-21 A1203-1206)

(8) That the "2003 agreement between the SAIC and OPA that was documented in the NYC Comptroller Audit and that after SAIC completed re-platforming, this package that would be installed at five pilot city agencies at no cost to the City. In exchange, if the City decided to continue the Project, it would do so under a fixed-price-level-of-effort contract. (3574-5 B577; MM 72 B1413) .

(9) Newson confirmed that Mazer was not involved in SAIC Contract negotiations on the City's behalf. Yowell and Bondy represented the City. (MM 70 B591-622).

(10)   Mazer did not participate, contribute or influence NYC Law Department, OMB and the Comptroller's Office in the review and approval process of Amendment 6 or any other Amendment thereafter 7 through 11. (GD 3734 A1458 – 1461).

This is important because the Government, during the trial, maintained that Mazer convinced the City to "amend" the City Time Contract to a fixed price level of effort type contract (A 93-94, 97 ¶16, 19c) that allowed SAIC and Mazer to defraud the City out of nearly $100 million dollars.  Whereas if the City would have selected a Cost-Plus Contract, it would have been more beneficial to the City thus saving 100 million dollars in cost overrun and unseen expenditure.

However, this is simply untrue.  Newson's testimony would have clarified that after review of several types of contracts and after receiving approvals from the OPA Board, Bondy, OMB, Mayor's Office of Contract Newsom certified in his capacity as OPA/ACCO under Section 2-03 that a FPLOE contract would be the most beneficial to the City, and that any other type of contract would not have been appropriate for the Project. (MM 64 B1213-1222; GX 750-20 A1201-1202; GX 750-21 A1203-1206)

Newson's testimony would have proven critical to Mazer's defense because it would have clarified under what premise that OPA/ACCO selected a FPLOE Contract over any other type of contract available to the City and that Mazer had no influence over, or for that matter

any impact or input in the contract negotiation process that ultimately determined that a FPLOE

contract was the most beneficial to the City in going forward with the City Time Project.

Furthermore, Newson would have corroborated Page, Hafeez, Himelewski, Bondy and

Gurjal's testimony that Mazer was not an employee of the City, nor did he have any authority

to act as an agent for the City, in making critical decisions concerning the City Time Project and

that all decisions associated with why the City chose the FPLOE contract were the responsibility

of Newson, Bondy, Page, Yowell, OMB, Comptroller's Office alone and not Mazer.

Newson's testimony would have verified that Yowell as the City representative did not

negotiate the labor hourly rates the City agreed to pay SAIC in the contract based on SAIC's

underlying cost of what profit SAIC or its subcontractors would earn. Newson would further

confirm that OPA and the City were well aware of exactly how much profit SAIC was making

on its labor rates as it related to each subcontractor that was approved by the City.

Furthermore, SAIC provided the City copies of all subcontractor agreements as part of the

OPA review and approval process.  Those agreements included specific hourly labor rates

for different labor categories that SAIC agreed to pay to all the subcontractors. (GX 175-1

B107-119; GD 2719 A1412-1424; MM 71 B1566-1568; MM 58 B868:22-870:3).  This was all

transparent and it was clear that Mazer had nothing to do with it.

The above testimony would have been critical to Mazer's defense because the

Government alleged that the City did not know SAIC's profit margin on labor costs that the

Government claimed were excessive and that constituted defrauding the City out of

approximately $100 million dollars. Newson would have clarified that the City actually did

know this information and, that the actual SAIC labor costs to the City were irrelevant in selecting the contract strategy. Additionally, Mazer had no impact or influence on Newson's decision as pertaining to Newson's responsibility as OPA/ACCO.

Newson's testimony given to the Government further confirms the following facts:

(11)  That under Sec. 2-06 "Prior to Vendor selection, he, as ACCO with OMB Approval, determined that contract prices were fair and reasonable ... (MM 71 B1525). Contract cost estimates including the 5 Year Labor Rate Schedule were reviewed and approved by OMB. (3545-2 B1705:23-1706:11; A1116; GX 400-17 A971-981; GX 400-20 B146-149; MM 72 B1420).

(12)  That under PPB rule Sec. 2-09 he as OPA/ACCO completed 21 steps in the oversight agencies' approval process before he prepared his recommendation for the Award of the City Time Agreement to SAIC (MM 71 B1525-1526).

(13)  That the funding source for the City Time Project was NYC Capital funds (local bond issues) as it was stated on all OMB RCAM Forms (SA3-SA19; GD 3734 A 1458 – 1461).

(14)  That in compliance with PPB Rule 4-01 OPA was required to submit SAIC yearly performance evaluations. Gurjal submitted those performance evaluations on OPA's behalf. For the duration of the Project, SAIC always received fair and good performance evaluations, confirming that SAIC met all its contractual obligations under the City Time Contract. (GD 3800 A1462-1465; GD 3801 B682; MM 71 B1533; 3574-5 B580).

(15)   That by giving good performance evaluations to SAIC, the OPA confirmed that it received quality labor to develop and implement the City Time software at the rate City negotiated.

(16)   That OPA received the working City Time System at the agreed upon price therefore confirming that OPA received the benefit of the bargain negotiated in the City Time Contract and its Amendments. (MM 53 B811-812)

(17)   That as OPA/ACCO he was working with Jim Shangle, who was the Contract Manager and his prime contact on SAIC side. Not Mazer (3545-2 B1719:16-1720:6; MM 5 B720-721; MM 15 B740-742).

(18)   That Hafeez, Malave, Gurjal and Bondy had signatory authority on behalf of OPA to approve Work Orders, Release Orders and Vendors Invoices.  Mazer certainly did not.

(GX 200-1 B120-121; GX 200-51 B122-123; GX 301-24 B124; GX 301-34 B125; GX 301-68 B127; GX 302-39 B128; GX 302-103 B129; GX 303-18 B131; GX 304-36 B133; GX 304-42 B134; GX 305-2 B135).

This is important because Newson's testimony would have been contrary to the Government's theory at trial that it was Mazer who approved requests for payments submitted to the City. (A 96 ¶19 b).  That was completely false.  Newsom and others would have made this clear to the jury.  They certainly already had made it clear in the testimony they gave to the Government.

(19)  That Mazer never had signatory authority and never had binding authority on behalf of OPA or the City.

(20)  That Mazer never signed any contractual documents that would bind OPA or the City. Bondy executed all contracts and their amendments on behalf of the City. (A 808; A 825; A 831; A 845; A 854; A1112).

(21)  That Mazer never submitted funding requests for the Project to OMB. Bondy did. (GX 400 -7 A 911-16; GX 400-14 A 959-70; GX  400-17 A 971-81; GX 400-26 A 982-83; GX400-29 A 1003-1020; GX 400-31 A 1021-1038).

(22)  That Mazer was never given written authorization from the City to be designated as an "Acceptance Official" or as a City Time Project Manager representing the City as required by the Contract that was governing the Project for one to have such a role.  Bondy was designated as "Acceptance Official" and City Time Project Manager for the City as a whole. (A751; GX 6000-2 B221-222; GX 6000-3 B223-237; GX 6000-4 B238-239; GX 6000-5 B240; GX 6000-6 SA110; GX 6197 B255).

(23)  That Spherion Atlantic Enterprises LLC (Spherion) was under contract with NY/OPA to provide Quality Assurance Services (QA) as well as Subject Matter Expert consultant services (SME) on the City Time Project. (3545-2 B1723:3-15; GX 125-1 B71-106).

(24)  That Spherion used sub-contractors on the City Time Project (3545-2 B1721:12-13).

(25)  Mazer was one of the Spherion SME's working on the Project through his own company MS Creative Technologies, Inc. (MS Creative). MS Creative was a sub-contractor to Spherion on the Project and provided SME's staffing. (3545-2; B1739:10-17; GX 150-1 A875-880)

84

(26)   That OPA reviewed and approved the sub-contract between Spherion and MS Creative (3545-2 B1735:14-17; GX 150-1 A875-880; GX 150-3 A881-894).

(27)   That because Mazer was a Spherion SME working on the City Time Project as Spherion sub-contractor, Mazer was considered as independent contractor and not an employee of the City. Newson also confirmed that Mazer's employment terms and conditions were defined and documented in the Spherion Contract with OPA (GX 125-1 Appendix A. Art.4.2 B91) and the Spherion Sub-Contract with MS Creative. (GX 150-1 A 878 Art. 8(a) A 875-893).

(28)   That the Spherion contract was governed by NYC PPB Rules (3545-2 B1707:11-16; GX 125-1 Appendix A. Art.9 B1766-1767).

(29)   That in November 2006, he, (Newson), created a City Time Contract History Summary presentation to the NYC Technology Steering Committee. It included explanations why OMB and OPA in 2002-2004 made many strategic decisions to ensure successful development and installation of City Time System. All those decisions were reviewed, agreed to and approved by all NYC Oversight agencies – and had nothing to do with Mazer.  (GX 451 B155-171; 3545-4 B541-542; Org. Chart MM 73 B1431).

(30)   That as a Director of Management Review and Analysis and Deputy ACCO he (Newsom) was interviewed, along with OPA Executive Director Bondy, OPA Deputy Director Hafeez and Assistant Executive Director Gurjal by Comptroller Auditors within the scope of the Audit (MM 72 B1406).  It is indisputable that Newsom was in charge of and responsible for the Audit.

(31)     That on September 8, 2010, he (Newsom) issued an OPA Official Response to the

referenced Audit Report (MM 72 B1422-1430).

(32)     That his (Newson's) response included a City Time Project history, answers to the

questions about Cost Projection Discrepancies, Project delays and why it took so long to

complete the Project**.  Newsom's response also confirmed that "The City Time System works,**

**works well and performs above expectations" (MM 72 B1428-1429).** [Emphasis added]

        Defense counsel's failure to call Newson to testify is yet another example of Shargel's

fundamentally ineffective assistance of counsel that severely prejudiced Mr. Mazer.  Again, it is

no wonder that the Government did not call Newson as a Government witness.  Based on the

information that he provided the during the Government's investigation, as reflected  in his

3500 material, Newsom would have clearly exonerated Mazer.

        For the Government to put forward its theory of prosecution against Mr. Mazer,

knowing what Newson and the other identified uncalled witnesses had told the Government

under oath before Mr. Mazer's trial was unconscionable.  It clearly constituted outrageous

Government misconduct that denied Mr. Mazer a fair trial, and his associated constitutional

rights.

**SARAH GURJAL**

        Sarah Gurjal was the Assistant Executive Director ("AED") of the OPA, reporting to OPA's

Executive Director, Bondy (3529-18 Part 1 B305:10-11). Gurjal was the manager of the City

Time Project Division of the OPA, and she ran the Project Management Office within the

Division (3529-18 p.1 B308:24-309:7). Ms. Gurjal was personally involved with the City Time Project since its inception in 1995 until its successful completion in June 2011.     (3529-18 p.1 B320:15-321:4, 323:14-16, B324:9-15)

Gurjal was available as a witness and she was initially on the Prosecution's witness list. The Government interviewed and received extensive sworn testimony under oath from Gurjal during the trial investigation and preparation. (See Government Materials 3529-18 part 1 and 2 B304-365; B366-386; 3529-17 B300-303; 3529-4 B256-260; 3529-14 B263-299; 3529-6 B261-262).

The following is clear from a review of the information, including sworn testimony, that Gurjal provided to the Government prior to Mr. Mazer's trial:

Gurjal advised the Government that Brian Newson was the OPA's Agency Chief Contracting Officer ("ACCO"). As OPA/ACCO, his responsibilities included managing the City Time contract,  reviewing and approving its yearly amendments and overseeing this process and the input by  all required NYC Executive oversight agencies (Law, OMB, MOC, Comptroller and many others), as well as ensuring that the Comptroller Office's Final Contract Amendment Registration complied with NYC PPB Rules (GX 750-3 A 1085-1111); (GD 3734 A 1458-1461).

Gurjal also told the Government that she relied on Carol Sutton, the Director of OPA's Budget Office, to coordinate Project budget issues with OMB. (DM 210C 1560-1567; Org Chart MM 73 B1431).

Gurjal said that the OPA was required to produce an agency status report to be submitted to the OPA Board and Mayor's Office on a monthly basis.

In managing the City Time Project division of OPA, Gurjal was responsible for creating and maintaining the City Time project status section of that report. Gurjal confirmed that she provided detailed updates for all tasks performed every month in each of the technical, and non-technical areas of the Project.  These included monthly update reports on software analysis, design, development, training, testing, deployment and service and support.  (MM 82 B1780-1883)

"These included monthly update reports on software analysis, design, development, training, testing, deployment, service and support. (MM 82 B1780-1784, 1787-1791, 1794-1799, B1802-1807, 1820-1827, 1830-1840, 1843-1853, 1856-1867, 1870-1881)

In addition to Project schedule update, the report included monthly status updates on contract amendment negotiations with Project vendors, Steering Committee meetings, Project integration with NYC oversight agencies including OMB, Law, DOITT, Comptroller Offices, Mayor Office of Contracts and many other oversight agencies. (MM 82 B1781, 1788, 1796-1797, 1804-1805, 1824, 1837, 1848, 1864-65, 1879). Monthly financial reporting included complete accounting summaries of All Project budgeted and actual expenses. (MM 82 1785-1786, 1792-1793, 1800-1801, 1808-1809, 1828-1829, 1840-1842, 1854-1855, 1868-1869, 1882-1883). Theses monthly reports confirmed that OMB and the City were aware of and in agreement with OPA CityTime Project spending budget at all times."

Gurjal confirmed that those detailed monthly reports were produced each month from 2000 until Project completion in June 2011, and included detailed documentation for every project technical, contractual, financial and strategic decision that was made on the Citytime Project during that entire time frame. (MM 82 B1780-1883)

The facts documented in those City Time monthly reports would have proven to the Jury that the crimes that the Government accused Mazer of were not committed and could not have been committed by Mazer for several reasons. Among the most basic of those reasons is that most of the relevant decisions and events took place years and months before Mazer even began working on the project in August 2004. Additionally, Mazer had no role in the processes at issue, let alone any authority to affect these processes and therefore could not have committed the crimes charged as a matter of both fact and law. A review of the information Gurjal provided to the Government before Mr. Mazer's trial demonstrates all of this beyond any question. (MM 82 B1780-1883)

These are fundamental reasons, of course, for the Government's failure to call Gurjal as a trial witness, it reflects a complete abrogation of the Government's duty to ensure the integrity of the trial process, and it highlights the fundamental nature of Shargel's Constitutional ineffectiveness and the prejudice flowing from it. And there is much more to this from reading the information Gurjal provided to the Government that only further emphasizes the fact that Mr. Mazer was denied a whole host of his fair trial rights.

Gurjal's trial testimony would have corroborated the testimony given to the Government by Page, Ruppel, Bondy, Hafeez, Newson, Himelewski and Yowell on the subjects with which she was involved, as described in this Petition and it would have confirmed the CityTime Project historical events and City decisions made by the City officials as outlined in the Statement of Facts section of this Petition.

Based on her actual, direct, managerial participation on the City Time Project, Gurjal made clear that "OPA was using the Spherion contract to hire Subject Matter Experts (SME)

89

who would assist the City in analyzing and managing the City Time developers' services and other implementation activities." (MM72 B1404)

Gurjal confirmed further that all SME's worked directly for the OPA, "They are working at our direction. They report to OPA" (3529-18 p.1 B339:1-21). She confirmed that SME's were also referred to as "OPA consultants" (3529-18 p.1 B340:3-7).

Gurjal would have provided critical trial testimony that Mazer was one of those SME's working on the project as a Spherion subcontractor through his own company, MS Creative Technologies, Inc. (GX 125-1 B71-106; GX 150-1 A875-880; GX 150-3 A881-894). **Tellingly, Gurjal would have testified that Mazer was reporting to her since August 2004 and that she personally signed off on Mazer's weekly timesheets (3529-18 p.1 B346:23-347:19;Org Chart MM 73 B1431).**

As Gurjal confirmed in her November 28, 2006 email to Bondy:

"Going forward my area of responsibility will consist of requirements and development of CT T&A (City Time's Time and Attendance System) and WFM (Work Force Management which is City Time for uniform staff), including Scope and Release Management, CM and CCA

Everything else that I currently am responsible for including CMO, Contracts and Budget (WO/RO approvals, invoice review and payment approvals), Test Case, Design and Acceptance Testing, Agency Implementations/Deployment, Training, User Support, Project Communications, and Data Center Operations will be managed by either Mohamed Hafeez or You." (See 3529-18 p.1 B311:17-21; MM 1 B714; Org. Chart MM 73 B1431; MM 74 B1432).

Gurjal also would have testified that as an SME, Mazer was responsible for assisting OPA in the management of its Implementation Support Area, which included: Data Center

90

Operations, Help Desk, Testing, Configuration Data Services, and Implementation Units, all reporting to Gurjal directly. (3529-14 B284:1-7). None of these, of course, are areas in any way related to the charges against Mr. Mazer and he had no involvement or authority in those other areas.

This is significant because Gurjal would have clarified that she, along with Bondy and Hafeez, managed the Project, rather than Mazer [and all other hired consultants/SME's]. Mazer reported to and received his assignments directly from Gurjal from August 2004 until her reassignment on November 28, 2006. Mazer reported to Bondy and Hafeez thereafter. (3529-18 p.1 B346:23-347:19, B348:23-24; GX 6197 B255; Org Charts MM 73 B1431; MM 74 B1432). Most significantly, any and everything Mazer said or wrote that in any way applied to or impacted on the Project went to Gurjal, Hafeez, and/or Bondy, (which one among them depended on the time frame) for review and approval at all times and without exception.

Gurjal's previously quoted email to Bondy also contradicts and exposes as entirely false the Government's allegations that "Mazer was given responsibility to run it [CT Project] for the City " and that "The other [Mazer] was the City's Top Guy " (Tr.4836:9-11 B47:9-11); "Mazer was being paid to run the Project on behalf of the City. He was the City's point man" (Tr.4844:2-4 B48:2-4).

Gurjal's testimony would have unequivocally confirmed the historical facts and events of the City Time Project outlined in the Statement of Facts section of this motion and would have completely undercut the Government's theory of the case as to Mazer and the false testimony, other "evidence" and argument in support of that theory.

91

In addition, based on tangible evidence from information and testimony Gurjal provided to the Government before Mr. Mazer's trial, had she testified at trial, Gurjal would have confirmed the following:

1. The original City Time Project plan was to buy a commercial off-the-shelf (COTS) software application to be installed at 80 City Agencies and used by 160,000 City workers. (3529-18 p.1 B333:14-17)

2. "..while the contract itself and turnkey part was fixed, so if they were to just pick-up the COTS software and without doing anything else just implement the original contract would have covered that". (3529-18 p.1 B347:21-24).

3. "It was a turnkey project as originally it was setup it was a turnkey, which meant the vendor had to do everything. What we were doing was reviewing deliverables. There was a set of deliverables as the contract laid out". (3529-18 p. B329:1-5)

4."..We would review to make sure the City's requirements were met and this would work for the City. That's what we were reviewing."(3529-18p.1 B330:12-14)

5. " I was responsible for basically making sure that the software is built according as per the City requirements. In other words, that the software met the City Specs.

 (3529-18 p.1 B338:6-11)

6. "I'm only developing the software so building ...up to the code" (3529-18 p.1 B349:10-11)

7. " OPA learned that MCI had no intention of doing a fixed priced contract for the City.. it was not something they had planned" (3529-18 p.1 B332:16-18)

8. " MCI assigned that contract to a new company Paradigm IV." "They lost interest in a fixed price contract" (3529-18 p.1 B332:25-333:1)

9. The COTS Application that the City bought had failed to perform properly, as per OPA's expectation. Gurjal conducted an analysis to "define the gap between that software and what the City's requirements were... The gap was so huge once the study was done...once requirements gathering was actually done in more detail" (3529-18 p.1 B333:19-334:1)

10. Gurjal confirmed that initially the City picked five agencies to be used as a "Pilot". OPA and Gurjal had initial interactions with those "Pilot" agencies. (3529-18 p.1 B334:3-9)

11. Gurjal testifies that OPA "... brought as part of the process and the analysis and the gathering of the requirements we brought similar agencies into the room and we did what we called focused analytical sessions to gather their requirements. We facilitated that" (3529-18 p.1 B334:10-16)

12. "..they determined that the COTS software, the commercial off the shelf software will not, in fact [meet the City's business requirements]..the gap was growing...even as the agencies came in and told us their requirements what the software did and what the City really needed.. because you're now trying to meet 80 different agencies and their practices all with one piece of software and that software didn't do everything that the agencies did." " So the gap was growing then at some point it was determined that the COTS software does not cut it, and it will need to be a more customized piece of software meaning...we'd have to build this ourselves if we need to have something working." "I think this decision ..not going with COTS software was done at that point. (3529-18 p.1 B334:18-335:14)

13. "Paradigm 4 was a very small company and who probably would not have been able to do custom software"  (3529-18 p.1 B335:16-18)

14. Gurjal confirmed that Paradigm 4 "gave the contract eventually to SAIC" From that point on SAIC assumed contractual obligations under the original City Time Agreement. (3529-18 p.1 B336:13).

Labor Rates/Cost Projection for City Time Project

Gurjal would have clarified to the Jury how the OPA utilized Labor Rate table, based on her direct participation in that process – and she would have demonstrated that the Government's presentation on these issues was entirely wrong.

The following are some specifics in this area:

15: "... the original contract had rates in it" (3529-18 p.1 B350:5; GD 2273 A1409). "... the original contract had the COTS software, remember, where we are buying COTS software. We were to identify the gaps. That was unknown. And then we had... because the gap was unknown nobody… none of the vendors will commit to build what's unknown for you on a fixed price ..because it's totally unknown to them. They don't know what it is, right? So, because of that there was a rate [table schedule attached to the contract]". "This is what we'll charge you for whatever new things that have to be built". "So, it was a rate in the old one". "While the Contract itself and the turnkey part was fixed, so if they were just pick up the COTS software and without doing anything else just implemented it that original contract would have covered that. Now since there's a gap and the gap is unknown there's also ...was a rate sheet in original contract". (3529-18 p.1 B350:10-351:1)

16. "... what has happened is the gap became larger and larger and larger… as we learned about the City requirements in more details than when we did the original RFP, right..as we went

along through that's not the rates we used today...", "... we had several amendments after that

.. and those subsequent Amendments actually revised those rates." (3529-18 p.1 B351:3-16)

17. Gurjal also testified to the Government that Labor Rates were negotiated by Edwin Yowell

and managed by an OPA employee in the Contract group and Mitch Goldstein (3529-18 p.1

B351:17-352:15)  Mazer had nothing to do with it.

Gurjal's testimony would have demonstrated without question that the Government's

trial allegations that Mazer was negotiating and establishing Labor Rates for the Project were

absolutely false.

Additionally, Gurjal would have testified at trial that OMB approval funding was

provided to rent a dedicated City Time Project space to accommodate new staff that OPA were

planning to bring on board to help OPA to expand the City Time System to the remaining of the

City agencies.

Specifically, Gurjal told the Government:

"...we were not staffed up, to manage a project of this size..."

"the City had asked us ...not to bring on City Employees as they saw that as being an overhead"

"In the long run it's a project cost that they wanted to just take and keep it... Instead of

incurring long-term personnel services cost."  (3529-14 B274:10-275:2)

"...It was after the move...the budget for the project had increased...Generally... Because when

City Time started it was underfunded..."

"In 2005 the Budget did increase... the [OPA and OMB] made projections over the next 5

years... It was substantial... That also meant that more money was available for resources to be

brought on board and Deployment was supposed to move really fast...there were all those

expectations that were there that went with 5-year outlay."

(3529-14 B286:18-287:12; MM 72 B1420).

     Gurjal's testimony in this area would have totally destroyed as false the Government's

main charge against Mazer that the City bought the COTS application for $63 million to be

installed in 80 agencies and that something Mazer did changed that and led to or created a

fraud that "had cost the City approximately $700 million". (A 86)  The Project's plan was

misguided from the start, the officials identified by Gurjal and others recognized them and

made changes costing exponentially more for a very different kind of project than originally

anticipated, and even very different from the first alternative picked, and these decisions long

pre-dated Mazer's involvement in any way with the City Time Project and had nothing

whatsoever to do with him.  That is about as basic as it gets in this case.  The entire prosecution

theory as to Mazer was a lie from start to finish and that is unconscionable.  It hurt Mazer even

worse to have Counsel who was ineffective in preparing to defend the case against him and in

providing his defense at trial and beyond.

     Gurjal's testimony and other information she provided to the Government also directly

contradict the Government's allegations that "In 2005 and 2006 .... Mazer acted in cohorts with

Denault to convince the City that it needed to "amend" the City Time contract to an FPLOE

contract.  (A 93-94, 97  ¶16, 19c).

     The irrefutable facts presented by Gurjal and also documented in the NYC Comptroller

Financial Audit establish beyond dispute that, "... in 2003 according to OPA officials the

developer [SAIC] agreed to re-platform the package ["R1B"] at no cost [to the City]. However, in

exchange the City would restructure the developer's contract to a 'level-of-effort'" (MM 72 B1413).

The aforementioned would have confirmed to the Jury that the City's restructuring of the SAIC contract to a Level-Of-Effort agreement came not because Mazer convinced the City it needed to amend the City Time contract, but rather because it was in accordance with the already agreed upon 2003 agreement with SAIC, after completing its development and installation of a prototype software at five pilot agencies. Gurjal, in her interview with Comptroller Auditors and the Government investigators, did not mention Mazer's name as a person that was advocating or involved in contract negotiation and approval processes, nor as someone who advised the City and OPA in that effort. And of course, as explained above, that makes perfect sense since Mark Mazer was not in any way, shape, or form involved with the Project at the time all of the big decisions were made to change the very nature, size, and scope of the Project from an off-the shelf product which never could have worked to the next iterations which bore little relationship to the original and which cost exponentially more by definition.

Gurjal testified to the Government and otherwise confirmed that top NYC Officials from OMB, OPA Board of Directors, Law Department, Comptroller and the Mayor's Office decided that City should move forward with "City-wide implementation of the City Time through a series of deployment releases" (A 1088). To implement the City's objective, OMB approved the "City Time Incremental Staffing Plan" which clearly identified for OPA the number of approved positions, Labor Categories, budgeted hours and when positions were authorized to be filled (GX 750-17 A1143-1177). "Attachment B was complete the Staffing Plan from 4/1/2006 –

3/21/2009 (A 1170-1172), and Amendment 7 also called for increase in staffing levels to meet the Project schedule. (GX 750-26 A1207-1209).

Gurjal's testimony above would have completely put the lie to the Government's accusation at trial that Mazer had anything to do with its assertion in the indictment that "Following the 2006 Contract Amendment, staffing on the City Time Project expanded dramatically." (A 94 ¶17).

Gurjal's testimony would have confirmed that OPA and OMB contemplated Project strategy changes that meant significant expansion of the Project scope, requiring more time and more money for additional team of capable technical consultants.

Gurjal also confirmed that the City paid SAIC the same fixed hourly rates for consultants regardless of whether the work was performed by an SAIC employee, consultants hired by sub-contractor Technodyne or Ariel Partners, or sub-sub-contractors like DAS.

Specifically Gurjal advised the Government of the following:

1. "… SAIC consultants could be really people on hire for SAIC as well as SAIC employee who is from our point of view they are all SAIC consultants you know. " (3529-18 p.2 B380:19-21).

2. "This is a conversation I've had with Joel Bondy.  When we get our consultants eventually, apparently there are so many levels of contractors and I think that's the way the market is and the world works, but from City's point of view… from my point of view if we're paying X dollars for consultant and the consultant eventually gets only, I don't know, some very small percentage of that money. "(3529-18 p.2; B381:20-382:1; GX 6100 B241)

"...I was told, it's none of your business what they make. Those are questions we don't ask " ..."it's up to us to get the quality of the work". (3529-18 p.2 B382:16-21).

Additionally, [Gurjal] performed yearly SAIC Performance Evaluations and consistently expressed satisfaction with SAIC's performance on the Project and the quality of work completed (GX 3800 A1462-1465; GX 3801 B682). Why is this important? It clearly proves that Mazer was not the 'top guy' managing the Project for the City as the Government falsely accused. There were layers of direction, review, and evaluation between Mazer and the City and then recommendations, suggestions, and policy decisions were made a couple of levels removed from Mazer. Mazer had no control over Project priorities. Mazer received his work assignments from OPA's upper management staff such as Bondy, Hafeez and Gurjal. He was simply following their orders.[4]

Gurjal would have testified that Mazer began reporting to Bondy and Hafeez on the Project-level after November 28th, 2006 (3529-18 p.1 B348:23-24; MM 1 B714) and that Mazer was looking after hardware, operations and at some point, implementation (which was the actual roll-out of the software to the agencies). (3529-18 p.1 B349:3-8). Also, Mazer only had supervisor level authority at the Project-level where his responsibilities were limited to evaluating the completeness and accuracy of work performed by consultants under his supervision and to adhere to City Time project standards of deployment. (GX 6195 SA111-112; GX 750-14 SA52-62; Tr.2695:18-2697:20 B1687:18-1689:20; GX 6194 B251-252; GX 6196 B253-

---

[4] As previously noted on November 28, 2006, Bondy streamlined the City Time Project management structure by removing administrative units and responsibilities from Gurjal's supervision, thus consolidating them under OPA Deputy Executive Director Mohamed Hafeez's Management. (See Exhibit MM1 B714)

254; MM 74 B1432).  Mazer's only role at any time was an operational one and not at all what was attributed to him at trial – either in terms of authority or actions.

Gurjal's testimony would have confirmed that Mazer did not have the authority to approve project expenditures regardless of cost. (DM 3 A1508 – 09).

Gurjal would have confirmed to the Jury that Mazer had to request Gurjal's authorization if additional funding was required to complete specific project tasks and she would have to review and approve any such additional funding, without exception, even on the most micro level.

Consider the following example:  On June 28th, 2006 Mazer emailed to Gurjal:

Mazer:  "Sarah, as we discussed earlier today, I am requesting your authorization for additional funds to complete DDC installation"

Gurjal:  "Mark, Yes, please go ahead if this after-hours work needed to be done".

Gurjal also added Malave to her funding approval email because Malave was responsible for tracking and monitoring the City Time Project expenses and was one of the OPA Official signatories on the OPA invoices review and payment approvals. Also, Gurjal added Bondy to her email because Bondy was City Time Project Manager and required to be held in the loop on any Project changes that impacted cost and schedule. (GX1418 A 1292).

Gurjal's trial testimony would have been directly contrary to the Government's theory that it was Mazer who approved requests for payments submitted to the City (A 96. ¶19(b)). That was complete nonsense and the Government well knew it.

Gurjal had first-hand knowledge that this was not true and she had explained the process in detail to the Government before Mazer's trial.  Moreover, the Government knew

from Gurjal and others, as well as from the documents themselves, that all invoice reviews and payment authorizations required multiple level signatures of OPA officials (specifically they required three signatures by Alexander Malave, Gurjal and Bondy) before payment authorization could be processed. (GX 200-1 B120-121; GX 200-51 B122-123; GX 301-24 B124; GX 301-52 B126; GX 301-68 B127; GX 302-39 B128).

After the November 28, 2006 reorganization (described previously), the OPA Deputy Executive Director Mohammed Hafeez assumed Gurjal's responsibilities in reviewing invoices and approving requests for payment. From that point forward OPA required two signatures, by Malave and Hafeez, to approve payment authorizations submitted to the City. (DM 303-16 A1585-1586; GX 301-34 B125; GX 302-103 B129; GX 303-18 B131; GX 304-36 B133; GX 304-42 B134; GX 305-2 B135). Mazer was never anywhere near being involved with that process; nor did he have any authority to be involved.

If Gurjal had been called to testify at trial she would have made clear the fact that only Senior City Managers like Bondy, Gurjal, Hafeez and Malave were in the position to make binding decisions on behalf of the City. A consultant like Mazer never was and never would have been in such a position, with any such authority.

Consider the following: On April 4, 2006, SAIC's Jim Shangle in his email to Bondy requested Bondy to confirm the extent of Mazer's authority on the City Time Project:

Shangle: "Please provide your concurrence that Mark Mazer is authorized to approve on OPA's behalf the purchase of PMO support center Facility build-put operations infrastructure not previously identified in SAIC work order…

Bondy, in his response made it clear that Mazer did not have authority to act on behalf of the City and OPA, confirming that Mazer was not an Agent of the OPA and definitely not the City's agent:

Bondy:  "There will be an approval process that will include the City's Project Manager for changes like this. And this is not it. In the future, please include Sarah (Gurjal) in any such exchange we will get back to you. (DM 2 A 1501).

Bondy's response confirmed that Mazer did not have authority to approve Work Order changes on OPA's behalf and definitely no authority to approve any project changes on behalf of the City.  Gurjal also confirmed that Mazer was not a City Time Project manager representing the City and OPA Bondy was the City's Official Project Manager representing the City (A 751) (that, of course, is why SAIC emailed Bondy). Bondy had written binding authority to represent the City and on the City's behalf to confirm Mazer's authority to SAIC. Bondy and Gurjal had authority to approve changes (DM 2 A1501); Mazer did not. Additionally, Bondy clarified to SAIC that Mazer had only limited Project authority, only representing OPA on the Project and not City-wide authority to represent the City or otherwise be an agent of the City of New York, specifically:

Bondy:  "If your question regarding Mark Mazer you are asking whether he is representing OPA in day to day management of the build-out project, the answer is "Yes". Regarding the approval of the new items that are currently outside of budget, my previous answer stands. "(GX 1465 A1304).

Gurjal also advised the Government that Mazer had only limited City Time Project responsibilities - to carry-out OPA decisions and work under OPA management supervision, as described in Bondy's response to SAIC (above). Specifically, Gurjal would have confirmed that

Mazer never attended OMB monthly planning status meetings to represent the Project. Only

Bondy, Gurjal and Hafeez attended them (GX 750-26 A 1207 – 09).

Mazer never attended OPA Board meetings - only Bondy did (as the City Time

ProjectManager) and reported to the Board on behalf of the Project. Gurjal did not have

authority to attend Board meetings either. Bondy was accompanied by his Executive Deputies

Yowell and Hafeez. (OPA Board Meeting Minutes Exhibit).  Mazer never attended CT Steering

committee meetings (DM 132 A 1521-23). Mazer never attended NYC Executive oversight

agencies Policy meetings.

If called as a trial witness, Gurjal would have accurately described the limited

managerial authority that Mazer had as Implementation Manager on the City Time Project only,

and no City –wide authority at all to represent OPA or the City (2007 Org Chart).  No reasonable

Juror could have accepted the Government's unsupported and false allegations regarding

Mazer's role and authority or that Mazer was the City Time Project Manager for the City and

responsible to "run the Project on the City's behalf." "As the City's top guy" (Tr.4836:9-11

B47:9-11); or the "City point-man" (Tr.4844:2-4 B48:2-4) and "an agent of the City of New York

with authorities to approve request(s) for payments submitted to the City" (A 96 ¶19(b)) if they

had heard Gurjal's testimony, consistent to what she already had told the Government under

oath, well before the Government knowingly presented this false picture in order to convict Mr.

Mazer.  A reasonable Juror never could have reconciled the Government claims against Mazer

with the actual facts from Gurjal, including, but not limited to the facts that:  Mazer never

attended NYC's Executive oversight meetings, never attended OMB Planning meetings to

represent the Project, and never attended OPA Board Meetings. Mazer did not approve any payment requests submitted to the City, and when SAIC questioned Body to clarify Mazer's Project authority, Bondy clearly stated to SAIC that Mazer did not have any authority to approve funding and represent OPA and/or the City.   Mazer had limited authority to implement OPA decisions on the Project-level only, according to Bondy, Gurjal and Hafeez.  This all goes to and destroys the entire heart of the Government's case; but the Jury never heard it. The Government sat on it and proceeded with a theory and accusations it knew were not true and Shargel did nothing to demonstrate that it was all false, notwithstanding the availability of these uncalled witnesses to make the points from actual first-hand experience and knowledge and personal participation in the events and processes at issue.

The Government would not have been able to discredit Gurjal's testimony or the supporting documentary evidence on these fundamental issues, including Bondy's emails that would have explicitly exposed as false the Government's "evidence" at trial on fundamental questions of authority and role for Mazer, which the Government presented from low-level City employee(s) and Project consultants who were not in any position of authority to make managerial decisions on NYC oversight agencies level or to know the actual processes and roles, the actual limitations imposed, the multi-layers involved for review and authorization and the hierarchy through which the decisions at issue had to go before any implementation.

In short, Gurjal's trial testimony would have effectively undermined the very premise of the Government's fraud case against Mazer.

At trial, Gurjal could have gone well beyond these fundamental issues.  As the Government would have to acknowledge, Gurjal, along with Bondy, Hafeez, Doria, Sutton and

Blunt, fully understood the relationship between Mazer and of the staffing firms (DAS) retained by Technodyne. To the extent Mazer had a financial interest in DAS, of course all top executives OPA members fully understood and accepted it as a normal non-conflicting business arrangement.

Gurjal's testimony would have confirmed that she and the other leaders did not believe this to be a conflict of interest because Mazer did not have NYC/OPA decision-making authority. Therefore, Mazer was allowed to continue to work on the Project until his contract was completed in 1/15/2010.

Moreover, under the "Doctrine of Tacit Acceptance" explained by the Second Circuit in *Shah v. Meeker*, 435 F. 3d 244, 252 (2d Cir. 2005)("If the plaintiff has been furnished with the means of knowledge and had not prevented from using them he cannot say that he has been deceived by misrepresentation of the other party. "), since Gurjal, Bondy, Hafeez, Doria, Sutton, Blunt, all had full knowledge of Mazer's relationship to DAS, the Government cannot later claim that Mazer defrauded the City where all top executives knew of his financial interest in DAS. By any measure, Gurjal's testimony (and the other identified uncalled witnesses) would have been a vitally important part of any meaningful defense strategy in this case and would have provided an absolute defense to the fraud charges brought against Mazer.

The failure by Shargel to call Gurjal and the other identified uncalled witnesses at trial is clear ineffective assistance of Counsel with devastating prejudice as the result. Additionally, it was unconscionable for the Government to put forward "evidence" that could never be reconciled with the true evidence the Government was sitting on from Gurjal and the others who ran the Project and had actual authority.

**Edwin Yowell**

From 1995 until June 30, 2005, Edwin Yowell was the Deputy Executive Director ("DED") of the OPA. He reported directly to the OPA Executive Director, Richard Valcich. After Valcich retired in April 2004, Yowell reported to the new Executive Director, Joel Bondy (GX 6000-4 B238-239; B1701:11-19).

The Government did not produce any 3500 materials concerning Yowell. However, there is information about Yowell that can readily be garnered from other sources. Yowell was responsible for representing the City on the City Time Project together with Valcich and Bondy in contract negotiations with SAIC (GX 6000-6 SA110; DM6 B683-692). Together with Valcich he negotiated the initial contract and Amendments 1, 2, 3, 4 and 5 to the City Time Contract. (MM 39 B793).

Yowell's testimony would have corroborated the testimony Page, Hafeez, Gurjal, Newson, Himelewski and Bondy, previously described in this petition, based on Yowell's personal experience in the relevant events.

Yowell would have confirmed at trial that "in 2003 the study was conducted" and results "revealed that technology used since 2000 was unable to meet the needs of the City." "Subsequently the developer [SAIC] with approval by the OPA began to design and build a new application based on a different platform. According to OPA officials, the developer [SAIC]

agreed to re-platform the package at no cost [to the City]. However, in exchange, the City would restructure the developer's contract to a "level-of-effort" contract.[5] (MM 72 B1413)

This agreement (MM 72 B1413) was documented in Amendment 5, in December 2003 (GX 100-6 A798-806).

Yowell began direct negotiations with SAIC on Amendment 6 in February 2004, two months after the City executed Amendment 5 (DM 6 B683-692). These negotiations were dependent on SAIC's successful completion of the development of the new re-platformed pilot program that was to be installed in five agencies as documented in Amendment 5 (GX 100-6 A799 Art. 3.8 – 3.9, 41).

Yowell also would have testified at trial that he and Bondy provided regular updates to Page and Ruppel on the Amendment 6 negotiations with SAIC and Bondy was in regular communication back. Specifically, Bondy stated in his Aug 13, 2004 report email "I plan to continue to negotiate with SAIC the specifics of this change in direction including a management plan and more specific estimate of the required staffing levels. I have already directed them to utilize existing hardware to support the pilot phase to better understand system requirements before we incur any additional expenses." (GX 6000-6 SA110).

---

[5] FN1 Again, a "level-of-effort" contract is used to define the amount of work to be performed within a period of time and is measured in man days or man hours per day/week/month]

Yowell would have confirmed that Bondy, in his capacity as the NYC Official responsible for managing the City Time Project for the City, on June 27th, 2004 gave an interview to the NY Post about City Time Project confirming the following facts:

1. "The price tag is now about $100 million dollars".

2. That he (Bondy) was overseeing the project for the City.

3. That there were delays in 2000 when the decision was made to shift to a web-based technology." (GX 6000-5 B240)

4. "There's no off-the-shelf product that can do what this system needs to…". We are in the process of learning what it's going to take to implement this…"

Before the City agreed to proceed with the new City Time Project, the City needed to determine what would be the most beneficial contracting strategy that would allow the City to do incremental development and implementation of the City Time System, recognizing that OPA did not have a complete set of functional requirements from the remaining seventy-six agencies that needed to be included in the new CT System.

Yowell would have testified that OPA and OMB drafted the "City Time Going Forward Contracting Strategy" which Bondy and Yowell presented to the OPA Board for approval. (GX 400-4 A898-910); (MM 60 B963; MM 76 B657).

This document clearly outlined that the City would be utilizing a fixed priced, fixed level of effort type of contract because it was "appropriate when the activities [software requirements for each agency] can't be fully scoped in advance, Delivery Risk assumed by the City (A908)."

"Functionality scope/cost will be bound by requirements management (A910)"

108

Yowell also would have confirmed that OPA was relying on Sarah Gurjal, Assistant Executive Director of OPA, to manage those critical areas of the project including: Requirements, Scope Management, Development Oversight and Project Management on behalf of the City (Org. Charts MM 73 B1431; MM 74 B1432).

Yowell would have testified that with Page's and the OPA Board's consent and subsequently with approval by OMB, OPA/ACCO, Mayor Office of Contracts (MOC), Law Department and other NYC oversight agencies, this contracting strategy was adopted to be used on the City Time project going forward, thereby increasing the costs dramatically, following the realization by all relevant parties that the initial "off-the-shelf" strategy could never work for this Project.

Following his retirement in July, 2005, Yowell was hired by the City as a consultant to continue working directly for Bondy specifically to assist OPA in concluding the Amendment 6 contract negotiations with SAIC and other procurement matters. MM 70 B591-622; MM 28 B764-766; MM B767-771).

Yowell would have testified that:

(1)  Together with Bondy he negotiated specific hourly rates for different "Labor categories."

(2)  After OMB reviewed and approved the "Labor Rate Table", it was appended to Amendment 6 (A1116)

(3)  He, Bondy and the City did not negotiate Labor Hourly Rates they agreed to pay SAIC on the basis of SAIC's underlying costs or what profit SAIC and its sub-contractors were earning.

(4)  The City was aware of and approved SAIC's profit margin on the Labor Rates. The City approved each of SAIC's sub-contractors on the City Time Project. As part of the OPA review

and approval process SAIC provided copies of their sub-contractors' agreements. Those

agreements included specific fixed price hourly labor rates for different "Labor Categories"

that SAIC agreed to pay to their sub-contractors, all of which was approved by the City after

full disclosure (GX 175-1 B107-119; GD 2719 A1412-1424; MM 71 B1566-1568).

(5) The City paid SAIC the same fixed-price hourly rates for consultants regardless of whether

the work was performed by an SAIC employee, a consultant hired by sub-contractors

Technodyne or Ariel Partners or sub-sub-contractors like DAS and many other companies.

(6) The City received agreed-upon consultant services from SAIC at the agreed upon price

confirming that the City received the benefit of its bargain (working City Time System).

(MM 53 B811-812)

(7) The City Time Agreement did not include provisions that limited SAIC's mark-up or required

SAIC to pass any savings to the City that it gained by having sub-contractors perform work

on the contract at a cheaper price. This agreement was consistent with other large IT

service contracts with the City and was completely acceptable to the City, with full

knowledge and without protest.

As noted earlier, it is well documented that Mazer did not participate in any contract

negotiation with the City or SAIC nor did he attend any meetings that Yowell and Bondy had

with OMB in discussing what contract strategy that the City should entertain with SAIC once

the "R1B" pilot program was successfully completed. Yowell, of course, would have had to

acknowledge this.

Mr. Mazer only recently discovered that Yowell, like the other uncalled witnesses

identified in this petition, was interviewed several times by federal agents during the course of

the Government's investigation.  However, unlike with the others, none of Yowell's statements (which had to contain both exculpatory and impeachment material) nor any 3500 material for Yowell was turned over to the defense.  Mr. Mazer contends that the failure to produce Yowell's statements constituted a violation of the Government's *Brady/Giglio/*Kyles obligations.  Mr. Mazer respectfully requests that the Court order the Government to provide all such material to Mr. Mazer at once.

Habeas Rule 6(a) "'Where specific allegations before the Court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief, it is the duty of the Court to provide the necessary facilities and procedures for an adequate inquiry.'" *Brady v. Gramley*, 520 U.S. 899, 908-09 (1997) (ellipsis in original; quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).  Rule 6(a) of the Rules Governing Section 2255 Proceedings provides. " A Judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." The question of "good cause" turns on an analysis of the circumstances surrounding a petitioner's claim. *Drake v. Portuondo*, 321 F. 3d 338, 345-46 (2d Cir. 2003) (where prosecutorial knowledge or perjured testimony was at issue, "sufficient basis" to remand existed in light of prosecution's "covert and evasive" behavior). Upon satisfaction of these standards, an explanation from the Government as to discrepancies is in order. See *Pizzuti v. United States*, 809 F. Supp. 2d 164, 190-91 (S.D.N.Y 2001).  We know from the testimony of every single other person situated similarly to Yowell, which, as demonstrated, has been filled with material that would have supported Mr. Mazer's defense at trial and which would have completely undercut the prosecution's case as to Mr. Mazer, that

111

Yowell's statements had to include material exculpatory and impeachment information for Mr.

Mazer, and they must be provided under the applicable standard.

Therefore, all relevant material as it relates to interviews Yowell gave to Federal

authorities should be turned over to Mazer immediately.

### WARREN RUPPEL

Warren Ruppel ("Ruppel") was NYC's Assistant Comptroller for Accounting and a

member of the Office of Payroll Administration ("OPA") Board of Directors representing the

NYC Comptroller on that Board. OPA was overseen by two members of the Board. Mark Page

represented the Mayor and Ruppel represented the Comptroller.

Ruppel was available as a witness to testify at trial and he was initially on the

prosecution witness list. During its investigation in this case, the Government interviewed and

received sworn testimony from Ruppel (MM 76; B623-661).

Based on the sworn testimony and other information Ruppel gave to the Government, it

is clear beyond any question that Ruppel would have been an invaluable trial witness for Mr.

Mazer's defense at trial.

In addition to being a vitally important fact witness, Ruppel would have made a perfect

expert witness for Mr. Mazer.  As argued in a later section of this Addendum, Mr. Mazer

contends that Shargel was ineffective for his failure not only to call key fact witnesses, but also

for his failure to call expert witnesses.  One of the vital areas for an expert witness in this case

would have been to explain to the jury the complicated processes attending the City Time

contract and amendments and the multi-layered review, authorization, and approval process,

along with an explanation of the limited authority Mr. Mazer had in that process.  Ruppel would

been the perfect expert witness, given intimate familiarity with the City's contracting processes in general and with this one in particular.

As a witness at Mr. Mazer's trial, Ruppel would have provided testimony on the subjects described below and his testimony would have been as described below, based directly on his earlier sworn testimony:

Ruppel's trial testimony would have presented critical facts explaining to the Jury the specific details of the City Time Project Timeline of events since its inception in 1995 until Ruppel's departure from the City at the end of 2005.

Ruppel's trial testimony would have corroborated Page, Bondy, Newson, Gurjal, Himelewski and Yowell's testimony as described in the sections of this petition related to each, confirming the origins of the Project, its original off the shelf product agenda, and the evolution from there, none of which had anything whatsoever with Mr. Mazer and most of which even pre-dated his appearance in any capacity. Ruppel would have set out the time line, described the historical events, and explained the decisions that were made by City officials exactly as set out in the Statement of Facts section of this petition.

Ruppel's testimony to the Government confirmed that the Comptroller created the City Time Steering Committee during 2002 – 2003 when it seemed that the City Time Project was going over budget. The Comptroller's Office had a technology representative on the City Time Steering Committee. The Committee was made up of Technology experts from various Agencies. (MM 76 B623-624)

Ruppel would have testified at trial that OPA was the Agency responsible for managing the City Time Project on behalf of the City. As noted earlier, OPA's Executive Director from 1995

till April 2004 was Richard Valcich. Starting in April 2004, it was Joel Bondy. They were the NYC "Acceptance Official" and the City Time Project Manager for the City as a whole reporting to the OPA Board of Directors. (A751; GX 6000-4 B238-239).

(1) Ruppel would have confirmed that Valcich and Bondy were assisted by Deputy Executive Director Edwin Yowell, and Sarah Gurjal, the Assistant Executive Director who was in charge of the City Time Project Division within the OPA Agency.

(2) Ruppel interacted with Rich Valcich, the OPA Executive Director and Ed Yowell, the OPA Deputy Executive Director during monthly Board Meetings. (B 76 B624).

(3) Ruppel was "comfortable hiring him [Bondy] to run OPA since he had a technical background. …Mark Page had more interaction with Bondy." (B 76 B624-625, Exhibit 5)

(4) Ruppel confirmed to the Government that "…in 2001, Valcich reported that pilot implementation would cost $47 million. It was not very alarming; budget (OMB) was unaware since the pilot cost that much…. According to Ruppel the increased budget was due to the infrastructure…" (MM 76 B624, Exhibit 4)

(5) Ruppel confirmed to the Government that the Comptroller approved Amendment 4, which increased the Budget to $110 million dollars. The Steering Committee was involved at this point. Several individuals reviewed the Budget increase, including individuals from OMB and Consultants hired from Gartner. Ruppel stated that everyone was uncomfortable that the Project began to go over budget. He felt the Project had to continue. (MM 76 B625, Exhibit 6). This very clearly and specifically shows the multi-layered review and approval process and the many people aware of and involved in the decision to approve a

dramatically increased Budget, for reasons having nothing to do with Mr. Mazer and without his involvement whatsoever. The Government badly misled this Court and the Jury in its whole theory of the case as to Mr. Mazer and the testimony Ruppel and the uncalled witnesses gave to the Government long before Mr. Mazer's trial shows unequivocally that the Government well knew its accusations against Mr. Mazer were a scam.

(6) Ruppel stated that frustration was building up with the delay and increased cost. There was too much money spent and there was nothing to show for it; but he didn't think it made sense to pull out from this project after so much money had been invested (MM 76 B625, Exhibit 7).

Ruppel would have explained in detail at trial that the initial strategy of investing $63 million in commercially off-the-shelf software was unrealistic to meet the City's business objectives; therefore, the decision was made to create a custom-designed application software to accommodate 80 City agencies' time-keeping needs.

Ruppel would have confirmed at trial that OMB and the Comptroller's Office agreed with Gartner's 2001 recommendation that the City should proceed with a new multi-phased approach to implement the system, including the development of a pilot program that could be deployed in a limited number of City agencies. (A1128).

Ruppel would have testified at trial that with the OPA Board's express approval, OPA and SAIC negotiated new contract terms, which were laid out in Amendment 3 in April 2002 (GX 100-4 A742-749). This testimony by Ruppel would have been critical to Mazer's defense

because the prior fixed-price contract was the model under the theory of an off-the-shelf system. The shift away from fixed-price Project actually started early in 2002 with Amendment 3, where the structure of City Time was switched to a custom model/platform from off the shelf. This was long before Mazer was hired by the City. Ruppel would have further clarified that the beginning of the shift from "fixed-price" to "fixed-price, level of effort" (FPLOE) started at that time [in 2002 Amendment 3] (3531-3 B402). **Ruppel's detailed testimony, based on his first-hand, direct involvement, would have completely undercut the Government's case in chief as to Mazer, by proving that Mazer could not have corruptly influenced the City by controlling the terms of the FPLOE contract when he had not yet even been hired when the FPLOE contract was initially negotiated. (MM 72 B1413)**

Ruppel would have further explained to the Jury that, based on Gartner's recommendation that the City change to a FPLOE contract, as opposed to fixed-price, authorizing and funding the five pilot programs was a necessary step that allowed the City to make changes to the scope of the work under the City Time contact (GX 100-5; A. 750-97, Art. 27, 41). This would enable the City to make demands of SAIC to perform work that was not originally contemplated under the original contract's terms to not exceed budget and enable SAIC to adjust the price based on any extra work done. (A 760, Art. 27.2 (a)).

(7) Ruppel advised the Government that the top priority was to get City Time to work. He does not believe Bondy entered the Project and asked for money or anything else. The Board wanted Bondy's assistance in how to get things done in an effective manner. (MM 76 B625, Exhibit 8).

(8) Ruppel confirmed that Bondy stated there wouldn't be any more amendments, but in March he added an amendment. Ruppel said, "He would be surprised if it specifically stated a dollar amount it did not." (MM 76 B625, Exhibit 9).

(9) Ruppel stated there was a sense of frustration. They wanted to get it done. There weren't any discussions on hiring new contractors on the Project.  Bondy's strategy must have involved the Steering Committee; they were relying on his vision. Ruppel added he never heard anything bad about Bondy and was anxious to get his skills on the Project. Ruppel stated the problems with the Project were mostly technological and even political. (MM 76 B625, Exhibit 10).

(10) Ruppel confirmed that he was receiving project updates from Bondy. (GX 6000-2 B221-222; GX 6000-5 B240; GX 6000-6 SA110).

(11) Ruppel also would have confirmed at trial that, in his capacity as an OPA Board member, he approved the authorization for Bondy to negotiate a consulting contract with Edwin Yowell to assist the OPA in preparation of the solicitation and evaluation of proposals, the negotiation of agreements, and the preparation of amendments of those agreements… Yowell would be working under the direction of Agency head [Bondy]. (B592; MM 60 B963-986).

Ruppel would have further testified at trial that Yowell was responsible for representing the City together with Valcich and Bondy in contract negotiations with SAIC (GX 6000-6 SA110;

DM 6 B683-692) and together with Valcich he negotiated the initial contract and Amendments 1, 2, 3, 4 and 5 to the City Time Contract.

Ruppel also confirmed to the Government that "in 2003 the study was conducted" and results "revealed that technology used since 2000 was unable to meet the needs of the City." "Subsequently the developer [SAIC] with approval of the OPA began to design and build a new application based on the different platform. According to OPA officials, the developer [SAIC] agreed to re-platform the package at no cost [to the City]. However, in exchange, the City would restructure the developer's contract to a "level-of-effort" contract.[6] (MM 72 B1413).

This agreement (MM 72 B1413) was documented in Amendment 5, in December 2003 (GX 100-6 A798-806).

Additionally, it would have been shown at trial that Yowell and Bondy began direct negotiations with SAIC on Amendment 6 in February 2004, two months after the City executed Amendment 5. (DM 6 B683-692). These negotiations were dependent on SAIC's successful completion of the development of the new re-platformed pilot program that was to be installed in 4 agencies as documented in Amendment 5 (GX 100-6 A.799 Art.3.8-3.9, 41).

---

[6] FN1 [A "level-of-effort" is used to define the amount of work to be performed within a period of time and is measured in man days or man hours per day/week/month].

Ruppel also would have confirmed that Yowell and Bondy provided regular updates to him (Ruppel) and to Page on the Amendment 6 negotiations with SAIC. Specifically, Bondy stated in his Aug 13, 2004 report email "I plan to continue to negotiate with SAIC the specifics of this change in direction including a management plan and more specific estimate of the required staffing levels. I have already directed them to utilize existing hardware to support the pilot phase to better understand system requirements before we incur any additional expenses." (GX 6000-6 SA110).

Ruppel would have pointed out at trial that Bondy, in his capacity as the NYC Official responsible for managing the City Time Project for the City, on June 27th, 2004 gave an interview to the New York Post about the City Time Project, confirming the following facts:

1. "The price tag is now about 100 million dollars".

2. He (Bondy) was overseeing the project for the City.

3. Bondy conceded there were delays in 2000 when the decision was made to shift to a web-based technology." (GX 6000-5 B240).

4. "There's no off-the-shelf product that can do what this system needs to…". We are in the process of learning what it's going to take to implement this…"

Ruppel would have testified at trial that Bondy and his deputies, Yowell and Hafeez, attended OPA Board monthly meetings with Page and regularly reported on the project status and critical issues(s) such as funding, contract amendments and other actions that required Board approval or Board action (OPA Board minutes MM 60 B963-986). All relevant players

were fully apprised of all relevant developments and, again, Mr. Mazer was not at all involved. Specifically:

Ruppel would have confirmed that during the 12/6/2004 OPA Board Meeting, Bondy reported "that the SAIC Contract is being amended to support on-going development. The Amendment will restructure the SAIC contract to provide four categories of service including operational support, deployment, software maintenance and continued software development." (MM 76 B648-649)

In addition, Bondy reported that a meeting was held with OMB to discuss additional resource plans."

Ruppel confirmed that on 1/24/05 OPA Board decided to use the SAIC Contract to procure deployment resources. (MM 76 B650-651)

As with the other uncalled witnesses, it is no mystery why prosecutors, hell-bent on a conviction, notwithstanding what they knew to be evidence directly demonstrating the false nature of their theory of prosecution against Mr. Mazer decided not to call Ruppel as a witness. Ruppel's testimony would have completely put the lie to the Government's theory of the case that sought to hold Mazer responsible for contract negotiations which charged excessively inflated rates, and that meant hiring more staff than necessary for eliciting financial gain. (A. 93 – 94, 97, §16, 19c). Ruppel would have testified from his own participation in the same about the actual review and approval process that led to the authorization for cost increases and that Mr. Mazer had nothing to do with it. The Government put forward a false theory of prosecution and misleading evidence in support of it, while burying the evidence it had that

would have exposed its theory for what it was. And Shargel obliged by not using any of the compelling evidence from the uncalled witnesses identified in this petition.

The following are additional material facts to which Ruppel would have testified at trial, based on testimony and other information Ruppel gave to the Government before Mr. Mazer's trial:

a) Mazer was never a City Time Project Manager representing the City. Bondy was. (A751; GX 6000-1 B220; MM 21 B754; MM 24 B759; MM 25 B760).

b) Mazer never attended OPA Board meetings or reported to the OPA Board on the Project status. Bondy did (OPA Board Minutes MM 60 B963-986). Ruppel never met Mazer and never spoke with Mazer on City Time Project issues or any other topics.

c) Ruppel would have confirmed that on June 2nd, 2005, Bondy presented to the OPA Board a "City Time Going Forward Strategy" and obtained Board approval to formalized in Amendment 6 (MM 60 B963-964; GX 400-4 A898-910; MM 76 B657). It became apparent to Ruppel, Page and all 'top level' City Officials that using a fixed-price level of effort type contract was "appropriate when functions and activities can't be fully scoped in advance". It was also understood that the "City would assume risk for delivery of working application" (A. 908). It was also understood that "functionality scope/costs will be bound by requirement management. "(A910). The City was responsible for scope management. Only the City knew what

functionality needed to be included in the new system. That is why the City

relied on Gurjal to manage the most critical areas of the project: including

scope management requirements, design and development oversight.

Ruppel confirmed that the OPA Board, OMB, the Law Department, the Mayor's Office of

Contracts, and the Comptroller Contract Office all approved the contract strategy to be

used on the City Time Project going forward.

d) The City never issued a written document empowering Mazer to be an

"Acceptance Official" on behalf of the City or OPA as would have been required

by the City Time contract that was governing the project in order to so empower

him. (A751).

e) Mazer did not have signature authority, express authority, actual authority, or

any kind of authority (and never held himself out to have such authority) to

represent the City and OPA in vendor negotiations. Bondy and Yowell did. (MM

70 B569-622).

f) Mazer did not sign any documents on the City's behalf binding the City to a

contract or any other commitments. Bondy did. (A751).

(GX 100-8 A. 808; GX 100-9 A825; GX 100-10 A831; GX 100-11 A845; GX 100-

13 A854; GX 750-3 A1112).

g) Mazer did not have any authority that would impact the NYC Budget. Bondy

did. (DM 2 A1501-07; GX 1465 A1304-12; GX 1418 A1292-93; DM 3 A1508-09)

h) Mazer never submitted funding requests to Page or the OPA Board on behalf of the Project. Bondy did. (GX 400-7; A911-16; GX 400-14 A959-70; GX 400-17 A 971-81; GX 400-26 A982-83; GX 400-29 A1003-1020; GX 400-31 A1021-1038)

Ruppel confirmed to the Government that the "NYC Charter requires that all contracts or agreements between City agencies and vendors be registered by the New York City Comptroller. The Comptroller's Office of Contract Administration is responsible for reviewing all contracts, contract amendments, leases, and concessions between City agencies, and vendors to determine whether they should be registered." (B1403; B1530-1532)

Ruppel also confirmed that "The Procurement Policy Board (PPB) is authorized to promote and put into effect rules governing the procurement of goods, services, and construction by the City of New York under Chapter 13 of Charter of the City of New York (MM 71 B1369).

Ruppel confirmed, of course, that NYC Government Contracts including the City Time Agreement (Contract) between OPA and SAIC (developer) was governed by NYC PPB rules (MM 71 MM 71 B1369, B1493-1581; GD 2273 B672).

In short, Ruppel's trial testimony on the subjects and in the manner described above-drawn directly from what Ruppel already had told the Government, would have been devastating to the Government's case, both for its substance and the position of authority and direct involvement that he held.

123

Shargel , due to his gross ineffectiveness, failed Mr. Mazer terribly by not being familiar with Ruppel's previous testimony to the Government and by not calling Ruppel as a witness at trial. At the bare minimum, Ruppel would have directly disputed the Government's central claim that "…Mazer the defendant was an agent, manager and representative of a local Government and Agency thereof, to wit, the City and OPA". (A109 ¶42; A111 ¶46; A112. ¶48).

Shargel's ineffectiveness prevented Mazer from presenting a meaningful defense and amounted to Constitutional error, severely prejudicing Mr. Mazer. From Ruppel's testimony, any reasonable Juror immediately would have understand beyond question that Mazer could not have been and was not managing the City Time Project for the City and did not have written (or any other) authority from the City giving him that power to do so. Mazer never attended policy Planning Meetings, and never met and spoke with Ruppel who was the ultimate authority on City Time Project. Upon hearing the facts presented by Ruppel, who had no motive to testify falsely about such fundamental facts, any reasonable Juror would have had to acquit. Simply put, the story on which the Government secured its conviction was false, the Government knew it was false and it also knew, accurately, that Ruppel (and the other identified uncalled witnesses) would have demonstrated beyond any reasonable doubt that the Government's theory of prosecution against Mr. Mazer was false and it knew so.

After Ruppel's testimony there is no possible way the Government could have convinced the Jury that "…Mazer was given responsibility to run it [City Time Project] for the City of New York" …[Mazer] was the City top guy (Tr.4836:9-11 B47:9-11). It just was not true and both Ruppel and the Government knew it was not true.

It is unconscionable that the Government went forward with its theory of prosecution against Mr. Mazer and adduced evidence in support of it, while knowing full well that Ruppel and the other uncalled witnesses would have readily demonstrated that its submission to the Jury was not true or accurate as to Mr. Mazer.

It is outrageous as well, especially considering that he literally charged well over a million dollars for his attorney's fee, that Shargel failed in every imaginable way to use this readily available evidence to completely undermine the Government's case against Mr. Mazer, evidence that would have come from the Government's own investigation.

### Valerie Himelewski

Valerie Himelewski was the OPA's General Counsel (GC), OPA Agency Chief Contracting Officer (ACCO) and OPA Foil Officer since March 5, 2007 (3531-16 part 2 B405:8-9, B406:20-21). As previously stated, Himelewski was available as a witness to testify at the trial and she was on the prosecutor's witness list.

During the City Time Project investigation, the Government interviewed Himelewski and received sworn testimony under oath (3531-16 part 2 B404-524). Additionally, during trial preparation, the Government interviewed Himelewski twice (3531-1 3531-1 B395-401; 3531-4 B1690-1691).

Himelewski's testimony and interview statements to the Government, without question, corroborate the testimony of Page, Hafeez, Gurjal, Newson, Bondy and Yowell as described within this petition and confirm the City Time Project historical events and the City decisions that were made by City officials outlined in the statement of facts section of this petition.

Himelewski testified before trial that after she applied for the OPA job she was interviewed by Newson, Doria and Hafeez (3531-16 p.2 B407:18-19).

Himelewski confirmed that the OPA relied on NYC Law and DCAS department for City Time legal work and advice. (3531-16 p.2 B408:3-10). There was not even a suggestion, of course, that the OPA relied in any way on Mr. Mazer.

Himelewski testified that "OPA reports to both the Mayor and Comptroller." (3531-16 p.2 B493:22-23). Brian Newson was her predecessor OPA/ACCO (3531-16 p.2 B407:15-16).

As OPA General Counsel, it was her responsibility to report any potential fraud and other abuse allegations to the NYC Department of Investigation (DOI). Himelewski made her first referral to DOI in January 2010 regarding Mr. Sal Salamone (3531-16 p.2 B411:24-415:18). Himelewski advised that "Joe (Bondy) told SAIC that under the circumstances, his (Sal Salamone's) Contract should not be renewed as a consultant (3531-16 p.2 B416:11-14.) She made no claim concerning inappropriate conduct by Mr. Mazer at any time.

Himelewski further advised the Government "Ms. Gurjal is one of the officials at OPA who always questioned corrupt practices that were occurring at the agencies…" (3531-16 p.2 B419:10-12).

According to Himelewski, she met with Ms. Gurjal about the City Time Project, and during her meeting with Ms. Gurjal "… she didn't have any allegations specifically of, that would be in the nature of corruption on the project." (3531-16 p.2 B420:17-25). Certainly there was no mention of any corruption involving Mr. Mazer.

Moreover, this was not just a random meeting. Himelewski gave sworn testimony that she expressly inquired about corruption. Himelewski testified before Mr. Mazer's trial as

follows: "During our discussion, … I asked her (Gurjal) specifically; I said, "Are you aware of anything that is going on in the City, the City Time Project that you think is in the nature of corruption and that would need to be referred to the Department of Investigation. " And she said, "Not really." (3531-16 p.2 B424:3-7).

"The main thing she was complaining that certain consultants were very arrogant and acted like they were really in charge of the project. Specifically, she was talking about Mark Mazer, Mitch Goldstein and Scott Berger." (3531-16 p.2 B425:1-10)  This might well explain why some were only too open to targeting Mr. Mazer – but arrogance is a far cry from corruption or any other charge leveled against Mr. Mazer.

Himelewski testified prior to the trial as follows: "OPA, in my opinion, was never properly staffed to handle the City Time Project… that was in large part of the decision of OMB not to fund it, and you know I wasn't here in early years of the project but I do know, certainly since I've been there (5/5/2007), there have been a number of requests for additional City staff which were never  approved, and OPA is basically told "use consultants" in those positions"… by OMB, yes that, because they weren't going to fund the City positions for it." (3531-16 p.2 B425:14 – 24).

Himelewski continued "…therefore…, you have to rely on these people…. It led to tension where…, I thought it was inappropriate, for example, that Mark Mazer, was signing official documents (Consultant's Timesheets) as the OPA representative, and I didn't think it was appropriate that he should have been signing as a consultant, but when I raised that issue I was told, "Well what are we going to do? We don't have anybody else who, you know in a City capacity to sign off on these things," and that is true that there were literally hundreds of

consultants on this project in various areas and there were maybe three  or four City Staff, to supervise the project so you have to rely on consultants…" (3531-16 p.2 B426:1-12). Mazer was only signing in this capacity with express direction and approval by OPA Management. (DM 127 A1520; DM 136 A1524-1537)  This shows clearly that everyone understood that Mazer did not have recognized authority to act for the City and was merely a consultant doing what was assigned to him by the OPA Management (Bondy, Gurjal and Hafeez). And in any event, at most, Mazer was considered to have signed as an OPA representatives only on Consultant Timesheets."

"I don't believe based on our conversation, there was nothing that came out of my conversation with Sarah Gurjal where she raised anything that I felt or she felt was a specific instance of something that was either a corrupt nature, and a conflict of interest or criminal activity… that needed to be referred." (3531-16 p.2 B427:25-428:7).

Himelewski told the Government that Mohamed Hafeez and Joel Bondy knew that Sarah Gurjal was unhappy with some of the things that were going on with her work situation." But it also appeared that others were unhappy with her work performance.  Consider the following: "I had a conversation with Joel (Bondy), that Joel's perspective was and, I guess I have to say I assume he related it to Mohammed that he felt that the reason Sarah was removed from managing all those duties is that she just wasn't capable of managing all of that, and that's why she was."

The investigator (Andrea Heidi) asked Himelewski who made that determination that Gurjal was not a competent manager to manage all the areas?

128

Valerie Himelewski: Well, he (Bondy) was in charge so he, he would have made the determination.

Andrea Heidi: I thought that SME's were in charge?

Valerie Himelewski: … I mean, Joel Bondy, is overall in charge of the City Time Project, so I certainly, the SME's can't make that decision to remove a City employee from a position. That would have to be Joel or Mohamed… I am sure it would have been Joel, and Joel did tell me that he felt she wasn't capable of managing all of those areas, which is why some were split off…" (3531-16 p.2 B429:4-430:5; MM 1 B714; MM 2 B715-717).  Himelewski again, therefore confirmed the hierarchy and, specifically, that the SMEs did not have such authority and, on the other hand, that Bondy and Hafeez did.

"When I had a conversation with Joel (Bondy) about Sarah (Gurjal), I was like, I looked at him like, "Are you kidding? You don't get that this is a problem?" But there, I didn't really get, I mean, I was frustrated that he didn't understand it was a problem but I believed that he really didn't get it, that he didn't understand that that was a problem… that is why I think honestly, he has made some bad judgments on this project, I don't get the sense that he's doing for the purpose of… steering money to a Contractor (SAIC) or getting money for himself" (3531-16 p.2 B442:3-13).

Himelewski confirmed that "All Spherion Consultants left OPA in January 15, 2010 because the Spherion Contract with OPA ended."  (3531-16 p.2 B431:19-23). Mazer was among those SME's.

Himelewski testified "…I've been at OPA for over three years, Mark Mazer I heard was involved in everything in this project, the number of times he actually had a meeting with me or

129

any direct dialogue with me, I could count on less than one hand, and I thought it was strange and I commented to people. I said "What is it with this Mazer guy?" I said, "I see everybody," like everybody on a high level, "on the City Time Project from time to time, but it's like they're keeping Mazer away from me or something." (3531-16 p.2 B454:7-19). Himelewski was right in the thick of things at all times with respect to the City Time Project. The fact that she almost never met with Mr. Mazer provides further support that Mazer was neither in a position to influence or affect policy nor did he attempt to do so.

In light of what Himelewski told the Government pre-trial, at trial, at a minimum, a reasonable juror would have had to ask him or herself the following:

a) How could Mazer be a "City Top Guy", managing the project for the City and he only met and spoke with Himelewski a "handful of times" over a three-year period?

b) How could Mazer be a Project Manager "running it for the City," but have so little to do with Himelewski, let along manage her, when her job was to draft, review and receive final approvals from NYC oversight agencies, including the Comptroller's office registration, for Amendment 8 in June 14, 2007, for Amendment 9 in May 29, 2008, Amendment 10, on June 30, 2009 and Amendment 11, October 28, 2010? Amendment 11 was initiated and completed 10 month after Mazer left the project.

c) If Mazer left the project on January 15, 2010, and purportedly had some management role, who was managing the project after that day? Because the project was completed in June 2011.

The above testimony would have provided critical support for Mazer's Defense. Himelewski would have completely contradicted the Government's allegations that "Mazer was given responsibility to run it (City Time Project) for the City" (Tr.4836:9-11 B47:9-11) and that

130

"Mazer was being paid to run the project on behalf of the City. He was the City point man." (Tr.4844:2-4 B48:2-4)

Himelewski's above testimony would have confirmed to the Jury that Joel Bondy was overall in charge of City Time Project for the City as a whole. Mazer absolutely was not and the Government's allegations against Mazer in this regard were simply false from start to finish.

Himelewski also confirmed the history of the fundamental change in the Project's direction away from the completely misguided off the shelf model. She told the Government that "… the fixed-price was a model under the theory on an off the shelf system. The shift away from fixed-price actually appeared to have started in 2002 with Amendment 3 when the structure of City Time was switched to a custom model/platform. The beginning of the shift from fixed-price to LOE (Level of effort) started at that time and then fully expanded by Amendment 6." (3531-3 B402).

Himelewski further testified that as OPA/GC and OPA/ACCO, she was responsible for conducting vendor negotiations on OPA and City behalf, negotiating Contract terms, conditions, cost and labor Rates. In addition, Himelewski was responsible for drafting Contract Amendments and reviewing those Contract documents with the NYC Law Department and Mayor's Office of Contracts and incorporating their comments and recommendations to receive a final approval (3531-1 B395).

Himelewski confirmed that "SAIC was a prime Contractor then on QA and Subject Matter Experts (SME) side was Spherion. Beneath SAIC there were… a handful of first-tier sub-Contractors, and then below that, there were what I was told was many sub-sub-Contractors, but that we, that OPA, didn't get into who they were…" "..When I first read the Contract and

131

saw what rates were on the Contract, I felt they were high, and so I suggested that the fact that there were so many sub-sub-Contractors on the Contract might mean that we're paying for a rate where a number of subs are taking a cut of that and that may be a reason that the rates are so high…" I went to Steve Cushman (Law Department) again and I asked him, because it's not a standard practice to ask about who the sub, subs are, you just have a billing rate and that's what you deal with. But so, I asked him, if it was appropriate for us to investigate how many subs were on the project with the thought that are we getting a fair price or are we actually paying too much because of that fact, and he said that I had a right to ask that. I told Mohamed Hafeez that, … I thought that it would be a good idea, and he said "Great" and he spoke with Joel (Bondy), and Joel said, "No, we don't do that. We don't look into you know who the subs are. Our Contract is with SAIC and what their billing rates are what we pay there's no need to look into the subs."

Himelewski confirmed that City Time Labor rates were based on NYS OGS Rates and certified that the rates were fair and reasonable. Specifically, she said "If the rates are with OGS, I can't say they are per se unreasonable." (3531-1 B397)

Based on her pre-trial testimony and other statements prior to Mr. Mazer's trial, it is clear that if she had been called to testify at Mr. Mazer's trial, Himelewski would have testified to the following:, based on discussions directly with Bondy:

1) Bondy was intimately familiar with the labor rates, reviewed them in detail, and made a business decision about them. Bondy said "We will leave rates as they are. And Bondy said it is SAIC's business as to what comprises the rates. Who they sub to, etc. Not our business to get involved as long as we believe they are fair and reasonable, which Bondy said they were."

2)      Himelewski:  "Bondy told me not to further look into markup."

3)      "Once I had that conversation with Bondy that was the end of me pushing on the rate issue." (3531-1 B397).

Himelewski made it unequivocally clear that Bondy, as OPA's Executive Director and City Time Project Manager for the City made policy, strategic and tactical decisions for the Project. She specifically noted the following:  "... approximately the end of 2007 or beginning of 2008, I had a conversation with Mohamed (Hafeez)... How the consultants were reporting their time, and he said, "I have told Joel that they need to all be on DCD's" but, "Joel said that there was some issue with, if we put them on the DCD (Data Collection Device), then they're considered City Employees for tax purposes" ... I actually told Joel that there was no issue with that... I was told shortly after that Joel had decided that they were not going to be on DCD's. (3531-16 p.2 B516:14-517:17).

Hemelewski's main responsibility as the OPA/ACCO was to ensure that the OPA City Time Agreement and its Amendments were prepared, reviewed and approved by NYC oversight agencies in compliance with NYC Procurement Policy Board (PPB) Rules.

Himelewski confirmed that "under the City Charter and PPB Rules, the Comptroller has to register all City Contracts."  This included, of course, the City Time Contract (3531-16 p.2 B495:14-25).

Himelewski further testified to the Government that as OPA/ACCO she had to approve and sign off on "all Agency purchase orders, Contract documents whatsoever or any time..." (3531-16 p.2 B496:21 – 497:8)

Himelewski would have been able to provide critical testimony based on her senior executive position as OPA's chief Contract Officer (ACCO) and having firsthand knowledge by actively participating in managing the City Time Contract Procurement Process.

Himelewski would also have confirmed the following if she had been called to testify at Mr. Mazer's trial:

(1) The "NYC Charter required that all Contract or agreements between City agencies and vendors be registered by the New York City comptroller. The Comptroller's Office of Contract Administration is responsible for reviewing all Contracts, Contract Amendments, leases, and concessions between City agencies, and vendors to determine whether they should be registered." (MM 72 B1406; MM 71 B1530-1532)

(2) "The Procurement Policy Board (PPB) is authorized to promote and put into effect rules governing the procurement of goods, services, and construction by the City of New York under Chapter 13 of Charter of the City of New York (MM 71 B1369).

(3) NYC Government Contracts including City Time Agreement (Contract) between OPA and SAIC (developer) are governed by NYC PPB rules. (MM 71 B1369, B1493-1581, B1397; GD 2273 B672).

(4) As OPA/ACCO, it was Himelewski's responsibility to ensure that all relevant sections of the PPB Rules were followed and complied with in order to secure NYC Oversight agencies' approvals (OMB, Law and others) and to obtain NYC Comptroller Contract Office approval and registration. This review, approval and registration process was done for every yearly Contract Amendment and for every Sub-Contract, on the City Time Project. (3531-16 p.2 B407:6-15, B408:1-22, B412:20-413:5).

(5) In addition, Himelewski maintained official files of Procurement documents submitted to the Comptroller's Office for approval and final registration. (3531-16 p.2 B427:14-23; GD 3734 A1458-1461).

(6) It was the OPA/ACCO's decision under PPB Sec. 2-03 to determine the type of Contract which would be more beneficial to the City to be used on the City Time Project. (MM 71 B1504). It was critical for the City to retain management control over the City Time Project in order to continue the incremental development and implementation of the City Time System at the time when OPA did not have a complete set of business requirements from the remaining seventy- six City agencies. Because of the uncertainty of the scope of work required to complete the system based on each agency's business needs, software applications needed to be custom-developed piece by piece and agency by agency. Under those circumstances a fixed price Contract was impractical.

This latter point is especially important because during Mr. Mazer's trial, the Government maintained that Mazer convinced the City to "Amend" the City Time Contract to a fixed price level of effort type Contract. (A 93-94, 97 ¶16, 19c). That allowed SAIC and Mazer to defraud the City out of nearly $100 million, the Government charged. Whereas if the City would have selected a Cost-Plus Contract, it would have been more beneficial to the City thus saving $100 million dollars in cost overrun and unseen expenditure. Not only is the underlying premise patently untrue; more to the point, Mazer had nothing whatsoever to do with the City's decision to go to the FPLOE Contract nor was he ever in a position to affect that decision one way or the other, whether it was the right decision or the wrong decision – as has all been fully

explained in each write- up for each uncalled witness identified here.  The failure to call each individually on this point and on the other points specifically identified for each was unconscionable and severely prejudiced Mr. Mazer.  The cumulative effect of the failure to call any of these identified witnesses was irretrievable prejudice to Mr. Mazer's Defense in this case.

Mr. Mazer has explained how the testimony of each of the uncalled witnesses would have demonstrated at trial that Mr. Mazer had nothing to do with the decision-making process, nor could he have had and so, even if the decisions made were wrong – and they were not – it simply had nothing to do with Mr. Mazer and, indeed, most of the fundamental decisions at issue were made by the actual authorities long before Mr. Mazer became involved with the Project.  He also has demonstrated the multi-layer and multi-step review process and the people who were involved – which of course never included him.  Ms. Himelewski confirmed all of this in the testimony and statements the Government had from her well before Mr. Mazer's trial.

As the Government well knew by the time of Mr. Mazer's trial, Himelewski's testimony would have confirmed all of the above and more.  She specifically informed the Government that after reviewing several types of Contracts for the City Time Project, in light of all of the agencies involved and all other relevant factors, and after receiving approvals from the OPA Board, Bondy, and the OMB, Mayor's Office of Contract she certified, as OPA/ACCO under Section 2-03, that a FPLOE Contract would be the most beneficial to the City, and that any other type of Contract would not have been appropriate in this situation as it relates to the Project.

Himelewski's testimony would have been critical to Mazer's Defense because it would have made clear the circumstances, the reasons for, and the multiple levels of review and approval that attended the OPA/ACCO's selection of a FPLOE Contract over any other type of Contract available to the City and that Mazer had no influence over, or for that matter any role, let alone impact, in the Contract negotiation process that ultimately determined that a FPLOE Contract was the most beneficial to the City in going forward with City Time Project.

Furthermore, Himelewski would have corroborated Page, Bondy, Hafeez, Newson and Gurjal's testimony as previously stated, that Mazer was not an employee of the City, nor did he have any authority to act as an agent for the City, in making critical decisions concerning the City Time Project and all decisions associated with why the City chose the FPLOE Contract were the responsibility of Himelewski, Newson, Bondy, Page, Yowell, OMB, and the Comptroller's Office as previously explained – and not Mazer.  This is simply an indisputable fact – and it is impossible to reconcile with the Government's prosecution of Mark Mazer.

Himelewski's testimony at trial would have informed the Jury that the City did not negotiate the labor hourly rates the City agreed to pay SAIC in the Contract based on SAIC's underlying cost of what profit SAIC or its subContractors would earn. Himelewski well knew and would have had to testify at trial that the OPA and the City were well aware of exactly how much profit SAIC was making on its labor rates as it related to each Sub-Contractor which was approved by the City.  Furthermore, SAIC provided the City copies of all Sub-Contractor agreements as part of the OPA review and approval process.  Those agreements included

specific hourly labor rates for different labor categories that SAIC agreed to pay to all the Sub-Contractors. (GX 175-1 B107-119; GD 2719 A1412-1424; MM 71 B1566-1568; MM 58 B868:22-870:3).

This testimony would have been critical to Mazer's Defense. The Government alleged at Mr. Mazer's trial that the City did not know SAIC's profit margin on labor cost that the Government claimed was excessive and that SAIC defrauded the City out of approximately $100 million dollars. But Himelewski knew this was not true (as did the Government, from information she and the other uncalled witnesses told the Government well before Mr. Mazer's trial) and she would have clarified this and testified further that the actual SAIC costs to the City were irrelevant in selecting the Contract strategy, and Mazer had no impact or influence on Himelewski's decision as pertaining to Himelewski's responsibility as OPA/ACCO and OPA General Counsel.

Based on information she provided to the Government, Himelewski also would have testified at trial that:

(7) Under Sec. 2-06 Prior to Vendor selection, she, as ACCO with OMB Approval determined that Contract prices were fair and reasonable (MM 71 B1509-1510). Contract cost estimates including the 5 Year Labor Rate Schedule were reviewed and approved by OMB. (A1116; GX 400-17 A971-981; GX 400-20 B146-149; B1420).

(8) Under PPB rule Sec. 2-09 she, as OPA/ACCO, completed 21 steps of oversight in the agencies' approval process before she prepared her recommendation for awarding the City Time Agreement to SAIC (Sec. 2-09). (MM 71 B1525-1526)

(9) The funding source for the City Time Project was NYC Capital funds (local bond issues) as it was stated on all OMB RCAM Forms (SA3-SA19; GD 3734 A 1458 – 1461).

(10) In compliance with PPB Rule 4-01, the OPA was required to submit SAIC yearly performance evaluations. Gurjal submitted those performance evaluations on OPA's behalf. For the duration of the Project, SAIC always received fair and good performance evaluations, confirming that SAIC met all its Contractual obligations under the City Time Contract.  "As OPA/ACCO I was approving SAIC performance evaluations. "

(GD 3800 A1463-1465; GD 3801 B682; MM 71 B1533).

(11) Himelewski certified that by giving good performance evaluations to SAIC, OPA confirmed that it received quality labor to develop and implement the City Time software at the rate the City negotiated.

(12) The OPA received a working City Time System at the agreed upon price, therefore confirming that OPA received the benefit of the bargain negotiated in the City Time Contract and its Amendments. (MM 53 B811-812)

(13) As OPA/ACCO she was working with Jim Shangle, who was Contract Manager and the prime contact on the SAIC side.

139

(14) Hafeez, Malave, Gurjal and Bondy had signatory authority on behalf of OPA to approve Work Orders, Release Orders and Vendors Invoices. Mazer did not.

(GX 200-1 B120-121; GX 200-51 B122-123; GX 301-24 B124; GX 301-34 B125; GX 301-68 B127; GX 302-39 B128; GX 302-103 B129; GX 303-18 B131; GX 304-36 B133; GX 304-42 B134; GX 305-2 B135). This is important because Himelewski's testimony would have been contrary to the Government's alleged theory that it was Mazer who approved requests for payments submitted to the City. (A 96 ¶19 b).

(15) Mazer never had signatory authority or any binding authority on behalf of OPA or the City as a whole.

(16) Mazer never signed any Contractual documents that would bind OPA or the City. Bondy executed all Contracts and Amendments on behalf of the City. (A808; A825; A 831;

A845; A854; A1112).

(17) Mazer never submitted funding requests for the Project to OMB. Bondy did. (GX 400 -7 A911-16; GX 400-14 A959-70; GX 400-17 A971-81; GX 400-26 A982-83; GX 400-29 A1003-1020; GX 400-31 A1021-1038).

(18) Mazer was never given written authorization from the City to be designated as an "Acceptance Official" also known as City Time Project Manager representing the City as required by the Contract that was governing the Project, in order to actually be an authorized Acceptance Official. Bondy was designated as "Acceptance Official" and City

140

Time Project Manager for the City as a whole. (A751; GX 6000-2 B221-222; GX 6000-3 B223-237; GX 6000-4 B238-239; GX 6000-5 B240; GX 6000-6 SA110;  GX 6197 B255).

(19) Spherion Atlantic Enterprises LLC (Spherion) was under Contract with NY/OPA to provide Quality Assurance Services (QA) as well as Subject Matter Expert consultant services (SME) on the City Time Project. (GX 125-1 B71-106).

(20) Mazer was one of the Spherion SMEs working on the Project through his own company MS Creative Technologies, Inc. (MS Creative). MS Creative was a sub-Contractor to Spherion on the Project, providing SME staffing. (GX 150-1 A875-880)

(21) The OPA reviewed and approved the sub-Contract between Spherion and MS Creative (3531-16 p.2 B437:14-17; GX 150-1 A875-880; GX 150-3 A881-894).

(22) Because Mazer was a Spherion SME working on the City Time Project as a Spherion sub-Contractor, Mazer was considered an independent Contractor and not an employee of the City.  Mazer's employment terms and conditions were defined and documented in Spherion's Contract with OPA (GX 125-1 Appendix A Art. 4.2 B91) and Spherion's Sub-Contract with MS Creative. (GX 150-1 A 878 Art. 8(a) A 875-893).

(23) The Spherion Contract was governed by NYC PPB Rules.  (GX 125-1 Appendix A Art.9 B1766-1767).

    Hemilewski would have testified at trial that as OPA/GC and ACCO she reviewed and approved the following Contract Amendments to SAIC Contract.

- Amendment 8 (A8) was approved on June 14, 2007. A8 increased the total Contract budget to $348,954,133 representing a $124,207,348 increase over Amendment 7 (MM 81 B1645:20-1646:2; GX 100-8 A811-828)

- Amendment 9 (A9) was approved on May 29, 2008. A9 increased the total Contract budget to $489,238,434 representing a $140,284,301 increase over Amendment 8 (GX 100-9 A829-835 ; MM 81 B1653:12-1656:9).

- Amendment 10 (A10) was approved on June 30, 2009. A10 increased the total Contract price to $628,461,443 representing a $139,223,009 increase over Amendment 9.

  (GX 100-11 A836-849; GX 750-22 B186-207).

Further, Himelewski would have confirmed at trial that in Amendment 11, after the software development was completed in September 30, 2010 under Amendment 10's terms, the City extended SAIC's Contract through June 30, 2011 to complete implementation and deployment of the City Time System. At that time, the City changed the Contract from FPLOE type to a fixed type Contract and agreed to pay SAIC a lump sum of $32,000,000 upon successful system acceptance. (GX 100-13 A 850-857); (GX 750-1 B173-174). The total City Time Contract price was increased to $660,461,443 reflecting the $32,000,000 increase (A 851 Art 2; Art. 3)

In addition, SAIC agreed to pay liquidated damages in the amount of $3,000,000 per month for each month that the Contractor failed to complete system acceptance after June 30, 2011. (A852 Art. 28.2; GX 750-1 B173-174; GX 750-12 SA52-53).

142

The above testimony would have been key testimony in support of Mazer's Defense because it demonstrated and confirmed that the City OPA/ACCO always took the steps necessary to use the most beneficial Contract type for the City, and that is why Himelewski, after completing development work on a FPLOE basis, switched to a  fixed price Contract for the remaining implementation work to complete the project.  As she (and the others involved in the review and approval process) concluded, it was simply the best and only viable way to go for this Project.

Himelewski would have testified that Mazer did not participate in, contribute to or influence her, the NYC Law Department, the OMB or Comptroller Office officials in the review and approval process of City Time Amendments 7 through 11. (GD 3734 A 1458 – 1461).

Hemilewski would have testified that as OPA/GC she was also responsible to review and advise OPA Management on any potential conflict of interest situation.

And she exercised that responsibility, when she thought it necessary or appropriate.  She advised the following:  "I found very late in the game that Scott Berger was under Mazer, and I said to Mohammed and Joel that he (Mazer) can't supervise someone he's getting a cut of the pay of, and, Joel didn't get it. Joel said to me, "I don't understand why that's a problem, "and I explained it to him, "it's a problem because…, let's say theoretically Scott Berger doesn't come in on a certain day, doesn't perform any services but submits a time sheet. Mazer has an interest in approving that time sheet because he is getting a cut of the money. So finally, they agreed or Joel said, "Well, I'm not sure I understand that but all right so they removed Scott Berger at that point…" I said, "You have to remove him. He can't be reporting to him" (3531-16

p.2 B439:20-440:14).  The removal was made.  This demonstrates that clearly, if Himelewski had any basis to believe Mazer was operating under any conflict of interests, either potential or actual, she would have taken immediate action against Mazer.  Of course, she did not.

Himelewski said further: "I didn't know a lot of what was going on, in terms of the relationship with subs… In that sense, yes, however, we knew that Mark Mazer's company at least I knew late in the game, MS Creative Technology. (Mazer) had other SMEs working on this project. As long as he was not supervising them I'm not sure that that's a problem because it's another sub-sub situation. The problem to me is if he is affecting, if he can sign off on their time sheets, if he's getting a cut of their pay but also at the same time has some say over their work to me that's a problem. (3531-16 p.2 B440:16-441:6).  And of course as has been demonstrated and cannot be disputed – Mazer did not have any such authority.

Himelewski advised the Government that "Elaine Doria and Pat Blunt came to (her) and they were talking about Mazer, and what they said was that he (Mazer) owns DA Solutions (DAS). (3531-16 p.2 B465:18-22)

This would be critical testimony in Mazer's Defense, because it showed Himelewski's direct conversation with Bondy and Hafeez about Mazer providing staffing on the City Time Project. Bondy confirmed that he knew about Berger reporting to Mazer and did not consider it to be a problem. When Himelewski advised Hafeez and Bondy that she had an objection to Berger's status, Berger was removed as a Mazer direct report and Berger reported to Hafeez until January 15, 2010.  Again, when even the hint of a potential conflict was raised, it was addressed.

As Agency General Counsel Himelewski provided the legal opinion on the above matter. Specifically, as long as Mazer was not supervising consultants directly, it was not a problem.

In addition, Bondy, Blunt, Doria, Sutton, Himelewski, and Hafeez all knew that Mazer owned DA Solutions and they, like Himelewski, did not consider it to be a problem at all because Mazer only supervised four people directly . (Org. Charts MM 73 B1431; MM 74 B1432). Furthermore, Bondy, Hafeez, Doria, Sutton, Blunt and Himelewski fully understood the relationship between Mazer and of the staffing firm DAS retained by Technodyne.

These players all confirmed that the fact that Mazer had a financial interest in DAS was something that all top OPA executives fully understood and accepted as a normal business arrangement.

Ms. Himelewski and others would have testified that they did not believe this to be a conflict of interests because Mazer did not have NYC/OPA official decision making authority. Therefore, Mazer was allowed to continue to work on the Project until his Contract was completed in 1/15/2010.

Himelewski would have testified that Brian Newson, the Director of Management Review and Analysis and Deputy ACCO was interviewed along with OPA Executive Director Bondy, OPA Deputy Director Hafeez and Assistant Executive Director Gurjal by Comptroller Auditors within the scope of the Audit (MM 72 B1406).

Himelewski would confirm that on September 8, 2010, Newson issued an OPA Official Response to the referenced Audit Report (3531-16 p.2 B422-430; 3531-16 p.2 B433:12-18).

Himelewski confirmed to the Government that the OPA response included a City Time Project history, answers to the questions of cost Projection discrepancies, Project delays and and an explanation of why it took so long to complete the Project. It also confirmed that "The City Time System works, works well and performs above expectations." (3531-16 p.2 B428-429)

Himelewski further testified prior to Mr. Mazer's trial as follows: "I want to give a balanced picture of this in the sense… While I believe for example that Joel Bondy has made some bad judgements, in this process I will say that Joel is probably the most knowledgeable person about City Time and I think everything I have seen of this is he thinks what he's doing is in the best interest of the Project and the City, I don't want you, you know, to leave here with the impression that his judgments were clouded by something other than thinking he's doing the right thing but I just think he doesn't have my perspective on City rules that's all I'll say." (3531-16 p.2 B510:16-511:1).

Finally, as is reflected in the section herein related to Brian Newson, Ms. Himelewski would have confirmed the following absolutely key information that would have made the Government's theory of the case as to Mr. Mazer's role an absolute impossibility, based on the regular reporting and approval of every step that was a vital part of the City Time Project and the process associated with it:

Ms. Himelewski would have testified that every OPA Director/Manager with department responsibilities was required to submit Monthly Status Reports documenting activities performed by each department. Each section would be combined and included into the OPA

146

Agency Monthly Status Report to be submitted to the OPA Board of Directors, Mayor's and Comptroller offices.

Further the OPA/ACCO documented every action that was taken by his OPA Contract office in support of City Time Project including:

- the Status of Contract Amendment negotiations with City Time vendors

- the Status of Contract Amendment documents preparation and submission to NYC oversight agencies for their review. (MM 83 B1925-1926, 1929-1930, 1933, 1936, 1939-1940, 1943, 1949, 1952-1953, 1955-1956, 1971-1972)

- the Status on responding to oversight agencies' questions that were asked of OPA during their review process. (MM 83 B1925-1926, 1929-1930, 1933, 1936, 1939-1940, 1943, 1949, 1952-1953, 1955-1956, 1971-1972) and

- the Status on obtaining OMB, Law Department, Mayor's Office of Contract (MoC), Comptroller office and other oversight agencies approvals, including the Comptroller Office Contract registration process (MM 83 B1925-1926, 1929-1930, 1933, 1936, 1939-1940, 1943, 1949, 1952-1953, 1955-1956, 1971-1972).

Defense Counsel's failure to call Himelewski to testify in order to prove Mazer innocent of the charges alleged against him was extraordinarily prejudicial error. There is no wonder why the Government did not call Himelewski as a Government witness, based on the information that she provided in the investigation, as reflected in her 3500 material. Based on Himelewski's information provided to the Government as reflected in this motion, Himelewski's trial testimony clearly would have exonerated Mazer. There is no excuse for Defense Counsel's omissions in this regard.

147

**JOEL BONDY**

Joel Bondy ("Bondy") is a key to understanding this case. Knowing what the Government knew about Bondy's role, it was unconscionable for the Government to prosecute Mr. Mazer and to pursue its theory of prosecution at trial against Mr. Mazer. The following explains exactly why this is so.

Bondy began working at OPA on the City Time Project as a Spherion Subject Matter Expert (SME) in 2002. Bondy's company, Bondy Consulting, was a Spherion Sub-contractor providing SME services on the City Time Project. (3574-5 B578)

During the City Time Project investigation, the Government interviewed Bondy extensively and received sworn testimony from him under oath (3574-1 B568-569; 3574-2 B570-574; 3574-5 3574-5 B575-583). Additionally, the Government had in its possession from May 8, 2008 and December 18, 2009 Bondy's sworn testimony in front of the NYC Council. (MM 58 B819-940; MM 81 B1582-1678; 3574-5 B575-583).

It is indisputable from the materials the Government had well before Mr. Mazer's trial that Bondy's testimony at trial would have fully corroborated the testimony of Page, Hafeez, Gurjal, Newson, Ruppel, Yowell and Himelewski as described in this petition and would have fully confirmed the explanation of the City Time Project chronology and the executive decisions that were made by City Officials outlined in the Statement of Facts section of this petition.

To the extent Shargel would claim that he did not call Bondy as a witness at trial because he knew Bondy would invoke his right under the Fifth Amendment not to testify, Shargel, of course, missed a great opportunity to help Mr. Mazer immeasurably.

Given that Shargel knew or should have known that Bondy had given extensive sworn testimony to the Government and to other agencies similarly situated and with similar interests and a full opportunity to examine Bondy under oath, Shargel should have offered into evidence at trial Bondy's prior testimony which was fully exculpatory of Mr. Mazer, showed Bondy's primary role in the relevant events charged, and which would have impeached the story claimed by Government witnesses about Mr. Mazer's role and authority.

Such evidence would have been fully admissible under Rule 804 of the Federal Rules of Evidence. If Bondy were to have invoked the Fifth if called to testify at Mr. Mazer's trial, as Shargel and Government counsel expressly indicated they anticipated to be Bondy's plan, Bondy certainly would have been "unavailable" under Rule 804(a)(1) or (a)(2) and his prior testimony, as identified and described herein, would have been admissible under Rule 804(b)(1) or (b)(3). Mr. Mazer was irretrievably prejudiced by Shargel's failure to take steps to have Bondy's fully exculpatory prior testimony admitted at trial.

This is just one more compelling example of the ineffective assistance of counsel reflected by Shargel's acts and omissions in this case. Further his failure in this regard might well have been based in part on an agreement Shargel made with Bondy's lawyer, without any input from Mr. Mazer and, contrary to Mazer's interests, assuring Bondy's lawyer that he would not allow Mr. Mazer to testify at trial, assuring Bondy's lawyer that Bondy did not need to be afraid that Mr. Mazer would inculpate him. Shargel had no right to make such an agreement and it was clearly contrary to Mazer's interests and Mazer's express desire to testify on his own behalf at trial. This is discussed in greater detail elsewhere in this motion.

Prior to Mr. Mazer's trial, Bondy testified that in April 2004 he became OPA Executive Director (3574-5 B578)

Bondy informed the Government that all NYC City-wide policies, strategic decisions, directions and priorities concerning the City Time Project were made and approved at the NYC Executive Oversight Level (City). The Mayor's cabinet was also supported by many City-wide Administrative Level Agencies including Office of the Mayor (Mayor), Law Department (LAW), Office of Labor Relations (OLR), Office of Management and Budget (OMB), Mayor's Office of Contracts (MOC), Department of Technologies and Telecommunications (DOITT), Technology Steering Committee (TSC) and many others.

As other witnesses confirmed, Bondy advised the Government that OPA was overseen by two members of the Board of Directors. One member, Mark Page (Page), represented the Mayor of New York and the second member, Warren Ruppel (Ruppel) and Michael Spitzer (Spitzer – Ruppel's replacement after Ruppel left the office), represented the NYC Comptroller.

Bondy advised that Page, Ruppel, and Spitzer jointly managed the Office of Payroll Administration (OPA) (MM73 B1431).

Bondy confirmed that as OPA Executive Director, he was assisted by Deputy Executive Director, Edwin Yowell (Yowell) until his retirement and Mohammed Hafeez (Hafeez) thereafter. (3574-2 B570)

Bondy told the Government that Sarah Gurjal (Gurjal), Assistant Executive Director was responsible for managing the City Time Project division of OPA and reported directly to Bondy. Bondy and his deputies comprised of the OPA senior management team (Agency) (MM73 B1431).

150

Bondy confirmed that Page was NYC Budget Director.

Bondy also confirmed that Page was an Executive sponsor and the Office of Management and Budget (OMB) was a lead Executive Agency overseeing the City Time Project representing the Mayor and NYC Executive Oversight Level Agencies (City). Page and the Office of Management and Budget (OMB) were synonymous when it came to the City Time Project.

Perhaps most significantly, had he testified at trial, Bondy would have had to testify that as OPA Executive Director, he was the official who was for managing the entire City Time Project on behalf of the City. This is also documented, of course, in the City Time Agreement with SAIC. As the contract reflects, "Acceptance Official" means the official in the Office of Payroll Administration who has the responsibility to accept deliverables under this agreement. Unless otherwise designated in writing by the City, the Acceptance Official shall be the Executive Director [Bondy] (A751).

Bondy, as the "Acceptance Official" and the City time Project Manager representing the City as a whole, exercised his signatory authority to bind the City to the Contract and to approve and authorize the payment of the SAIC and Spherion invoices and he would have so testified at trial.

Further Bondy would have testified at trial that the OPA Board, OMB and other Executive Oversight Agencies were the ultimate decision makers on the City Time Project.

Bondy would have explained to the Jury that the OPA Board defined OPA Agency missions, priorities, and direction. It was Bondy's and his senior Management Team's responsibility to implement the OPA Board's and NYC Executive Management's decisions.

Tellingly, Bondy testified prior to Mr. Mazer's trial as follows:  "I report to a Board of the Mayor and the Comptroller and they both oversee the way that I am running the agency and I report to them on a monthly basis. (MM 58 B889:17-20)

Bondy would have confirmed that Page, as the OPA Board Member representing the Mayor along with Ruppel and Spitzer for the Comptroller, gave Bondy official written approval each and every time before Bondy executed Contract Amendments (GX 750-20 A1201-1202; GX 750-21 A1203-1206; MM 64 B1213-1222).

Bondy executed the Contract Amendments on behalf of the City and OPA (GX 100-8 A808; GX 100-9 A825; GX 100-10 A831; GX 100-11 A845; GX 100-13 A854; GX 750-3 A1112)

Bondy and Hafeez executed the City Time Project Work Orders with SAIC on behalf of the City and OPA (GX 360-1 B136; GX 360-2 B137; GX 360-3 B138; GX 360-5 B139; GX 360-6 B140; GX 360-7 B141; GX 360-8 B142;   GX 360-9 B143; GX 360-10 B144)

Bondy submitted to Page as OMB Director all funding requests to fund continued work on the City Time Project. After conducting a thorough review process, OMB approved all funding requests. (GX 400-7 A 911-16; GX 400-24 A 959-70; GX 400-17 A 971-81; GX 400-26 A 982-83; GX 400-29 A 1003-1020; GX 400-31 A 1021-1038).

Bondy and Yowell were actively involved in Contract Amendment negotiations with SAIC and Spherion on behalf of the City (MM 70 B591-622; MM 28 B764-66; MM 32 B776-777; MM 39 B793; GX 6000-6 SA110).

Bondy further testified pre-trial that he was personally involved in the Contract Amendment negotiations, confirming that from April 2004 through December 2009 he

negotiated four contract Amendments with SAIC and seven Contract Amendments with Spherion. (MM 58 B874:6-875:12).

Bondy would confirm that he communicated with Page on a regular basis discussing City Time issues, including development and implementation strategies, cost of the Project and Project objectives. (GX 6000-1 B220; GX 6000-2 B221-222; GX 6000-3 B223-237; GX 6000-4 B238-239; GX 6000-5 B240; GX 6000-6 SA110; MM 18 B748-51; MM 21 B754; MM 22 B755; MM 23 B756-758; MM 24 759; MM 25 B760)

Bondy confirmed that he and his deputies Yowell and Hafeez attended OPA Board monthly meetings. Bondy always reported to the Board on the City Time Project issues and provided regular status updates on critical issues that required Board approval or Board action (MM 60 B963-986; MM 64 B1213-1222).

Bondy also confirmed to the Government that in his capacity as the NYC Official responsible for managing the City Time Project for the City, on June 27th, 2004 he gave an interview to the NY Post about the City Time Project confirming the following facts:

1.      "The price tag is now about $100 million."

2.      He (Bondy) was overseeing the Project for the City.

3.      He (Bondy) conceded there were delays in 2000 when the decision was made to shift to a web-based technology." (GX 6000-5 B240)

4.      "There's no off-the-shelf product that can do what this system needs to…" We are in the process of learning what it's going to take to implement this…"

During Bondy's interview with the Government he confirmed that "The initial cost of

the Contract was approximately $58 million. Bondy noted that there were many "recognized unknowns in price" when the original contract was drafted, including data collection sites and field conditions in the agencies.  It was expected that these variables would affect the price of the Contract down the road. There was an expectation on behalf of the City at the outset of the project that the cost of the project would be more than $58 million. Bondy noted that every cost change "would have to be justified." The difficulty of the project was that they were trying to create a computerized departmental time keeping system "80 times for 80 agencies."  The system would not be one system for all City agencies, but was basically a custom system for each agency based on the contractual time keeping requirements of the agency. "(3574-5 B576)

Bondy also provided the following information to the Government prior to Mr. Mazer's trial:

The City Time system was initially based on Smart Time - a commercial "off the shelf" package. Smart Time was the building block for the City Time system, it was then customized for each agency.

During the early phases of the project, the City concluded that there were several flaws in the Smart Time system. The first major flaw was that approximately eighty separate customized versions of the system would be running simultaneously (one at each agency) and would therefore have to be maintained separately at each agency. The second major issue was that, because the system was PC based, individual PCs operating the system would all need software to be continuously maintained. Bondy described this issue as a "software distribution nightmare" noting it was an "unimaginable plan."

Bondy further advised the Government that:

154

"In order to address these issues, the City's IT adviser, Gartner Group, recommended a different enterprise architecture for the City Time system by going to a "network based system" - not a PC based system - which would have "web based" access. Bondy said that at the time the system was being designed, technology was changing in a

assign the contract was a realization by the firm that the original software package upon which City Time was based would require a large amount of customization and that it would be more effective to design a new web-based centralized system.

The following individuals were involved in the assignment: Richard Valcich, the OPA Executive Director at the time, as well as the two OPA Board members Mark Page, the OMB Executive Director, and Warren Ruppel from the Comptroller's Office. Bondy said that he "assumed" these City officials "had responsibility for the decision." Bondy did not know whether companies other than SAIC were considered by the City or Paradigm 4 for the assignment of the Contract. The Contract was assigned to SAIC via a Contract Amendment. Bondy was not involved in the City's vetting of SAIC at the time of the assignment. Bondy did not know if SAIC had developed timekeeping software for other Government agencies before it was assigned the City Time contract. Bondy said that Paradigm 4 selected SAIC by "shopping the contract around" and that the City approved the ultimate selection of SAIC. Bondy noted that this was his "understanding" of how the Contract was transferred to SAIC. (3574-5 B777) Mr. Mazer, of course, had no role in the decision to change systems or in the selection of SAIC by Paradigm 4 and the City. It was 4 years before Mazer was even hired to work on the Project.

Bondy further advised the Government "In about March 2004, SAIC conducted an internal assessment of the City Time software and determined that the software package

was not acceptable for the City's requirements and would not be acceptable for supporting the anticipated number of users. SAIC subsequently proposed to develop a new technological framework capable of meeting the City's needs at no additional cost to the City. SAIC called this a "technology infusion" program and commenced a redevelopment of the system based upon a new software architecture. SAIC's "no cost" proposal was based upon anticipated revenues from future licensing fees." (3574-5 B578)

This SAIC no cost development proposal to the City was also documented in the NYC Comptroller Financial Audit of OPA and included in the B. City of New York Office of Comptroller Finance Audit Section of this Petition. (MM 72 B1398-1430).

Bondy would have testified at trial that Yowell drafted all City Time Agreements and Amendments. Together with Yowell, Bondy was responsible for conducting vendor negotiations on OPA's and City's behalf, negotiating Contract terms, conditions, cost and labor rates. Yowell was also responsible for conducting a review of the Contract Amendments with the NYC Law Department and the Mayor's Office of Contracts, incorporating their comments and for receiving final approval. (MM 28 B764-66; MM 29 B767-771; MM 32 B776-777) Mr. Mazer certainly had no role in any part of the process.

Bondy further told the Government that after Yowell retired on June 30, 2005, Bondy hired Yowell as a consultant to continue contract negotiation work on Amendment 6 of the SAIC City Time Contract. Yowell reported directly to Bondy who supervised his contract negotiation with SAIC (MM 70 B591-622).

Bondy confirmed that he received and approved Yowell's invoices for his contract consulting services. (MM 70 B608-622).

Bondy assured the Government that OPA gave Yowell excellent performance evaluations and extended his contract for another year. (MM 70 B601-606)

Yowell continued his contract negotiation work on behalf of the City until May 2007 when OPA hired full time General Counselor Valerie Himelewski.

Bondy would confirm that Yowell began direct negotiations with SAIC on Amendment 6 in February 2004, two months after the City executed Amendment 5 (DM 6 B683-695). These negotiations were dependent on SAIC's successful completion of development of the newly re-platformed pilot program that was to be installed in five agencies as documented in Amendment 5 (GX 100-6 A 799 Art. 3.8 – 3.9, 41).

Bondy told the Government that he provided regular updates to Page and Ruppel on Amendment 6 negotiations with SAIC. Specifically, Bondy stated in an Aug 13, 2004 report by email "I plan to continue to negotiate with SAIC the specifics of this change in direction including a management plan and more specific estimates of the required staffing levels. I have already directed them to utilize existing hardware to support the pilot phase to better understand system requirements before we incur any additional expenses." (GX 6000-6 SA110). Once again, Bondy clearly informed the Government that this was a multi-layered approval process in which several key public officials were involved, one checking the other and nowhere in any of that process was Mr. Mazer.

Bondy advised further that before the City agreed to proceed with the new City Time Project, the City needed to determine what would be the most beneficial contracting strategy that would allow the City to do incremental development and implementation of the City Time

System, recognizing that OPA did not have a complete set of functional requirements from the remaining seventy- six agencies that needed to be included in the new CT System.

Accordingly, OPA and OMB drafted the "City Time Going Forward Contracting Strategy" which Bondy and Yowell presented to the OPA Board for approval. (GX 400-4 A898-910; MM 60 B963)

This document clearly outlines that the City would be using a fixed priced, fixed level of effort (FPLOE) type of Contract because it was "appropriate when the activities [software requirements for each agency] can't be fully scoped in advance, Delivery Risk assumed by the City (A909)." That was the stated and fully appropriate reason for this significant change at that time as the officials fully agreed and approved.

"Functionality scope/cost will be bound by requirements management (A910)." OPA in turn relied on Sarah Gurjal, Assistant Executive Director of OPA, to manage critical areas of the project including: Requirements Scope Management and Development Oversight Project Management on behalf of the City (Org Charts MM73 B1431; MM 74 B1432)

Bondy would have testified at trial that with Page's and the OPA Board's consent and subsequently OMB's, OPA/ACCO's, Mayor's Office of Contracts' (MOC), the Law Department's and other NYC oversight agencies' approval this contracting strategy was adopted to be used on the City Time Project going forward. (GX 750-20 A1201-1202; GX 750-21 A1203-1206; MM 64 B1213-1222) That was the best decision to be made, under all relevant circumstances, based on the best business judgment of these professionals.

Bondy further testified during the Government's investigation prior to Mr. Mazer's trial that:

OPA has "been pressing all along" for cost reductions by SAIC. He noted that OPA has been trying to keep project teams to the minimum size required. Bondy was asked whether he had pressed SAIC for an overall cost reduction for the City Time project. He responded, "Not as such, nor was I directed to do so." He added, "I was directed to get the project done by June 30, 2011." Bondy said that he put in a plan to complete the project by March 31, 2011 which "takes in the account inevitable slippages." Bondy said that OPA was "trying to get to a point to come to an agreement acceptable to the Comptroller's Office." According to Bondy, his direction from Mark Page was to make sure that OPA had a team on-board to get the job done by June 30, 2011." (3574-5 B581)

Bondy continued:

"That sourcing by Technodyne was not brought to his attention, noting this was a "sourcing issue" by SAIC through its subs. Bondy said that OPA determined the size of the consultant teams. According to Bondy, Technodyne selected and sourced sub-consultants. According to Bondy, "sourcing issues were not on my radar screen." He said, "Costs are not connected to sourcing issues, costs are fixed." According to Bondy, the hourly cost of an individual consultant is fixed based upon established rates. The project cost goes up based upon how long it takes to get the job done, not the cost of sourcing. Bondy noted that team size does affect the project cost, but OPA regularly evaluated team size and that the team size did not increase during the life of the project, However, he said that there has been gradual growth of team size." (3574-5 B582)

Specifically, Bondy told the Government that on November 7, 2006 he conducted a Staffing Plan Review meeting with every City Time Unit Manager to ensure that the City Time

159

Project has necessary staffing to complete the job. Bondy stated "our number one job as managers is to make sure we, and our people have the resources needed to get the job done. Then, obviously we do the job as best we can." (DM 126 A1516-1519)  Again, this was Bondy and not an evaluation by Mr. Mazer.

In Bondy's sworn testimony to the NYC City Council on December 18, 2009, Bondy confirmed that he (Bondy) negotiated the Labor Rates with SAIC to be used on the City Time Project.

Specifically, Bondy explained, "What we established is a process very similar to the Civil Service process for hiring and payment of City employees. What we did was we had developed a table of standard titles, Junior Programmer Analyst, Senior Programmer Analyst, Project Manager Level One, Staff Analyst, System Tester, Trainer. We've developed a table of titles and these titles correspond to the titles which are documented or covered in the New York State OGS services contacts. Then we negotiated rates for those titles."

Bondy continues "It was April 2004. The gold standard that was being used to determine what should be the costs for products and services, information technology products and services were the New York State OGS services Contracts. So, what we did was we felt that that only represented a starting point for negotiation, that the City should be able to do much better than the State.

What we've done is we start with the OGS rates and we negotiate much lower, steep discounts against those negotiated rates and those are the rates that we're paying. We don't negotiate a rate for any individual consultant. "(MM 58 B868:22-870:3)  Bondy's testimony in this area (and all around) would have been devastating to the Government's whole theory of

prosecution and case against Mazer at trial on the labor rates related issues.

Also at the same NYC City Council December 18, 2009 hearing Henry Gerrita, Assistant Associate Director of DC 37, representing 125,000 active members and 50,000 retirees, testified under oath and confirmed what Bondy had testified to:  " This is a policy that this administration has pursued not only to this agency (OPA) but throughout all the City agencies. They draw down from the State OGS contract and they assumed that as a rate and they negotiate from that as a reduction." (MM 58 B913:22-914:5). Gerrita, like Bondy confirmed that it was NYC Government policy for IT projects to utilize NYS OGS contract rates as a starting point in rate negotiation and negotiate rate reductions. This strategy was approved on the highest level of NYC Governments and not approved by Mazer as the Government alleged.

Bondy also provided examples, pointing specifically to fees paid to Spherion's Mitchell Goldstein.

"The title in which he is working, the OGS rate, the Spherion OGS rate for that title is $391.17 an hour. We are paying $236.25 an hour to Spherion for his services, which represents off the top of my head I would say about a 40% discount off the standard rate."

"That's what would be charged by Spherion for his services because I don't know what Mitch Goldstein makes.  Again, that's what the firm charges the City. The standard rate, which has been negotiated, which is supposed to be a discounted rate. That was negotiated by the State for that title is $391."

Bondy repeatedly was asked by the Chairperson, if he or the City knew how much Goldstein or any other individual consultants were making? Bondy's response was firm:

I, again, don't know what they get. What I know is what Spherion gets. I don't know

what their salaries or rates are that they get paid by Spherion. All we know is what we are charged by the Vendor, by the contractor. We negotiate those rates and then they have their own arrangements with the people that they provide to us so we do not know what they've been paid."

Council Chairperson James asked further: "And these rates were based on State Law?"

Bondy responded: "Right".

Chairperson James: "So we pay these individuals standard rate but Spherion actually pays the individuals and Spherion bills the City of New York. Is that how it works?

Bondy replied: "Yes". (MM 58 B871:6-873:14)

Bondy further testified that "The individual consultants who work on City Time, they may be employees of Spherion or they may be sub-contractors of Spherion. We capture the sub-contractor information." (MM 58 B880:4-9)

"… If these people are working for Spherion as employees or as sub-contractors, that's just a matter of whether they get paid via 1099 or W2. To us, the cost is what we pay Spherion according to negotiations." (MM 58 B881:7-10).

Bondy testified further that:

In 2005, OPA brought in an analyst from Gartner with knowledge of payroll and timekeeping systems in order to evaluate the status of the City Time program. OPA hired Gartner through Spherion's Contract in order to assess the system architecture. Gartner had conference calls and meetings with OPA. Gartner's conclusion was that there was no existing system which was capable of meeting the City's requirements. Gartner concluded that the system needed to be flexible in order to meet the City's evolving needs and capable of adding

large numbers of users. Moreover, the system needed to be capable of processing information in accordance with the City's myriad rules regarding collective bargaining units and time differentials. (3574-5 B777; B1445-1460)

Bondy testified that

In 2005, when OPA approved the new software for the Project, OMB approved a large Amendment to the Budget. (3574-5 B582)

Bondy also confirmed this fact in his testimony in front of the City Council on May 8, 2008, which was set out in significant detail in the Statement of Facts of this petition.

Bondy confirmed that many agencies were not cooperating with getting the City Time Project finished until the agreement was reached with the Comptroller's Office and the Mayor's Office in September 2010. Bondy said that Mark Page did not use his clout to push the Project's completion with City agencies. Bondy said that he met monthly with Mark Page regarding the City Time project, but these meetings did not yield the results that he had hoped for with the City agencies. (3574-5 B582)

Bondy further testified that the Comptroller's Office did not demand a 5% cost reduction from SAIC. Bondy said that there was a cost of living clause in the contract that called for a 5% annual increase. The effective date for this increase was in April (2010). According to Bondy, Valerie Himelewski, OPA's General Counsel and ACCO refused to process invoices with the 5% increase because she thought that OPA did not have the independent contracting authority to do so. According to Bondy, the "problem" was that SAIC had already passed on the 5% COLA increase to its subcontractors.

Bondy said that Himelewski's position was that OPA should be pursuing an

aggressive cost reduction with SAIC. According to Bondy, Mark Page never had an issue with the budget for the project. He said that "Get it done" was the direction from OMB. Bondy believed that Himelewski was "forcing the issue" by refusing to process invoices with the 5% increase. Bondy said that he reached out to Andrea Cohen at the Law Department and that Cohen advised that under the contract OPA should approve the invoices with the 5% increase. According to Bondy, after his conversation with Cohen, Himelewski agreed to process the invoices. (3574-5 B581).

It was a known fact that Mayor Bloomberg's IT Strategic Directions Planning Initiative mandated that every City-wide Strategic Technology Project had to be reviewed, approved and monitored by the NYC Technology Steering Committee (TSC). TSC was chaired by the Deputy Mayor, Doctoroff and membership included the additional three Deputy Mayors, Page as OMB Director, and other NYC Oversight agencies executives (GX 451 B156).

On November 6, 2006 during his City Time Project presentation to the TSC, Bondy described Project goals and the scope of the Project. Bondy confirmed that the City's new project strategy was to continue software development per Gartner's recommendations in multiple development releases one thru seven.  It also included a City Time Contract history summary explaining why OMB and OPA in 2002 – 2004 made many strategic decisions to ensure development and implementation of the new custom designed City Time system. Bondy confirmed that development began in March 2004 and they anticipated completing it in October 2008.

Bondy also confirmed that the agency deployment process began in July 2005 after

"pilot" software was ready to be installed at five "pilot" agencies. (GX 451 B158). All those decisions were reviewed, agreed and approved by all NYC Oversight agencies and documented in the Statement of Facts of this Petition.

Bondy confirmed that Spherion provided QA analysts and Subject Matter Experts (SMEs) for the project. SMEs were individuals who could not be hired by OPA as City employees, but who worked on the City Time Project as needed based on expertise. When Valcich was Executive Director of OPA, Spherion's Contract was amended to allow Spherion to hire SMEs for the project. Spherion was responsible for managing the QA staff for the project. OPA managed the SMEs on the project. (3574-5 B578)

Bondy gave testimony specifically about Mr. Mazer: Bondy testified that "Mark Mazer is a Subject Matter Expert (SME)... working on the City Time program, employed by Spherion, who is working for us to manage the operations and system testing, Help Desk and Implementation effort of the SAIC provided services." "Mark Mazer is someone that worked with me at the Administration of Children's Services as a City Employee at that time." Bondy knew Mr. Mazer and his work and he (Mazer) worked under Bondy's management control under Bondy's active scrutiny. Every indication is that Mazer acted in accordance with Bondy's directions and with his approval before and after review, every step of the way.

Bondy testified that "He (Mazer) works on the Project, which is in my agency and I manage my agency so that is the relationship. (MM 58 B847:18-848:15)

Bondy further testified that "I took a more active role in the management of the City Time program. I was responsible for the placement of people into their management

positions for managing (units) of the Project. So, yes I had organized the activities of the Project into units in which they are organized and also appointed the people who run those organizations…" (MM 59 B850:25-851:6; GX 6197 B255; MM 1 B714; MM 2 B715-717; MM 6 B181; MM 16 B743-744; MM 20 B753) Bondy would confirm that on November 28, 2006 he transferred City Time Administrative responsibilities from Sarah Gurjal to Mohamed Hafeez.

As Gurjal confirmed in her November 28, 2006 email to Bondy:

"Going forward, my area of responsibility will consist of requirements and development of CT T&A (City Time and Attendance System) and WFM (Work Force Management which is City Time for uniform staff), including Scope and Release Management, CM and CCA Everything else that I am currently responsible for including CMO, Contracts and Budget (WO/RO approvals, invoice review and payment approvals), Test Case Design and Acceptance Testing, Agency Implementations/Deployment, Training, User Support, Project Communications, and Data Center Operations will be managed by either Mohamed Hafeez or You" (MM 1 B714; MM 2 B715-717; MM 73 MM73 B1431; MM 74 MM 74 B1432; 3574-2 B571).

This is significant because Gurjal's November 28, 2006 email to Bondy confirmed that she, along with Bondy and Hafeez (Not Mazer), managed the City Time project on behalf of the City. Mazer and the other hired consultants/SMEs did not.

Such testimony at trial by Bondy (and Gurjal) would have decimated the Government's allegations that "Mazer was given responsibility to run it [CT Project] for the City" and that "The other [Mazer] was the City's Top Guy" (Tr.4836:9-11 B47:9-11); "Mazer

was being paid to run the Project on behalf of the City. He was the City's point man" (Tr.4844:2-4 B48:2-4)."  The Government's allegation in this regard was outrageously wrong and misguided as to Mr. Mazer.

Bondy further testified and confirmed to the NYC City Council during the December 18, 2009 hearing the following: "I report to the Board of the Mayor and Comptroller and they both oversee the way that I am running the agency and I report to them on a monthly basis…"

"I have never had a meeting with the Mayor or Comptroller. I meet with their delegates, their representatives. Their Directors are appointed to my Board … They review the (cost) numbers on a very high level… At a very detailed level, I meet every month with OMB to go over the numbers…

Chairperson James: As it relates to City Time?

Mr. Bondy: As it relates to City Time, Yes.

Chairperson James: And each and every time that you've met with OMB and representatives of the Mayor of the City of New York they are fine with these numbers?

Mr. Bondy: Yes

Chairperson James: They're not concerned at all?

Mr. Bondy: I wouldn't say they're not concerned. The reason why they review the numbers with me monthly is to make sure that I'm sticking within the budget and the program that we defined and agreed upon in 2005 and instituted in the Contract in 2006. I would say that while they probably are not necessarily comfortable with the overall magnitude that we have come to, they are comfortable with the facts that we have stuck

within that budget and we have stuck to the plan that we had put in place at that time.

Chairperson James: What about the Comptroller of the City of New York?

Mr. Bondy: Through my Board of Directors, the Comptroller is aware and all of the feedback, I have gotten comfortable with what we have done. Also, our contracts are registered by the Comptroller's Office and I believe gets an extra degree of scrutiny whenever we register an Amendment and whenever we register a CP, a Certificate to Proceed, which is done on a six month basis. We are requested for extremely detailed documentation of what constitutes towards the makeup of all of that spending and funding." And with them to discuss this before those items are registered. (MM 58 B890:12-892:3)

Bondy also confirmed that " SAIC received a monthly amount that is based on the number of criteria such as the budget, title, the State Contract and the budgeted number of hours. Bondy stated that at the end of each month there is reconciliation done against the SAIC timesheets and what SAIC has submitted at the beginning of the month. If SAIC consultants worked less hours then projected, the City would get credit"... Bondy stated that the accounting group (under Alexander Malave's management within Mohamed Hafeez's organization) does a detailed audit which is based on hours worked by the SAIC consultants versus the invoices that were paid out. SAIC must prove to OPA that whatever [hours worked] was listed on the invoices were delivered. Bondy also stated that there has been significant money recouped in the past from SAIC from under-budgeted hours." (B568). Bondy would further confirm that the Implementation area that Mazer helped OPA to manage saved the City over $7.3 million in unused budgeted hours. Specifically, from

04/01/2006-12/31/2006 Mazer saved the City $4,292,934.39 (DM 16 A1512), and from 01/01/2007-09/30/2010 the City saved $4,714,884.29. Work Order 67 (WO67), for which Mazer was directly responsible, saved $2,249,844.08 for the City and OPA toward this total. (GX 1602 B1679 - 1681)

Bondy told the Government that OPA was required to complete Vendor Performance Evaluations annually for SAIC, in compliance with NYC PPB rule Sec 4-01, to receive Comptroller Office approval and final registration for annual Contract Amendment. (3574-5 B580).

Bondy confirmed "that the agency's ACCO is responsible for following the City's process regarding performance evaluations."

Bondy also confirmed that it was "Sarah Gurjal, the Assistant Executive Director of OPA was responsible for the (SAIC) evaluation along with Alexander Malave, OPA's fiscal Officer for the City Time Project. (GD 3800 A1462-1465; GD 3801 B682)

Bondy's extensive firsthand knowledge of and direct full time involvement with the City Time Project as presented in his testimony on multiple occasions, as referred to herein and in Statement of Facts section of this petition would have fully put the lie to the Government's allegations against Mr. Mazer.

Bondy's testimony to the Government was multi-faceted and comprehensive. It included a City Time Project history, answers to many questions, including, specifically, why the initial project budget was increased form $63 million to over $600 million, why it took so long to develop a custom City Time system and to complete the project, and why there were cost projection discrepancies and project delays.

Defense Counsel's failure to subpoena and call Bondy to testify at trial for Mr. Mazer was constitutionally ineffective assistance of counsel by any standard and it severely prejudiced Mr. Mazer and denied him a fair trial altogether, leading to a conviction on a wholly false prosecution theory.

### THE COURT'S EXCHANGE WITH SHARGEL HIGHLIGHTS THIS INEFFECTIVENESS

Particularly compelling proof that Shargel was constitutionally ineffective for failing to call the witnesses identified herein is reflected in the Court's own admonishment to Shargel when he tried to convince the Court to include instructions to the Jury that would effectively hold that the Government did not call the above named witnesses [even though they were on the Government's witness list] because these 'top executive' City officials' testimony would have harmed the Government's case against Mazer.

Judge Daniels admonished Shargel for requesting such instructions as follows:

The Court: I think that the issue has squarely raised that the argument was made that there were witnesses who might have been called at this trial and might have relevant evidence to give, and they were not called. (Tr. 5119: 5 -8; B49:5-8)

The Court: you [Defense Counsel] were still entitled to call that person as a witness and subpoena as a witness if you thought that person had relevant evidence. (Tr. 5121: 11 – 13; B51:11-13)

The Court: The law says that you could have called them if you thought they had exculpatory evidence to give, but let me remind you that you can make arguments but the Defendant has no obligation to call any witnesses. But you can't make arguments that somehow there's a witness out there that they [Jury] should have heard and that they didn't get to hear only because the Government had the opportunity and the right to bring them in here and you didn't. You can't imply that you pretty much said that. (Tr. 5122: 16-24; B53:16-24)

The Court: The basic premise of this instruction is that if you want them, if you think there's something important for them [the Jury] to hear and the Government

doesn't bring those people in, you have a right to bring them and the equal right and opportunity to bring those people in. (Tr. 5124: 18-22; B53:18-22).

The Court: I don't have any idea what witness you're trying to make reference to and that you tried to imply to the Jury should have been here that wasn't here…you simply made a generic argument. (Tr. 5126: 15-20; B56:15-20)

After defense counsel identified Mark Page from OMB, Sarah Gurjal and others, the

Court responded with the following:

The Court: Now that you identified these people it makes it even more relevant because you could have called those people if you wanted them to testify (Tr. 5127: 1 – 13; B57:1-13)

Mr. Shargel: The repeated suggestions (by the Government) that Mark Mazer set the prices for the laborers, and they say that over and over again as one of the key elements of their fraud, we have learned that there are many people who are way above Mark Mazer's station in the City life who do that.

Court: Then you should have called them…If you wanted to demonstrate that …you had the right and ability to do so. (Tr. 5127: 16 -24; B57:16-24)

Finally, one of the most telling exchanges between Shargel and the Court that highlights

in extraordinarily strong terms just how clear and fundamental – and prejudicial – Shargel's

ineffectiveness was for his failure to call to testify these top executive level City employees who

could have and would have completely exonerated Mr. Mazer:

Mr. Shargel: Judge, if there were three people that were victims of bribery ---

The Court: And two of them said it wasn't your client. Yes, it would be your responsibility to call the two who said it was somebody else other than your client and not the Government's responsibility. And you can't say to the Jury that because they didn't call the other two you're supposed to assume that they would have had something negative to say. (Tr. 5127:25 – 5128:7; B57:25-B58:7)

The Court: …I sympathize with you, but it was in your hands. You created this monster, not me. So we'll see. (Tr. 5131:25 – 5132:2; B61:25-B62:2).

This exchange between this Court and defense counsel demonstrates the very prejudice that inured to Mr. Mazer directly as a function of Shargel's error in not calling Page, Hafeez, Gurjal, Newson. Ruppel, Himelewski and Even Yowell as defense witnesses to provide direct exculpatory evidence.  This clearly satisfies both prongs of *Strickland.*

Shargel's absolute failure even to interview these witnesses after reviewing their 3500 material and other public documents alone reflects clear ineffective assistance of counsel in the investigative and trial preparation stage of the proceedings – firmly recognized as a critical stage in the process.  It is inexcusable and certainly cannot be justified by any purported strategy.  *See e.g., Davis v. Alabama,* 596 F.2d 1214, 1217 (5th Cir. 1979); U.S. v. DeCoster, 487 F.2d 1197, 1201 (D.C. Cir. 1973).

Had they been called to testify, there is far more than a reasonable probability that the outcome would have been completely different.  The entire substance and tone of the trial as to Mr. Mazer certainly would have been entirely different.  Their testimony, based not on supposition, but on prior sworn testimony and credible documents, has been described in detail above.  That should suffice to more than sufficiently prove Mr. Mazer's claim on this issue.

Mr. Mazer was irretrievably prejudiced with respect to the evidence that went (and did not go) before the jury and, as the exchange above reflects, in presenting his defense theory altogether to the jury on the most material issue of guilt or innocence.

Tellingly, of course, Shargel had no legitimate – and certainly no strategic-based – reason to offer the Court for his failures, as the exchange quoted from above demonstrates. There was no tactic at work here; there was just an abysmal failure in the most fundamental

regard and this unequivocally constitutes ineffective assistance of counsel under *Strickland* or any other standard requiring that the judgment of conviction and sentence be set aside.

As mentioned earlier in this Addendum, it is easy to understand why the Government decided not to call Gurjal, Page, Newson, Ruppel, Himelewski, Hafeez, Yowell, or Bondy at trial. Any basic review of their prior testimony and other relevant documents would have made it clear to the Government that rather than support the Government's false and misguided theory of prosecution as to Mr. Mazer, they would have completely exposed the Government's theory as false and without any basis even as to its premises.

The details that demonstrate this point already have been provided herein at great length and need not be reiterated here. In the most basic terms, though, the Government presented an illusion in this case that in 1998 the City signed a contract to develop its City Time system for $63 million, went to sleep till 2011, and when they woke up they realized that they spent $700 million on the same system as they planned to spend $63 million in 1998 and that somehow Mr. Mazer was responsible for this or even had a role it. These witnesses, unequivocally, one and all indisputably would have shown that this was absolutely untrue and could not be true.

The Government never presented to the jury the extent and multiple layers of the due diligence, review, and approval process that NYC Executive oversight agencies like OMB, Legal, Mayors Office, Comptroller Office, etc. went through month after month, year after year in reviewing and approving every little detail of the project.

It was Shargel's duty, professional responsibility, and constitutional obligation to present this to the jury, through these witnesses' first-hand testimony, showing multiple levels

of the City officials who were informed and who evaluated the ongoing budgeting needs of the City Time project during the entire time Mazer worked on the project. It would have made the Government's theory impossible. They also would have clearly proven Mazer's lack of authority to make or influence the decisions, steps, and role falsely attributed to him by the Government. They would have proven that the staffing plans, projected costs, and Labor Rates under contract and its amendments were transparent and constantly were reviewed by multiple City agencies.

Once again, Mr. Mazer's Fifth and Sixth Amendment rights were violated by the acts and omissions of his defense counsel in this regard and the judgment of conviction and sentence must be set aside.  An evidentiary hearing must be provided.  While Mr. Mazer recognizes that ordinarily the decision as to whether to call witnesses and which witnesses to call at trial is a decision relegated to a "lawyer's strategy," here than can be no legitimate "strategy" justification for neither interviewing nor calling to testify witnesses who were among the most exculpatory possible in every regard and about whose testimony there was no need for "speculation;" for there was a full record of their prior testimony and other statements and evidence which firmly established them as material exculpatory and impeachment witnesses who would have torn apart the Government's theory and evidence and fully supported Mr. Mazer's defense.  This case is among those cases in which "strategy" or "speculation" provides no refuge for the Government.  *See e.g. Pavel v. Hollins,* 261 F.3d 210, 217-218 (2d Cir. 2001).

"To warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that he has a 'plausible' claim of ineffective assistance of counsel, not that 'he will necessarily succeed on the claim.'" *Puglisi,* 586 F.3d 209 at 213 (2d Cir. 2009) (quoting *Armienti*

*v. United States*, 234 F.3d 820, 823 (2d Cir. 2000)).  Mr. Mazer has more than satisfied that

standard with all of his claims.

## FAILURE TO CONSULT WITH OR CALL EXPERT WITNESSES AS REQUESTED

Mr. Mazer asked Mr. Shargel to retain the services of several expert witnesses to

assist in trial preparation and testify on Mazer's behalf during the trial.  Shargel refused and

failed to follow Mr. Mazer's wishes and Mr. Mazer was unfairly prejudiced by this in violation of

his Fifth and Sixth Amendment rights.

Mr. Mazer specifically asked Shargel to bring on an expert in government contracts

generally and, specifically, an expert in the kind of contract process in New York City that is at

issue in this case.  Mr. Mazer felt that it was essential to have an expert witness explain to the

jury in terms they would understand how the contracting process works, the multi-layers of

review required for the review, approval, and authorization of expenditure requests and

especially with the extraordinary changes in the Project at issue, as occurred here.  The expert

would have been essential in explaining the limited authority and role Mr. Mazer had in the

process under the terms of the contract and the rules and regulations that governed the City's

contracting process.

The expert Mr. Mazer asked Shargel to consult with and call as a witness would have

had a full background of experience with the peculiarities of the New York City contracting

process, the Procurement Policy Board (PPB) rules and regulations, the NYC Charter Chapter 13

regulations, including the Vendex procedure, the method and moving parts involved in the

process that led to Amendments 1 through 11, and more technical detailed information that

was crucial for the jury to understand.

As noted above, this was absolutely essential, especially in light of Shargel's own apparent lack of a full understanding of the process or inability to keep the details in mind, and his failure to call the witnesses identified above who could have given first hand testimony on these subjects. This all went to the very heart of Mr. Mazer's defense theory.

Secondly, Mr. Mazer asked Shargel to consult with and call to testify a forensic accounting expert witness who would have conducted a Labor Rate Analysis to confront a critical part of the Government's case that badly misled the jury as to both the facts and Mr. Mazer's role. An expert readily could have and would have exposed the errors in the Government's case; instead, it went largely unchallenged and this severely prejudiced Mr. Mazer.

Specifically, an Accountant Expert would have testified that through the reconciliation process OPA and the City were credited $7.3 million by SAIC for unused Labor Hours in the units under Mazer's management and confirm that SAIC actually reduced OPA invoices. (DM 16 A1510-1512; GX 1602 B1679-1682; GX 400-14 A974).

An expert forensic accountant would have provided critical Labor Rate Analysis comparing multiple labor rate tables to confirm that OPA actually paid discounted labor rates. This would also confirm that Labor Rates in Work Order 67 that OPA negotiated with SAIC, used to pay for consultants, were actually reduced from the Labor Rates in Amendment 6.

Finally, a forensic accounting expert would have further verified that Mazer did not approve payment requested (invoices) submitted to the City and OPA as a Government charged Mazer with in the indictment. Rather, the forensic accountant would have found and explained that it was Malave, Gurjal, Hafeez and Bondy who approved all invoices submitted to OPA for

the City Time Project expenses.  (GX 200-1 B120; GX 200-51 B122-123; GX 301-12 B124; GX 301-52 B126; GX 301-68 B127; DM 303-16 A1585-1586; GX 302-103 B129; GX 303-18 B131; GX 304-36 B133; GX 304-42 B134; GX 305-2 B135)

Finally following his conviction, Mazer insisted that Shargel retain the services of a federal sentencing exert to assist in the sentencing phase of the case.  Shargel refused to do so.

Mr. Mazer specifically insisted on having a sentencing expert who would conduct a thorough national analysis to enable the defense to show the Court at sentencing the tremendous disparity in the sentence being considered for and that ultimately was imposed on Mr. Mazer given the relevant factors at issue.  This is explained in greater detail in the following section of this Addendum.

Mr. Mazer has now retained the services of just such a sentencing expert who regularly performs such work and he has submitted with this Motion the results of such analysis and, of course, it fully supports the argument that Mr. Mazer wanted to have forcefully made on his behalf at sentencing.  The sentence imposed on him is far outside a normative sentence for a defendant under similar circumstances and that is an important factor for the Court to consider at sentencing, as the cases cited herein demonstrate.

Those expert witnesses would have provided a key part of Mr. Mazer's defense in both disproving the Government's theory of this case that Mazer influenced (or even could have influenced) the City into accepting a contract that ultimately cost the City over $100 million in cost over-run expenditures.  They would have completely exposed the error of the Government's theory on the Labor Rate aspect of the case.  And they would have provided the Court with vitally important and directly relevant sentencing information that would have at

least demonstrated to the Court the range of sentence imposed around the country for a similar loss figure and a similarly situated defendant.

While the decision as to whether to call an expert witness at trial often is relegated to the realm of trial strategy allocated to defense counsel, that is not the case where, as here, the Defendant made his adamant wishes on the subject well known to defense counsel, along with his sound reasons for the same, where defense counsel never even bothered to explore the matter, and where there is no strategic reason that in any way supports or justifies the failure to investigate the matter or call the expert to testify for the Defendant.

Indeed, it is directly relevant here that in *Pavel v. Hollins*, 261 F. 3d at 224, the Second Circuit agreed with the Ninth Circuit assessment in *United States v. Tucker* 716 F. 2d 576, 581 (9th Cir. 1983), that in a complex fraud case "it should have been obvious to a competent lawyer that the assistance of an accountant [was] necessary." The Court expressly noted that counsel may be found to be ineffective for failing to consult an expert where "there is substantial contradiction in a given area of expertise" or where counsel is not sufficiently "versed in a technical subject matter...to conduct effective cross-examination."

Both of those factors apply here and fully support a finding of constitutional ineffectiveness with respect to Mr. Shargel's failings in refusing Mr. Mazer's requests to consult with experts in these areas and his refusal to use their services at trial.

**DEFENSE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR FAILURE TO ARGUE THAT THE DEFENDANT'S SENTENCE WAS PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE**

When imposing a federal sentence, a district court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." (18 USC § 3553 (a) (6))  Also see *Kimbrough v. United States*, 552 US 85, 108 (2007). The Second Circuit has held that Section 3553 (a) (6) requires a district court to consider nationwide sentence disparities and not just case – or district – specific. *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008). "Reasonableness review involves consideration of both the length of sentence (substantive reasonableness) and the procedures used to arrive at the sentence (procedural reasonableness)." *United States v. Canova*, 485 F.3d 674, 679 (2d Cir. 2007). Defense Counsel needs to be prepared and must argue these basic tenets of the sentencing law.

In the instant case Mazer's counsel failed to argue that the 20 years sentence imposed on him clearly reflected a wide disparity nationally from other defendants who were convicted of the same offenses and who were further attributed with a similar loss amount [$100 million].

In researching this issue, Mazer retained a nationally respected sentencing expert who has carefully examined this case.  He has now provided a national sentencing disparity report which clearly shows the striking disparity at play here.  (Exhibit "1" attached hereto)

The expert's report, drawn from facts and numbers readily available now and at the time of Mr. Mazer's sentencing, demonstrates quite clearly that most defendants similarly situated have received sentences that are substantially lower than Mazer did.

This expert, or one with comparable expertise, certainly was available for Shargel to have used in connection with Mr. Mazer's sentencing to put this compelling disparity information before the Court. But with or without an expert, the data was readily available and Shargel was constitutionally ineffective for his failure to research the data and for his failure to use it at sentencing.

This Court did, of course, indicate that it had considered § 3553 (a) factors in arriving at the maximum statutory sentence on each count of conviction and the sentence imposed was, of course, below the guidelines range of 43 that the PSI report has scored. However, the latter fact is simply a function of the principle that this case represents yet another clear example where the guidelines in fraud prosecutions "have so run amok that they are essentially absurd on their face." *United States v. Adelson*, 441 F. Supp. 2d. 506, 515 (S.D.N.Y. 2006), due to the "kind of piling on points for which the guidelines have frequently been criticized." *Id.* at 510. *See also United States v. Lauersen*, 348 F.3d 329, 342-344 (2d Cir. 2003)

In a recent Second Circuit case, *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017), *cert. denied*, 2017 U.S. LEXIS 7231 (December 4, 2017), the Court reversed a within-guideline sentence as substantively unreasonable where the court neglected to consult readily available sentencing statistics from the U.S. Sentencing Commission.

In *Jenkins*, the Second Circuit held that the sentence that the district court imposed based on the irrationality § 2G2.2 created the type of unwarranted sentence disparity that violates § 3553 (a) (6). As the Court found the Commission's statistics, which were readily available to the district court at the time of sentencing – in Jenkins and in Mr. Mazer's case - allow for a meaningful comparison of the defendant's behavior to that of other similarly

situated defendants, and plainly showed there, as here was excessive and unwarrantedly disparity from other similarly situated offenders. The *Jenkins* principles, of course, apply with the same force in the instant case, for fraud and all other charges of conviction.

Similarly, in U*nited States v. Singh*, 2017 U.S. App. LEXIS 24994, *16-*18 & n.3 (2d Cir., December 12, 2017), the Second Circuit considered a 60 month sentence in an illegal re-entry case to appear to be both procedurally and substantively unreasonable and remanded the case for reconsideration, notwithstanding the defendant's significant criminal history (CHC II) and the lower court's finding of a lack of remorse with respect to a particularly serious underlying crime in the defendant's history. Among the factors the Court found significant was the harshness of the sentence imposed relative to nationwide norms for the charge of conviction, even with a multi-level enhancement as was imposed for Mr. Singh. In contrast to an offender like Mr. Singh, of course, Mr. Mazer has no criminal history whatsoever.

The decisions in *Jenkins* and *Singh* highlight the ineffective assistance of counsel at sentencing that attended Mr. Mazer's case, for the failure by Shargel even to consider this readily available and applicable argument using readily available, meaningful nationwide statistics, let alone his failure to do the work necessary to make the appropriate showing.

*See also, United States v. Stock,* 685 F.3d 631, 629-30 (6th Cir. 2012) (observing that sentence was "by far the longest" imposed for an offense such as the one at bar, and that this might affect the reasonableness of the sentence on remand); *United States v. Musgrave*, 647 Fed. Appx. 529, 538 (6th Cir. 2016) (upholding reasonableness of sentence against Government appeal where district court "studied sentencing statistics nationally and in the Southern District of Ohio"); *United States v. Buesing*, 615 F.3d 971, 974 (8th Cir. 2010) (affirming sentence that

was arrived at in part through analysis of Sentencing Commission statistics); *United States v. Stern*, 590 F. Supp. 2d 945, 961 (N.D. Ohio 2008) (because the purpose of guideline sentencing is to reduce unwarranted disparities nationwide, "[t]he Court has carefully considered an extremely wide variety of opinions from across the country as well as the National Guideline Statistics"); *United States v. Brasfield*, 2011 WL 3844181, *4 n.5 (E.D. Wis. 2011) (reviewing statistics for child pornography offenders); *United States v. Garcia-Jaquez*, 807 F. Supp. 2d 1005, 1016 (D. Colo. 2011) (considering statistics for immigration offenses); *United States v. Kamper*, 860 F. Supp. 2d 596, 608 (E. D. Tenn. 2012) (lamenting the absence of statistics for MDMA offenses and stating that "[t]he Commission's statistical work is invaluable to district court judges").

Shargel proved to be constitutionally ineffective when he failed to argue that the Government's position as to Mazer's sentence was procedurally and substantively unreasonable because it was (and still is) inconsistent with 18 USC  § 3553 (a) (6) which expresses the need to eliminate unwarranted sentencing disparities on a "national level." *Pepper v. United States*, 562 U.S. 476; 131 S. Ct. 1229, 1248 (2011).

Shargel argued that he had recently represented a client in a similar fraud case when the defendant received a substantially lower than guideline sentence for approximately the same amount of loss.  But he never supported that argument – a legally cognizable one under the statute and one which could have been forcefully demonstrated in a much broader context than just his anecdotal evidence from one client.  Shargel never investigated nor argued to this Court, what the national average sentence among defendants with similar records who had been found guilty of similar conduct.  This is exactly what is provided for in Section 3553 (a) (6),

which concerns "national disparities between defendants with similar criminal histories convicted of similar criminal conduct – not just disparities between same district court or co-defendants. *United States v. Wills*, 476 F. 3d 103, 110 (2d Cir. 2007).

While Mr. Mazer cannot demonstrate in a vacuum that the Court would have been persuaded at the time of sentencing with a showing that demonstrated the disparities, Mr. Mazer was constitutionally entitled to have that showing made, as it is directly relevant under Section 3553 and the decision in *Jenkins and Singh* demonstrates both its relevance and its importance.

Mr. Mazer has attached as a consolidated Exhibit "1" to this Addendum, three charts that reflect data from national sentencing statistics that were readily available at the time of sentencing (authenticated and explained in an Expert Declaration that is part of Exhibit "1") and that give rise to truly striking inferences that Shargel should have brought to the Court's attention at sentencing as a function of basic sentencing advocacy. He would have been best served to have done so through an expert witness; but in any event, basic Fifth and Sixth Amendment effectiveness required that he at least use the national statistics himself to make the argument. Mr. Mazer can make the point even more emphatically at an evidentiary hearing on this motion; but the following should suffice for now to make the point. Based on data that would have been available to him at the time, had he bothered to look, counsel for Mr. Mazer could have (and should have) credibly argued at sentencing (through an expert or just based on the data) at least the following (See Exhibit "1" attached hereto):

As reflected in Chart 1 (Sentencing Distribution), Mr. Mazer's 240-month sentence was in the 86th percentile. Meaning it was greater than 86% of the 227 sentences in this group. It

also was 4 times greater than the median sentence of 60 months, and over twice the 107.7-month average.

As reflected in Chart 2 (Loss Distribution), Mr. Mazer's loss amount of just over $100 million was significantly lower than the average loss amount of $523,408,883, and the median of $195,000,000.

As reflected in Chart 3 (Scatter Plot), no other individual with a loss amount of just over $100 million received a sentence of 240-months. In fact, for such a loss amount, Mr. Mazer's sentence was the highest ever imposed between fiscal years 2006 and 2016.

Each chart's data is compelling in arguing that Mr. Mazer's sentence was far too harsh; but the data reflected and the absolute conclusion derived from the data in Chart 3 is overwhelming. Mr. Mazer has no record of any criminal convictions other relevant factors about him and his role in this matter have been discussed above. Notwithstanding all of that, the sentence imposed on him in this case was the highest sentence imposed in the whole country between 2006 and 2016, based on the loss amount attributed to him by the Government – a loss amount that Mr. Mazer believes has no basis in law or in fact under any circumstances.

Surely, this data alone would have at least given the Court pause before imposing the stiffest sentence in the entire nation over a ten year period, even in a universe of similar attributed loss amounts, on Mr. Mazer.

Mr. Mazer believes that this data, if properly presented to the Court at sentencing, preferably through an expert, but even just as authenticated data presented by counsel, along with a fair consideration of the Section 3553 factors, would have compelled the Court to

impose a significantly lower sentence and Shargel was constitutionally ineffective for his failure

to make the available and availing arguments at sentencing.[7]

**DEFENSE COUNSEL CONCEALED FROM PETITIONER THAT HE SUFFERED FROM THE EFFECTS OF A MENTAL IMPAIRMENT (UPON INFORMATION AND BELIEF, ALZHEIMER'S DISEASE OR SOME OTHER VARIETY OF DEMENTIA) AND PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND HIS ASSOCIATED FAIR TRIAL RIGHTS BASED ON COUNSEL'S IMPAIRMENT AND ITS EFFECT AT ALL TIMES THAT HE REPRESENTED PETITIONER.**

In November of 2017, while preparing the instant 2255 petition, Petitioner Mazer was

advised that his trial counsel, Gerald Shargel, has been diagnosed with a mental impairment

(the information given to Mr. Mazer was that the impairment is Alzheimer's disease or some

related form of dementia) and is not able to practice law. Indeed, as reported in the press,

Shargel has resigned from his law practice and has acknowledged having "health" issues which

he would not disclose.

---

[7] The American Bar Association's "Criminal Justice Standards for the Defense Function" (4th ed.) strongly suggest that failure to research and cite favorable sentencing statistics may constitute ineffective assistance of counsel. In the seminal case of Strickland v. Washington, 466 U.S. 668 (1984), the U.S. Supreme Court observed that "prevailing norms of practice as reflected in the American Bar Association standards . . . are guides to determining what is reasonable" for purposes of establishing whether counsel was constitutionally defective.

Standard 4-1.1(b) thus provides that these Standards "may be relevant in judicial evaluation of *constitutional claims* regarding the right to counsel." (Emphasis added). As part of counsel's general duty to investigate, Standard 4-4.1(d) provides "Defense counsel should determine whether the client's interests would be served by engaging fact investigators, forensic, accounting or other experts, or other professional witnesses *such as sentencing specialists* or social workers, and if so, consider, in consultation with the client, whether to engage them. Counsel should regularly re-evaluate the need for such services throughout the representation." (Emphasis added).

Standard 4-8.3 expressly applies to "Sentencing." Subsection (a) provides that "[e]arly in the representation, and throughout the pendency of the case, defense counsel should consider potential issues that might affect sentencing. . . . *Defense counsel should also consider whether consultation with an expert specializing in sentencing options or other sentencing issues is appropriate*." (Emphasis added). Subsection (b) then provides that "Defense counsel's preparation before sentencing should include *learning the court's practices in exercising sentencing discretion*; the collateral consequences of different sentences; and *the normal pattern of sentences for the offense involved*, including any guidelines applicable for . . . sentencing." (Emphasis added). Mark Allenbaugh, https://sentencingstats.com/blog/ineffective-assistance-counsel-sentencing (October 13, 2017).

https://www.law.com/newyorklawjournal/sites/newyorklawjournal/2018/01/10/shargel-retires-from-the-law-capping-49-years-of-trials/?slreturn=20180018204732.

Petitioner has a good faith basis for believing that Shargel suffered from this debilitating condition at all times while representing Petitioner at each stage of the process in this case since he first was retained.  At all times, including through the present time, Shargel failed to disclose to Petitioner this very serious impairment under which he suffered and, indeed, he concealed it from Petitioner.  Mr. Mazer expects to be able to submit evidence as well from another of Shargel's clients during this same time period that further supports both the idea that Shargel suffered from Alzheimer's at all relevant times and that it dramatically impaired his ability to zealously and effectively defend his client at trial or adequately prepare for trial.

If Petitioner had been made aware that Shargel suffered from this condition, he, without any question would have dismissed Shargel as his Attorney and retained alternative counsel to represent him.  Shargel's concealment of his impairment had the effect of denying Mr. Mazer the ability to knowingly and meaningfully exercise his right to counsel of choice.  Moreover, this situation created a conflict of interests between Mr. Mazer's interests and Shargel's interests (in keeping his very large fee and his position with the large law firm he joined contemporaneously with taking on this case, and in obtaining additional fees for additional clients and their cases).

In retrospect, knowing this now explains a great deal about the deficiencies in Shargel's performance in this case.  These were deficiencies that Mr. Mazer noticed and commented on at the time; but he was put off with excuses like, "You know Jerry won't remember what you tell him from day to day" or "You know Jerry can't focus on or retain details."  It also explains

186

why Shargel actually was not able to understand or focus on the complexities of this case and was completely unable effectively to cross-examine government witnesses, make use of exculpatory and impeachment evidence or to prepare Mr. Mazer to testify on his own behalf at trial as Mazer consistently insisted he wanted to do.

Shargel's failure to disclose to Mazer that he was suffering from Alzheimer's not only constituted ineffective assistance of counsel under traditional *Strickland* analysis; it  importantly presented a conflict of interests between Shargel's own interests and Mazer's best interests and denied Mr. Mazer the right to knowingly and meaningfully select counsel of choice for his defense.

As a preliminary matter, Mr. Mazer must be provided with full discovery concerning Shargel's diagnosis, any and all communication with his firm about his condition, and all other information regarding this impairment at all times from its onset.  Ultimately, Mr. Mazer's judgment of conviction and sentence must be set aside based on the conflict of interests arising from Shargel's impairment that adversely affected Mr. Mazer and on the otherwise ineffective assistance of counsel that severely prejudiced Mr. Mazer.

### RELEVANT FACTUAL BACKGROUND CONCERNING THIS CLAIM OF INEFFECTIVENESS

All facts previously set out in Mr. Mazer's Section 2255 motion are incorporated herein. The focus in this section is on examples of facts that indicate the adverse effects and, indeed, prejudice for Mr. Mazer's defense as a function of Shargel's medical impairment.

Mr. Mazer can point to several incidents where Shargel's defense strategy or tactics were explicitly affected (or wholly absent) because of his debilitating disease.  One example is evident from Shargel's request to the Court at the end of the trial for a special jury instruction

187

that would have informed the jury about inferences it could draw from the failure by the government to call certain key witnesses at trial. As the Court might recall, and as described in another section of this motion in further detail, when Shargel requested the jury instruction at issue, the Court actually admonished Shargel for requesting it because Shargel had had every opportunity to call the key witnesses for Mr. Mazer, but wholly failed to do so. As this Court so candidly put it, "...I sympathize with you, but it was in your hands. You created this monster, not me. So we'll see. (Tr.5131:25-5132:2 B61:25-62:2). Shargel simply and without any legitimate reason failed to call the witnesses at issue.

A consideration of Shargel's completely disjointed, disorganized, disoriented, repetitive, and otherwise abominable closing argument clearly reflects his impairment and rendered it devoid of impact, to say the least.

Shargel's mental impairment, especially if Alzheimer's, also explains why he failed to interview and call those witnesses and several other critical defense witnesses (as argued in the uncalled witnesses section of this petition) when a review of these potential witnesses' 3500 material undisputedly contained powerful exculpatory evidence that would have fully supported Mr. Mazer's theory of defense and, in fact, would have completely exonerated Mazer for all criminal liability.

The only explanations are that either Shargel forgot what he read in each witnesses' 3500 material, he knew that he could never prepare each witness for trial testimony considering his lapses of memory, or that the complex details of this case were just too overwhelming for him and he knew he had to end the trial as soon as he could, even if it meant foregoing critically important exculpatory testimony, because of his condition and to avoid

188

having the condition publicly uncovered. He also risked having to refund the huge attorney's fee he charged in this case and required Mr. Mazer to pay up front.

The exposure of his condition also would have risked his new relationship with Winston & Strawn, the firm he had recently joined, with Mr. Mazer being the big client he brought into the firm.[8]

Additionally, Shargel's memory loss further explains why he told Mazer that he did not have time to prepare him to testify in his own behalf. The time limitation may have only been one factor. The real reason was that Shargel knew that he could not prepare himself to have Mazer testify as there surely would have been 2 to 3 days of grueling testimony through direct and cross examination and Shargel simply could not focus on or remember the details. Mr. Mazer believes Shargel clearly knew during the trial and perhaps before that he would never be able to prepare Mazer to testify or conduct the direct examination and so Shargel insisted that Mazer not testify, despite knowing that Mazer wanted and needed to testify and that his (Shargel's) decision on this point directly conflicted with Mazer's expressed wishes and best interests.

There are several other incidents [some of which are described in detail in other sections of this motion] from which it becomes clear that Shargel provided constitutionally ineffective assistance of counsel as a function of his disease, and was not functioning as the attorney Mr. Mazer thought he had retained or at any level that came close to satisfying the Sixth

---

[8] Shargel and his firm could well have faced stiff disciplinary sanctions if his condition were uncovered and he continued to appear at trial to represent criminal defendants in complex cases, like the circumstance present here. *See e.g., Matter of Velez*, 123 A.D. 3d 231 (1st Dept. 2014); *Matter of Farinella*, 91 A.D. 3d 35 (1st Dept. 2011); *Matter of Kalina*, 78 S.D. 3d 92 (1'st Dept, 2010).

Amendment guarantee to effective assistance of counsel. Mr. Mazer was severely prejudiced by this and his defense clearly was adversely affected.

For all the reasons given above, this Court should order full discovery on this issue, conduct an evidentiary hearing in order to determine what effect Shargel's debilitating Alzheimer's disease had on his professional performance to represent his client and whether Mazer would have elected to hire different counsel had Shargel disclosed his illness prior to trial, and ultimately set aside Mr. Mazer's judgment of conviction and sentence.

While the few reported cases that have considered the impact it has, in constitutional terms, when a defense attorney in a criminal case is found to have suffered from Alzheimer's have analyzed the issue within the *Strickland* construct[9] – and Mr. Mazer respectfully submits that Shargel's performance was constitutionally ineffective under *Strickland*[10]- Mr. Mazer respectfully contends that in the context in which the matter arises here, Shargel's situation should be considered a *per se* conflict, requiring the automatic reversal of the judgment of conviction and sentence or, at the very least, an actual conflict that adversely affected Mr. Mazer using the analytical framework of *Cuyler* and its progeny. As mentioned earlier, Mr.

---

[9] *See e.g. Clark v. United States*, 2013 U.S. Dist. LEXIS 15517; 2013 WL 5815507 (S.D.N.Y., October 29. 2013)(Fact-intensive inquiry leads to conclusion that attorney's Alzheimer's in representing defendant for guilty plea did not render counsel ineffective); *Dows v. Wood*, 211 F.3d 480 (9th Cir. 2000).

[10] Indeed, Mr. Mazer respectfully submits that having a lawyer who suffers from Alzheimer's or some other mental impairment in a complicated criminal case with voluminous relevant written materials from which the defense theory finds full support and with witnesses who have detailed testimony to offer which would exonerate the defendant, is similar to the sleeping lawyer situation presented in *Tippins v. Walker*, 77 F.3d 682, 685-687 (2d Cir. 1996). In that case, of course, the Court found the prejudice arising from the circumstance of a sleeping lawyer to constitute *per se* or "inherent" prejudice for purposes of *Strickland's* second prong. Like the lawyer in *Tippins*, here it was not just a matter of Shargel missing certain key opportunities, it is a matter of the breakdown of the entire adversary process at trial for Shargel was unable even to "sort out what initiatives were open" as a line of defense in the case. It is a matter of fundamental fairness to hold that a trial held without a fully functioning advocate for the defense does allow the defendant the kind of defense to which he is entitled under the Fifth and Sixth Amendments to the Constitution.

Mazer also contends that, given the concealment by Shargel of his condition, he also has been deprived of his right to counsel of choice under *United States v. Gonzalez-Lopez. 548 U.S. 140 (2006)*.

Mr. Mazer relies on his detailed description earlier in this motion for his legal analytical framework for the kind of claims presented here. The judgment of conviction and sentence in this case must be set aside due to the ineffective assistance of counsel and other Fifth and Sixth Amendment deprivations arising from Shargel's medical condition and from his concealment of the same from Mr. Mazer

**MAZER WAS DENIED HIS CONSTITUTIONAL RIGHT TO TESTIFY ON HIS OWN BEHALF AND DEFENSE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR NOT APPROPRIATELY ADVISING MR. MAZER OF HIS CONSTITUTIONAL RIGHT TO TESTIFY, FOR OVERRIDING MR. MAZER'S DESIRE TO TESTIFY ON HIS OWN BEHALF, AND FOR NOT BEING PREPARED FOR MR. MAZER TO TESTIFY AND FOR NOT PREPARING MR. MAZER TO TESTIFY**

Mr. Mazer's rights under the Fifth and Sixth Amendments to the United States Constitution were violated when he was effectively denied the right to testify at trial. His lawyer failed to inform Mazer that he had a right to testify on his own behalf and that the decision as to whether he would testify on his own behalf was his alone to exercise or waive. Further, when Mr. Mazer expressed his clear desire to testify, Shargel overrode Mazer's decision to do so by telling him he would not let him testify, by failing to prepare him to testify, and by failing to be prepared himself for the Mazer to provide the meaningful, even dispositive testimony he would have provided on his own behalf.

With all due respect, the violation of Mazer's constitutional rights in this regard and Shargel's actions were exacerbated by the failure of the Court ever to address Mazer and advise

him that he had the right to testify or to inquire of Mazer whether he wished to testify on his own behalf. Mr. Mazer respectfully includes this in his claim that his Fifth and Sixth Amendment rights were violated. Moreover, even greater prejudice was caused to Mr. Mazer by the jury instructions which, while indicating that no defendant has an obligation to testify, highlighted that Mazer did not testify and contrasted Mazer with Aronshtein, who, the jury was reminded, did testify. [Trial Transcript at 5332]. Mr. Mazer respectfully submits that the denial of his right to testify was rendered even further prejudicial under the circumstances, in light of the prosecution's comment on his failure to testify as discussed hereinbelow.

Had Mr. Mazer testified on his own behalf at trial, the result undoubtedly would have been completely different. He would have been acquitted; for he was not guilty of the charges against him and he would have explained exactly why. Mr. Mazer's testimony would have included the facts set forth herein in all of their detail, including, but not limited to, the facts described under the uncalled witnesses section of this Addendum and the entire introduction and background in this Addendum.

It is well established that a criminal defendant has the right to testify on his own behalf. *Rock v. Arkansas*, 483 U.S. 44, 49-53 (1987). Also see *Brown v. Artuz*, 124 F. 3d 73, 76 (2d Cir. 1997). This right…is essential to due process of law in a fair adversary process. *Bennett v. United States*, 663 F. 3d 71, 84 (2d Cir. 2011) (internal quotations marks omitted). That is because "the most important witness for the defense in many criminal cases is the Defendant himself," and he has the "right to present his own version of events in his own words." *Rock,* 483 U.S. at 52. The ultimate decision to testify remains at all times with the Defendant; defense

counsel; though charged with an obligation to apprise the Defendant of the benefits and risks of testifying cannot make the decision, regardless of tactical considerations. *Brown*, 124 F. 3d at 77 – 78.

In the instant case, Mazer informed Shargel that he wanted to testify in order to present the truth about the events depicted at trial. The true facts in this case, as described in detail in this Addendum, are clearly and fully contrary to what the Government presented at trial. Mazer would have directly addressed all relevant facts in his testimony, including all facts described in this Addendum. Mr. Mazer will not burden the Court here with a recitation of all of those facts; rather he would just ask the Court to consider all facts presented in this Addendum *in pari materia* with this section of the Addendum and he incorporates them all here as the subject of what his testimony at trial would have been.

Government witnesses who testified and portrayed Mazer as the person in charge of the project for the City did not tell the truth. Mazer would further be able to clarify for the Jury that it was to his benefit to accelerate the completion of the project [instead of slowing the project down as the Government claimed] because only then would he receive the full financial benefits that he had earned for his years of working on the project.

Mazer would have fully explained to the Jury the concept and strategy behind the productization effort once the software was fully developed. Specifically, he would have revealed what specific roles Mitchell Goldstein, Reddy Allen, Joel Bondy and Gerard Denault and many others played in purchasing the City Time business units from SAIC for the purpose of reselling the program to other municipalities, which Mazer would have supported through

several emails and contract drafts that Mazer received in discovery materials and has provided

in the Appendix hereto.  (MM 69 B1331-1368)

Mazer learned for the first time by hearing some of the trial testimony in this case that

there may well have been some improprieties in the productization effort; but that if there

were, it was entirely a scheme of Denault, Bondy and Goldstein and not Mazer's.  If there were

such a scheme, Mazer was a victim in their scheme instead of being partners in the legitimate

business operation he thought he was pursuing and intended to pursue.

That is why, among many other reasons, Mazer stressed to Shargel before the end of

the trial how important it was that he (Mazer) testify on his own behalf.  In addition to all of the

other facts described hereinbefore, Mazer would have explained the true facts concerning the

25 million dollars and the corporate structure that was testified about at trial.  If and when an

evidentiary hearing is granted in this case, as Mazer respectfully submits it must be, he will now

explain all this to the Court at an Evidentiary Hearing, as he would have done at trial.

Moreover, Mazer would also have explained in detail several material conversations he

had with Bondy all the way up until August 2013 [2 months before the trial] that would have

demonstrated Mazer's innocence as well.

Shargel refused to prepare or allow Mr. Mazer to testify, notwithstanding Mr. Mazer's

clear and consistent demand to testify and is repeated statements to Shargel that he wanted to

testify on his own behalf.  Mr. Mazer believes there might well be several inappropriate and

fully illegitimate reasons for Shargel's persistence in and eventual success in overriding Mr.

Mazer's desire testify.  Mr. Mazer believes one of those reasons was based on an agreement

with Denault's and Bondy's attorneys to keep Mazer off the witness stand, in order to protect Bondy and Denault. Mr. Mazer needs additional discovery on this issue and he respectfully reserves the right to assert this issue in the context of conflict of interests analysis as well, based on such discovery. More facts are required to determine the full extent of what he has a good faith reason to believe was indeed a conflict that adversely affected him.

Shargel actually articulated to Mr. Mazer that he could not let him testify because he (Shargel) "did not have the time to prepare (Mazer) to testify." It certainly appears to be true that Shargel was not prepared to prepare Mr. Mazer to testify; but he absolutely should have been and absolutely was obligated to be prepared and to prepare Mr. Mazer, consistent with Mazer's Fifth and Sixth Amendment rights (including the rights to effective assistance of counsel, to compulsory process, to confrontation, and his other fair trial rights).

Mazer has no criminal record nor other obstacle to testifying that lawyers often cite as strategy behind advice not to testify. Here there was no question even of advice; Shargel simply would not and did not permit Mazer to testify and Mazer never knew the decision and the right were exclusively his to exercise or waive. Unfortunately, as noted, he was never so advised by the Court. Had he been, he would have known that he had the right to do so and if Shargel still refused, Mr. Mazer could have brought the matter directly to the Court's attention.

In retrospect, knowing now what is beginning to surface about the mental impairment under which Mr. Mazer know has reason to believe Shargel was operating at trial, Mr. Mazer believes that Shargel simply was not sufficiently familiar with the facts of the case and could not focus long enough to prepare Mazer and therefore was not prepared and could not be

prepared to have Mr. Mazer testify. Shargel could bluff his way along at trial otherwise; but preparing for a full direct examination of Mr. Mazer would have required affirmative and detailed steps Shargel simply could not handle.

Mazer saw this frequently when he would go over material facts about the case, only to have Shargel ask him about these same facts on a later occasion, as if the earlier conversation never had taken place. But it never occurred to Mazer that his lawyer would be suffering under an actual mental impairment and that it would be concealed from the client and the Court in such a serious matter and so he just dealt with the frustration of Shargel's regular lack of preparedness.

In short, Mazer believes there are several explanations for Shargel's refusal to let him testify or even to advise him accurately about his right to testify and ultimately for Shargel's ultimately successful efforts in overriding his (Mazer's) vehemently expressed desire to testify on his own behalf at trial. None of the reasons was legitimate or appropriate and the result was a clear violation and insurmountable violation of Mr. Mazer's Fifth and Sixth Amendment rights.

Shargel's failure to call the uncalled witnesses identified herein alone must be deemed to be reversible error for the reasons given. The denial of Mr. Mazer's right to testify and the actions by Shargel associated with this issue perhaps uniquely constitutes reversible error; for there simply is no substitute in such a situation as this for having Mr. Mazer detail all of the facts to the jury in his own words and with his credibility on full display. Certainly, in combination, the cumulative effect of the facts surrounding this issue and the uncalled

witnesses issue (along with all other issues raised here) absolutely requires setting aside the judgment of conviction and sentence as to Mr. Mazer.

It has long been recognized that the testimony of a criminal Defendant at his own trial is unique and inherently significant. Indeed, even the most persuasive attorney may not be able to speak for a Defendant as the Defendant might, even with halting eloquence, speak for himself. *Green v. United States* 365 U.S. 301, 304 (1961). When the Defendant testifies, the Jury is given an opportunity to observe his demeanor and to judge his credibility firsthand. And again, as the Supreme Court noted in *Rock v. Arkansas*, 483 U.S. at 52, "the most important witness for the Defense in many criminal cases is the Defendant himself." This is just that kind of case.

Mr. Mazer respectfully requests an evidentiary hearing on this and on all issues raised in his motion. *See e.g., Bennet v. United States*, 301 Fed. App'x 31, 32 (2d Cir., December 3, 2008)(reversing denial of COA and remanding for evidentiary hearing with live witnesses on issue of the denial of defendant's right to testify and ineffective assistance of counsel associated with it).

**THE COURT MUST CONSIDER THE CUMULATIVE EFFECT OF THE INEFFECTIVENESS**

The law in this Circuit absolutely requires the court to consider the cumulative effect of all claims of error in the aggregate, even if no one issue alone would suffice to constitute reversible error. *See e.g. Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001)(reversing conviction based on cumulative effect of errors; must consider all claims in the aggregate); *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001)(same); *Bennett v. United States*, 2006 U.S. Dist.

197

LEXIS 12395 at *45; 2006 WL 738162 (S.D.N.Y, March 22, 2006)("The case law in the Second

Circuit is clear that the Court must consider claimed errors in the aggregate" - ineffective

assistance of counsel claims and all other constitutional claims); *Kyles v. Whitley*, 514 U.S. 419

(1995)(Court must consider *Brady/Bagley* claims cumulatively).A claim of ineffective assistance

of Counsel can hinge on one allegation or as here the cumulative effect of several. *See*

*Rodriguez v. Hoke*, 928 F. 2d 534, 538 (2d Cir. 1991).

      Courts need not decide whether one or another or less than all of the alleged ineffective

claims would suffice because *Strickland* directs courts to look at the "totality of evidence before

the Judge or Jury," keeping in mind that "some errors have … a persuasive effect on inferences

to be drawn from the evidence, altering the entire evidentiary picture. *Id*. at 695-96.  Also see

*Lindstadt v. Keane,* 239 F. 3d 191, 199 (2d Cir. 2001). Courts must consider these errors of

ineffectiveness and, in fact all errors in the aggregate, for their cumulative effect. *Id.*; See also

*Stouffer v. Reynolds*, 168 F. 3d 1154, 1163-64 (10th Cir. 1999).  (Taken alone, no one instance

establishes deficient representation.  However, cumulatively, each failure underscores a

fundamental lack of formulation and direction in presenting a coherent defense.). Furthermore,

Courts should examine the cumulative effect of error committed by Counsel across both the

board at trial and sentencing and all other critical stages in the process. *Moore v. Johnson*, 194

F. 3d 586, 619 (5th Cir. 1999).

      In the instant case, a consideration of all of the examples of ineffectiveness referred to

herein, individually and in the aggregate, must lead, beyond any dispute, to the conclusion that

the judgment of conviction and sentence must be vacated.  There is no "trial strategy" or any

other purported excuse or justification at play here; nor is there any other factor that could

lead to any other conclusion. Individually and taken as a whole cumulatively, by any measure, defense counsel's errors and the prejudice they caused Mr. Mazer were so serious as to deprive him of a fair trial, a trial whose result is unreliable. Strickland, 466 U.S. at 687.

There is far more than a reasonable probability that, but for Counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694. Also see *Aparicio v. Artuz*, 269 F. 3d 78, 95 (2d Cir. 2001).

An Evidentiary Hearing is respectfully requested.

**GROUND II: THE COURT COMMITTED UNCONSTITUTIONAL SENTENCING ERROR**

In the Second Circuit's opinion in the instant case the Court referred only to the evidence that Mazer caused or agreed to the submission of false time sheets among some of the sub-contractors as part of an alleged unauthorized severance policy. (See slip Op. 5-6 B1481-1482). This narrow finding of time sheet fraud represented a mere $32,501.00 of payments made by the City under the City Time contract (See Op. Br. at 50, N.12 B1470-1471). Even the Government seems to have abandoned their allegations stated in the S2-Indictment that Mazer was part of the wide-ranging fraud of hundreds of millions of dollars that the City paid to SAIC on the City Time Project was tainted directly or indirectly by fraud (S-2 Indictment, A 90 ¶10.) Highlighted in the Government's Appeal Brief, was the following:

> Also, Denault was the primary champion and advocated for Amendment 6
> within SAIC. (Tr.241-242 B1-2). As Project Manager and as the head of SAIC's
> New York Office, Denault directed [not Mazer] SAIC's negotiations with
> the City including with respect to billing rates and resources (Tr.725-27 B14-16).
> Under SAIC's pricing policies SAIC determined billing rates to the City based
> on a formula that factored in the costs to sub-contractor labor, thus the
> higher the cost to SAIC of sub-contractor labor, the higher the billing rate the
> City would be for labor…As Project Manager, Denault had the power to
> choose whether to hire SAIC employees or sub-contractors onto the project,
> and to influence which subcontractor were hired.

(Tr.759-60 B17-18, Tr.1767-73 B19-25, Tr.1777-83 B26-36) (Govt. p.7-8 B1964-1965)

The Second Circuit in its opinion acknowledged that Mazer was not part of nor did he participate in the Government's primary claim of labor rates fraud. This was based on the alleged intentional over-charging of subcontractor rates that was clearly adopted by the 2nd Circuit as Denault's responsibility alone.

Respectfully, this Court erred by sentencing Mazer based on conduct for which the Court of Appeals found that co-defendant Denault alone was responsible for and that did not involve Mazer at all. Mazer's offence level was increased by 26 points, based on the labor rate scheme affecting the entirety of the lengthy contract; but the government acknowledged on appeal and the appellate court found that Denault and only Denault was responsible for this conduct.

In *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013), the Court instructed sentencing courts to take extra care in making findings of the "small class of defendants… convicted of fraud offenses associated with very large [G]uidelines loss calculations [for which] the Guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, common sense." *Id.* at 380. This rings with special application in the instant case and Shargel was ineffective for not making this argument at sentencing. But for Shargel's ineffectiveness, Mazer's Guidelines calculations for the conduct involving unauthorized severance payments of no more than $32,501 would have resulted in a range closer to one or two years.

The difference between that figure and the sentence imposed is certainly substantial enough to constitute prejudice by any standard and must, at the very least, compel this Court to vacate Mr. Mazer's sentence of 20 years imprisonment and order a resentencing at which

Mr. Mazer can make the appropriate showing on this issue which must result in a dramatically reduced sentence.

Failing to provide the opportunity for a re-sentencing based on this example of ineffectiveness would result in both the appearance and the reality of a grave injustice. Mr. Mazer's sentence was in fact based on a crime never proven – either by a standard of beyond a reasonable doubt or the lesser sentencing standard of preponderance of evidence.

The Second Circuit, citing *Corsey*, 723 F. 3d at 377, already concluded that defense counsel's failures for not requesting individual defendants' sentencing hearings did not allow this Court to follow best practices. It resulted in a failure to actually sentence each defendant separately and on his own and did not allow the Court to provide a more thorough explanation of the reasons for the very lengthy sentences imposed (See Mem. Op. 14 B1490).

Shargel's errors led to a lack of procedural protection reflected in the Second Circuit's statements. This ineffectiveness regarding the scope and amounts truly involved in this case for Mr. Mazer, standing individually, requires a re-sentencing at which Mr. Mazer will demonstrate that his 20-year sentence was clearly excessive and unjust. *Rita v. United States*, 551 U.S. 338, 356 (2007) ("Confidence in a judge's use of reason underlines the public's trust in the judicial institution.").

As the Second Circuit articulated in the instant case:

"We remind the district court that it is best practice to provide a more thorough explanation of the reasons for the sentences imposed and to do so separately for each defendant. *United States v. Coursey*, 723 F. 3d 366, 377 (2d Cir. 2013). Even when, as here, a judge is not required to say more, doing so still serves as a "salutary purpose." See *Rita v. United States*, 551 U. S. 338, 357 (2007).

It does not matter that in this case that this District Court imposed a sentence below the suggested Guidelines range of life.  Defense counsel's ineffectiveness led to a sentence that was indeed "divorced both from the objectives of Section 3553 (a) and, frankly, from common sense." *Corsey*, 723 F. 3d at 380.

The severe 20-year sentence that was imposed without the requisite consideration both of the disparities discussed above and the individual consideration of Mazer's actual conduct, as conceded on appeal by the government and as found by the Second Circuit reflects a sentence of close to life for Mr. Mazer and takes away his liberty for nearly an entire generation.

Mr. Mazer also wishes to make clear that he raises his ineffective claims in conjunction with this claim of error as well.

Therefore, for the above given reasons the Court should at a minimum vacate the sentence and conduct a resentencing based on the loss amount of $32,501 attributed to the timesheet fraud calculation.

## GROUND III:  PROSECUTORIAL MISCONDUCT

Mr. Mazer's trial was marred by several examples of egregious Prosecutorial misconduct.  These included the Government's use in closing argument of appeals to the Jurors' base emotions in ways that repeatedly have been held to constitute clear Constitutional error. The misconduct also included the Government's impermissible comments, through clear and unmistakable, inference on Mr. Mazer's failure to testify on his own behalf at trial.  And the misconduct included as well knowingly putting on false testimony by Government witnesses

and the Government's failure to correct its witness's false testimony, which Government

Counsel certainly knew was false as it was being elicited and delivered.

Prosecutorial misconduct is a ground for reversal when it causes the Defendant

"Substantial prejudice *United States v. La Morte*, 950 F. 2d 80, 83 (2d Cir 1991) by so infecting

the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v.*

*Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). Remarks of the

Prosecutor in summation amount to a denial of due process when they constitute "egregious

misconduct *Donnelly v. DeChristoforo,* 416 U.S. 637, 647 (1974). In assessing whether the

comments complained of meet this test, reviewing Courts consider "the severity of the

misconduct, the measures adopted to cure it, and the certainty of conviction in absence of the

misconduct. "*United States v. Melendez*, 57 F. 3d 238, 241 (2d Cir. 1995).

In the instant case three (3) times during summations the Prosecutor commented on

the Defendant's "greed", specifically, during, closing arguments the Prosecutor stated, "The

evidence of these three men's corruption, of their deception, of their greed is overwhelming"

(Tr.5245:24-5246:1 B63:24-64:1). Then again, it's their own corrupt decisions, their own corrupt

actions, and their own greed that put them in this position." (Tr.5247:10-11 B65:10-11) and

finally, "That is motivated by corruption and greed that a fraud that happened again and again

and again." (Tr.5277:13 B69:13)

The Second Circuit has long held that a Prosecutor who argues that a Defendant's

conduct is driven by "greed" constitutes Prosecutorial misconduct thus demanding complete

reversal of conviction *United States v. Stahl*, 616 F. 2d. 30 (2d Cir. 1980). Additionally, AUSA

Master told the Jury of one million dollars in cash that was discovered in Mazer's safe deposit

box. That evidence was irrelevant to the Government's case, and unduly prejudicial to Mazer because it invited the Jury to engage in class-based bias against him. The Government can show no connection between that money and tainted money from the alleged fraud scheme and made no attempt to do so.

The U.S. Attorney's constant reference to Mazer's wealth and portrayal as a man driven by greed, did in fact intend to arouse prejudice against Mazer because of his wealth and alleged greed, was intended to arouse prejudice against Mazer and was a calculated and persistent effort by the Government to create such prejudice in the minds of the Jury throughout the trial which calls for Mazer's conviction to be reversed; see *United States v. Quattrone* 441 F. 3d 153 (2d. Cir 2006) (quotation omitted). Further, since Defense Counsel did not object to these highly prejudicial remarks during summation and thus it could not be raised on direct appeal,  it is but one more part of the cumulative effect in Mazer's Ineffective Assistance claim, as well as plain error, which surely was not harmless.

The following is just one example of the inappropriate comments the Prosecutor made (and to which Defense Counsel failed to object when an objection should have been made):

AUSA Masters:

 "I didn't hear a word from Mr. Shargel "disputing" that Natanzon also paid $10 million to the same shell companies and paid cash to Mark Mazer. Think about that. It's $30 million. $30 million. Staggering amounts of money. Mr. Shargel asked, this 80/20 split, have you ever heard of such a thing. My response, yes, you have, right at this trial. Yes, you have. It's astounding. It's brazen. It's outrageous. But it happened. It surely happened because you saw the witnesses testify about it." (Tr.5256:7-15 B66:7-15).

The only one who could have disputed Natanzon's testimony, and to whom the Prosecutor clearly was referring, was Mazer himself.  However, Mazer chose to exercise his

Fifth Amendment Right not to testify at the insistence of Defense Counsel and against Mazer's wishes, as is discussed elsewhere in this motion. Defense Counsel refused to allow Mazer to testify to this crucial area of evidence to which the Prosecutor referred, as well as to other important matters and to compound matters, Defense Counsel failed to object here, compounding the prejudice to Mr. Mazer. Without question, the Prosecutor deliberately violated the fundamental rule that summations are limited to the facts in evidence only, and cannot be directed toward a Defendant's choice not to dispute evidence by exercising his Fifth Amendment privilege not to testify. See e.g., *Griffin v. California* 380 U.S. 609, 614 (1965). A Prosecutor's comment that the Government's evidence on an issue is "uncontradicted, undenied, unrebutted or undisputed" etc. will be a violation of Defendant's Fifth Amendment Right if the only person who could have contradicted, denied, rebutted or disputed the Government's evidence was the Defendant himself. *United States v. Whitten*, 610 F. 3d 168 (2d Cir. 2010). Clearly AUSA Master's remarks that Shargel did not offer any evidence disputing the Government's case directly reflected Mazer's failure to testify on his own behalf explicitly violated his Fifth Amendment Right to remain silent. That ultimately calls for a reversal to his conviction. As the majority of circuits have held, "A prosecutor may not make comments either directly or indirectly that lead the Jury to draw a negative inference from a Defendant's decision not to testify." *Whitten*, 610 F. 3d at 199. Also, see *United States v. Tucker* 714, F. 3d 1006-1014 (7th Cir. 2013).

The Prosecutorial misconduct continued where AUSA Master made several references to unproven facts that were not part of the Government case in chief. Specifically, Master stated during closing arguments that Mr. Denault had authority over setting up the Labor rates

table and that Mr. Denault negotiated these contracts [with the City] himself and that he was

negotiating across the table with Mark Mazer.  This was a critical aspect of this case for which

the Government produced absolutely no evidence (Tr.5264:24-5265:13 B67:24-68:13).

Moreover, Master went so far as to tell the Jury that Mazer would lie because he is a

native of the former Soviet Union. (Tr.5283:1-2 B70:1-2).  The AUSA was insinuating that

because Mazer came from the former Soviet Union some 30 years ago, Mazer was

automatically a liar. One can easily see the intended improper prejudicial effect that comment

would have on the Jury and the impression it would leave in the Jury's minds in effecting the

influence on the Jury deliberations. *Bentley v. Scully*, 41 F. 3d 818, 823 (2d Cir. 1994).

This and other statements by AUSA Masters violated the due process prohibition against

a Prosecutor's making "knowing use of false evidence" including misrepresentation of the

nature of non-testimonial evidence *Miller v. Pate*, 386 U.S. 1, 6 – 7 (1967).

Further, during summation, the AUSA claimed that Denault ran the project for his

company SAIC and Mark Mazer was given responsibility to run it for the City of New York. There

was virtually no evidence presented during trial to support this claim that Mazer ran the Project

yet the AUSA references Mazer as running the Project for the City several times throughout his

summation (See Tr.4836:9-11 B47:9-11; Tr.4844:2-4 B48:2-4; Tr.4864:9 B1762:9).  The AUSA

knew that it was Joel Bondy running the Project for the City since this was clearly stated in

Bondy's,  Page's, Newson's, Gurjal's, Hafeez's, Himelewski's, and Ruppel's statements to the

authorities in the 3500 materials  and also confirmed in other documents including:

1.  City Time Contract with SAIC (A751);

2.  Bondy submitted City Time Funding requests to Page, OMB; (GX 400-7 A 911-16;

GX 400-14 A959-70; GX 400-17 A 971-81; GX 400-26 A 982-1002, GX 400-29 A1003-1020; GX 400-31 A1021-1038)

3. Bondy Requests to OPA Board for Amendment Approvals. (MM 64 B1213-1222; GX 750-20 A1201-1202; GX 750-21 A1203-1206; GX 400-19 B145; GX 400-28 B150; GX 400-34 B151-154; GX 750-30 B213-219)

4. Status reports given by Bondy to OPA Board (MM 60 B963-986)

5. Bondy's emails to Page updating on the status of the project (GX 6000-1 B220; GX 6000-2 B221-222; GX 6000-5 B240; GX 6000-6 SA110; MM 21 B754; MM 22 B755; MM 23 B756-758; MM 24 B759; MM 25 B760)

6. Himelewski's sworn testimony (3531-16 part 2. B429:20-23) which AUSA Master had access to.

7. Ruppel's Sworn testimony (MM 76 B623-661).

8. Bondy's interview with NY Post on June 17th, 2004 (GX 6000-5 B240).

The AUSA further misled the Jury to believe that Amendment 5 [to the contract] which was enacted in December 2003 (GX 100-6 A798-806) was a fixed price contract and "in or about 2005 and 2006 ....Mark Mazer… advocated for an Amendment 6 to the SAIC City Time contract. He specifically recommended that the City change the SAIC contract from a "fixed price" contract… to a "fixed price level of effort" contract. The City ultimately amended SAIC contract as Mark Mazer recommended …" (A93-94, 97 ¶16, 19c). This change did not take place in Amendment 6 in 2005 and 2006 as the Government misleadingly claimed at the trial in an effort to argue that it was Mazer's idea indeed, the Government was well aware that the shift

away from "fixed price" contract actually started early in 2002 with Amendment 3, when the
structure of the City Time System was switched to a custom development model/platform. That
was the beginning of the shift from a "fixed price" contract to a "fixed price level of effort"
contract, which started at that time (3531-3 B402).  This is a fundamentally important fact
insofar as it relates to Mr. Mazer's culpability and, as the Government well knows, the true
facts concerning the timing of this change is one of several key exculpatory facts with respect to
Mr. Mazer.  This is discussed more in depth elsewhere in this motion.

Additionally, the Government knew because it was documented in the NYC Comptroller
Financial Audit that in 2003 the City made an agreement with SAIC that "According to OPA
Officials, the developer [SAIC] agreed to re-platform the package [City Time System] at no cost
[to the City]. However, in exchange, the City would restructure the developer's [SAIC] contract
to [fixed-price] "level-of-effort. (MM 72 B1413).

This was critical because the 2003 SAIC Agreement with OPA documented in the
Comptroller Financial Audit (MM 72 B1413) and Contract Amendment 3, 4 and 5 that began
shift from "fixed price" to fixed price level of effort took place in 2002-2003 sixteen months
before Mazer was retained as consultant in August 2004. Obviously, Mark Mazer could not
"recommend" this evolution of the contract. And definitely Mazer did not "recommend" to the
City this Contract Amendment in 2005 and 2006 because the City and OPA agreed to it with
SAIC in December 2003 as it was documented in Amendment 5 (GX 100-6; A798-806).

Any testimony that the Government presented during trial that Mazer corruptly
influenced the City in negotiating a FPLOE contract was explicitly perjured testimony. It is

fundamental to the integrity of our system that a Prosecutor cannot knowingly make an argument to the jury that he or she well knows are untrue and/or were never a part of the record actually adduced in the case. *United States v. Shareef*. 190 F. 3d 71, 78 (2d Cir. 1999). But that is exactly what happened here. This outrageous fact was compounded by the failure of defense counsel to object to the U.S. Attorney's egregious remarks during summation in a timely manner. The whole body of complication of misconduct, considered, as it must be, in the aggregate, unquestionably constituted a denial of Mazer's due process rights and fair trial as provided in *Donnelly v. DeChristofore*, 416 U.S. at 647. Moreover, Mazer's Appellate Counsel was ineffective for failing to raise these issues on direct appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985) (Constitutional right to effective assistance of Counsel on appeal)

**PERJURED TESTIMONY**

The following reflects just some of the examples of demonstrably false testimony adduced by the Government during Mr. Mazer's trial – all of which the Government knew or should have known was false, but failed to correct. The matter of course was exacerbated and rendered even more devastatingly prejudicial by the failure of ineffective Defense Counsel to take any appropriate action in the face of clearly false testimony.

During Elaine Doria's testimony on direct examination, she stated that on William A Coco's timesheet the center section was handwritten in and that it was not done on a computer like it's supposed to be. She testified further that she was sure that the timesheet was not signed by Mr. Coco himself. (Tr.2766-2767 B1764-1765). What Doria apparently did not realize (or knew and lied nonetheless) is that when a consultant is terminated at that point

he would be denied access to his computer as a matter of policy and this, in fact, is exactly what happened to  Mr. Coco was when he filled out his last timesheets.   Mr. Coco's last timesheets were indeed handwritten, but for a perfectly innocent and unavoidable reason, not in line with the sinister agenda suggested by Doria.  He was denied access to a computer.

Even if the testimony about the handwriting were not intentionally misleading, what clearly demonstrates perjury as to Doria's testimony is the claim that it was not Mr. Coco's signature on any of the timesheets. Significantly when Mr. Coco testified, he concisely stated that this was his signature, maybe it seemed different because he was highly upset that he was being terminated (Tr.2916-2921 B33-38). Defense Counsel Hoffman did object to the Government's use of perjured testimony by Doria, but Defense Counsel Shargel did not take any further steps to have the Government correct the elicited perjury. (Tr.2922:5-2923:13 B39:5-40:3).

A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the Jury *United States v. Agurs*, 427 U.S. 97,   103 (1976).

Even if the Prosecutor did not know that a witness was committing perjury, "A lie is a lie no matter what its subject, and if it is in any way relevant to the case the [US Attorney] has the responsibility and duty to correct what he knows to be false and [to] elicit the truth. *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959); *Haskell v. Superintendent Greene SCI*, 866 F.3d. 139 (3d Cir. 2017) .

There is no question that Doria falsely testified concerning Mr. Coco's timesheet and it is beyond just supposition that her testimony affected the Jury's decision as to whether Mazer falsified certain timesheets.  Furthermore, once Doria's perjury became apparent through Mr. Coco's testimony, the Government failed to correct the elicited perjury. Nor did the Defense force the Government to correct this false testimony in front of the Jury or even effectively use Coco to make the point, demonstrating once again that the Defense Counsel was Constitutionally ineffective, which calls for a reversal on the fraud charges.

Furthermore, Mr. Mazer has a good faith basis for believing and asserting here that the Government intentionally solicited perjured testimony in the Grand Jury proceedings and throughout the trial. This allegation is based on the 3500 materials for Page, Hafeez, Gurjal, Newson, Ruppel and Himelewski previously discussed at length in the uncalled witness section of this brief.  Their 3500 material establishes beyond any doubt  that Mazer was not responsible for running the City Time project for the City of New York; rather  that it was Joel Bondy's job.

Further, Mazer never attended any of the City meetings concerning contract negotiations or implementation of each contract Amendment nor could he have corruptly influenced the City in accepting a fixed price level of effort contract, as the Government significantly proved during trial. Further all the top OPA Executives Doria, Blunt, Hafeez, Gurjal, Himelewski, Sutton, Bondy and others knew the nature of the relationship between Mazer and DAS.  Moreover under the "Doctrine of Tacit Acceptance" by the Second Circuit in *Shah v. Meeker* 435 F. 3d 244 (2d Cir. 2006)  "if the plaintiff has been furnished with means of knowledge and has not been prevented from using them he cannot say that he has been

deceived by misrepresentation of the other party." *Id.* at 252. It's no wonder why the Government decided not to call any of the top level executives who actually worked on the project and who controlled and approved the Contract Amendments, work orders and invoices. These top Executives' 3500 materials paint a completely different picture than what the Government presented to the Jury [and possibly the Grand Jury].    Putting on witnesses to testify to the opposite of what the Government well knew the 3500 material from witnesses who knew the true facts provided clearly violated the Government's duty to avoid knowingly adducing false testimony through its witnesses at trial (and, we believe, before the Grand Jury).

Perjured testimony is material if there is any reasonable likelihood that the false testimonies could have affected the judgment of Jury, *Agurs*, 427 U.S. at 103, and the Prosecutor's knowing use of perjured testimony violates the Due Process Clause even if it only undermines a witness's credibility.  *Napue v. Illinois*, 360 U.S. at 269-70.  In order to be granted a new trial on the grounds that a witness committed perJury, the Defendant must show that: (1) the witness actually committed perjury , (2) the alleged perJury was material, (3) the Government knew or should have known of the perjury at the time of trial and (4) the perjured testimony remained undisclosed during trial. United *States v. Josephberg*,  562 F. 3d 487, 494 (2d Cir. 2009) (internal quotation marks and alternations omitted).

When comparing Bondy, Hafeez, Gurjal and Newson's 3500 materials along with their testimony in front of the City Auditors with the testimony the Government presented at trial, one comes inescapably to the conclusion that the trial testimony simply cannot be reconciled in any material way with the earlier sworn statements from these key witnesses. Simply put,

either these top executives were lying when they spoke to federal investigators and when they testified in front of the City Auditors - highly unlikely since they were never indicted for lying to federal agents and no suggestion has been made that they lied - or the Government knowingly and intentionally elicited perjured testimony to prove its case.

Consider one seemingly minor, but actually tremendously material example: The Government put on testimony in support of its claim in the indictment (S-2) that "Mazer approved requests for payments submitted to the City." (A96 ¶19(B)). However, the Government knew prior to indicting Mazer and proceeding to trial that the only City Executives who did have the authority to approve payments to SAIC were Malave, Gurjal, Hafeez, and Bondy – and the Government knew this throughout the trial, but put on evidence to present the Jury with quite a contrary picture in order to secure Mr. Mazer's conviction for conduct he did not engage in and could not have done. Examples of the 3500 material that was irreconcilable with the Government's position at trial can be found at Hafeez (3580-1 B586-587); Gurjal's email to Bondy and Malave (MM 1 B714). (GX 200-1 B120-121; GX 200-51 B122-123; GX 301-34 B124; DM 303-16 A1585-1586).

The Question now becomes why would the Government charge Mazer in S-2 Indictment with approving payments submitted to the City when the Prosecutor had first-hand knowledge that Mazer had no authority to do so? And why did the Government come up with this fabricated evidence to convict Mazer on those false charges?

The related question of course is why didn't Mazer's Defense Counsel expose this perjured testimony of key Government witnesses simply by using these top executives' 3500 material

213

and other sources of information available to him.  This clearly shows once again ineffective assistance of Counsel for failure to expose the perjury solicited by the Government. For all of these reasons, , Mazer respectfully requests an evidentiary hearing on the alleged perjured testimony by the Government.

Here the severity of the repeated Prosecutorial misconduct in the instant in combination and in further combination with the additional Constitutional errors that have been identified in this motion, all had a cumulative effect of depriving Mr. Mazer not only of his Due Process right, but all associated fair trial rights and this must cause this Court to vacate Mr. Mazer's conviction entirely.   Mr. Mazer must be given an evidentiary hearing into these claims. See *United States v. Yakobowics*, 427 F. 3d 144 (2d Cir. 2005) (quotations omitted).

## THE GOVERNMENT'S BRADY VIOLATION

During the course of preparing his post-conviction motion, one of the Attorneys assisting Mazer discovered a transcript of Joel Bondy taken before the NYC City Council of the Committee on Contracts on December 18, 2009. The testimony given by Bondy contained favorable and exculpatory evidence that completely contradicted the Government's theory of the case against Mazer as the top City Officer who ran the City Time Project for the City of New York.

The Government knew, or should have known, of the existence of these transcripts which should have been disclosed in the Government's discovery material. In reviewing these transcripts, it became clear why the Government would try to suppress this evidence from the Defense because Bondy's testimony at the NYC City Council of the Committee on Contracts

hearing virtually exonerated Mazer from all alleged criminal liability alleged in the Government's S-2 Indictment. Simply put there can be no real question that if Mazer would have had the benefit of the unlawfully withheld material, he would have been acquitted of all criminal charges. That, of course, goes well beyond Mazer's burden on this issue; but it is a fact no one fairly can dispute. The withheld material is just that material in the context of the charges against Mazer, the prosecution's theory of the case and Mazer's defense theory.

The government's violation in withholding this material from Mazer violated his rights to a fair trial, including his rights to confrontation, to call witnesses and put on evidence on his own behalf, and to the effective assistance of counsel, as well as his right to the due process of law. The withhold material violated the principles well established in Brady, Giglio, Kyles, Weary, and their progeny. It was fully exculpatory, it would have provided multiple opportunities for impeachment, and it directly undercuts the integrity of the investigation and the decision-making process in bringing these charges against Mazer and in failing to prosecute Bondy. It also demonstrates a clear violation of the government's affirmative obligation to avoid putting on false or misleading testimony, long ago recognized in *Napue v. Illinois*, 360 U.S. 264 (1959).

A petitioner such as Mazer is entitled to a new trial where the Government does not comply with its disclosure obligation under *Brady v. Maryland*, 373 US 83 (1963). "Brady requires that the Government disclose material evidence favorable to a criminal defendant." *United States v. Mahaffy*, 693 F. 3d 113, 127 (2d Cir. 2012). "Evidence is favorable if it is either exculpatory or impeaching, and it is material if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (citations and internal quotations marks omitted). The Defendant need not show that the suppressed evidence would have resulted in acquittal. See *Youngblood v. West Virginia*, 547 U.S. 867, 870, 126 S. Ct. 2188, 165 L. Ed. 2d 269 (2006) (per curiam). Rather, a conviction must be reversed 'upon a showing that the favorable evidence should reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. (internal quotation marks omitted).

In light of Brady and its progeny, "the individual Prosecutor has a duty to learn of any favorable evidence known to the others acting on the Government's behalf." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "The Prosecution's affirmative duty to disclose evidence favorable to a Defendant can trace its origins to early 20th century structures against misrepresentation…" Id. at 432. This duty encompasses disclosing prevarications made in the law enforcement process. *Banks v. Dretke*, 540 U.S. 668, 675-76 (2004) ("When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight.")

Claims that a Prosecutor has violated Brady must contain three components:

(1) the evidence at issue must be favorable, either because it is exculpatory or impeaching;

(2) the evidence must have been suppressed, either willfully or inadvertently; and,

 (3) prejudice must have ensued. Strickler v. Green, 527 U.S. 263, 281-282 (1999); *Juniper v. Zook*, 2017 U.S. App. LEXIS 23107, *24 (4th Cir., November 16, 2017)(citing *Banks v. Dretke*, 540

216

U.S. 668, 691 (2004). A Petitioner need not "demonstrate [ ] by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted ultimately in the Defendant's acquittal.'" *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (quoting *Kyles*, 514 U.S. at 434). The question is whether there is a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Id. at 870 (quoting *Kyles*, 514 U.S. at 435); *See also, Turner v. United States*, -- U.S. --, 137 S.Ct. 1885, 1894; 198 L. Ed. 2d 443, 452 (2017); *Juniper, Supra.* at *29 (same); *Browning v. Baker*, 871 F.3d 942, 962 (9th Cir. 2017)(*citing Turner*) .

With regard to favorable evidence identified in the first Brady element , courts uniformly have held Brady and the Due Process Clause are violated when the government withholds evidence that is  material to either guilt or punishment.  Turner, 137 S. Ct. at 1888; *Weary v.* Cain, 136 S. Ct. 1002, 1006; 194 L. Ed. 2d 78 (2016)( per curiam); *Smith v.* Cain, 565 U.S. 73, 75 (2012).  .

"Evidence is favorable if it is either exculpatory or impeaching …"  *United States v.* Vaid, 2017 U.S. Dist. LEXIS 143495, *35 (S.D.N.Y., September 5, 2017), *quoting from United States v. Rowland,* 826 F.3d 100, 111 (2d Cir. 2016). There is, of course, no 'difference between exculpatory and impeachment evidence' when it comes to the Prosecutor's duty to disclose evidence favorable to the accused." *Moore v. United States*, 846 A. 2d 302, 305 n. 4 (D.C. 2004) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)); *see also, United States v. Vaid*, 2017 U.S. Dist. LEXIS 143495, *34-*35 (S.D.N.Y., September 5, 2017), *citing* United States v. Bagley, 473 U.S. 667, 676 (1985).

And this is true, even if there has been no request by the accused.  *Browning*, 871 F.3d

at 958, *quoting from, Strickler v. Greene*, 527 U.S. 263, 280 (1999) and "irrespective of the good

faith or bad faith of the prosecution. *United States v. Vaid*, 2017 U.S. Dist. LEXIS 143495, *34

(S.D.N.Y., September 5, 2017), *citing, Turner, Supra.,* 137 S. Ct. at 1888.

Indeed, Brady imposes an affirmative "duty on prosecutors to learn of material

exculpatory and impeachment evidence in the possession of state agents …." Browning, *Id.,*

*citing Youngblood v. West* Virginia, 547 U.S. 867, 869-70 (2006); *Kyles v.* Whitley, 514 U.S. 419,

438 (1995).

With respect to the second *Brady* element, as noted, in analyzing whether the

Government has suppressed relevant evidence under the second *Brady* component, the

Prosecutor's duty extends beyond in his own possession and in his own knowledge: "the

individual Prosecutor has a duty to learn of any favorable evidence known to the others acting

on the Government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. It is not

the prosecutor's personal knowledge that defines the limits of constitutional liability.

*Browning*, 871 F.3d at 958.

Under the third Brady element, requiring prejudice, the Government's failure to disclose

must be material to the result of the proceeding. *Kyles*, 514 U.S. at 433-34. The Supreme Court

has explained that "evidence is 'material' within the meaning of *Brady*, when there is a

reasonable probability that, had the evidence been disclosed, the result of the proceeding

would have been different*." Smith v. Cain*, 132 S. Ct. 627 at 630. "Reasonable probability, in

this context, means a reasonable probability that the suppressed evidence "undermines

confidence in the outcome of the trial." *Turner*, 137 S. Ct. at 1893; *Kyles*, 514 U.S. at 434;

*Bagley*, 473 U.S. at 678. The suppressed evidence must be considered in the context of the

entire record and it must be considered in the aggregate.  That is, "the court must **both** "add[]
to the weight of the evidence on the defense side … all of the undisclosed exculpatory evidence
**and** substract[] from the weight of the evidence on the prosecution side … the force and effect
of all of the undisclosed impeachment evidence."  Juniper, 2017 U.S. App. LEXIS 23107 at *32-
*33, *quoting from, Smith v. Sec'y Dep't of Corr.*, 572 F.3d 1327, 1347 (11th Cir. 2009)(Emphasis
in original).

     Under the materiality standard in this context, "the question is **not** whether the
defendant would more likely than not have received a different verdict with the evidence, but
whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy
of confidence."  *Juniper*, 2017 U.S. App. LEXIS 23107 at *29-*30, *quoting from, Kyles*, 514 U.S. at
434 (Emphasis in original).

     There is no question that the withheld evidence here is of the most material nature and
that its suppression irretrievably prejudiced Mr. Mazer.

     In the instant case, the materiality of the withheld evidence – Bondy's testimony before
the  Contract Committee  is so clear and the examples that prove the same are so numerous
that it is too cumbersome to list them all here.    Bondy's complete testimony has been
provided in the Appendix section of the brief for the Court's convenience. (MM-58)  The
following, in summary form, reflects the substance of Bondy's withheld exculpatory and
impeaching testimony.

     According to Bondy in his testimony before the Contract Committee,  he (Bondy)
confirmed that he was the Project Manager and had absolute control over the Project as to all
decisions made during the course of the Project from the time he took over as Project Manager

to its completion.  This included all negotiated Amendments to the Contract and the approval process for each Amendment. Bondy further took responsibility for all labor rates and staffing planning that were negotiated in each Amendment and further confirmed that OPA was not concerned with what SAIC paid its consultants or subcontractors. Bondy further explained the Project costs and why the City had no alternative but to go from the originally planned off the shelf product to the more expensive custom designed software.

Nowhere in Bondy's testimony does he even once imply that Mazer had Citywide authority to act on the behalf of the City while he was a consultant on the Project, nor did Bondy implicate Mazer in criminal wrong-doing while Mazer was a consultant on the Project. In fact, Bondy credited Mazer's work as being essential for the successful completion of the Project.

In light of this material suppressed evidence, it is easy to understand how  the Government would intentionally, albeit unscrupulously, suppress this testimony from Bondy in its overzealous and misguided agenda to charge and convict Mr. Mazer.

The suppression of Bondy's testimony before the Contract Committee clearly more than satisfies all three elements of the *Brady* test, without any question undermines the confidence in the fairness of the verdict in this case, and it demands that the judgment of conviction and sentence for Mr. Mazer be vacated.

**GROUND IV: The Judgment of Conviction and Sentence as to Counts One, Two, Five and Six of the Superseding Indictment Must be Vacated Based on the Decisions and Rationales in *McDonnell v. United States and United Health Servs. v. United States ex rel. Escobar* and Their Progeny.**

In Count 5 of the Superseding Indictment, Mr. Mazer was charged with and convicted of a conspiracy under 18 U.S.C. Section 371 to commit bribery in violation of 18 U.S.C. Sections 666(a)(1)(B) and (a)(2) and 371. In Count 6, Mr. Mazer was charged with and convicted of bribery under 18 U.S.C. Section 666(a)(2).

Based on the recent decision from the United States Supreme Court in *McDonnell v. United States*, 136 S. Ct. 2355; 195 L. Ed. 2d 639 (2016) and the decisions from the United States Court of Appeals in *United States v.* Silver, 864 F.3d 102, 119 (2d Cir. 2017) and *United States v.* Skelos, 2017 U.S. App. LEXIS 18525; 2017 WL 4250021 (September 26, 2017), at the very least, Mr. Mazer's convictions on Counts 5 and 6 of the Superseding Indictment must be vacated.[11] The jury instructions in this case deprived Mazer of his rights to the due process of law and to a fair trial.

In setting aside, the conviction in *McDonnell*, the United States Supreme Court articulated a new, narrower standard for the "official act" requirement under the Hobbs Act and for Honest Services Fraud, emphasizing the importance of limiting the reach of the criminal statutes at issue to conduct that truly is criminal and of giving adequate notice of what sort of "official act" will come within the statute's ambit. *McDonnell,* 136 S. Ct. at 2372-2373. In

---

[11] To be clear, Mr Mazer contends that the holding and rationale in *McDonnell* applies with equal force to require vacating his conviction on all counts. Additionally, Mr. Mazer is advised that the Mens Rea Reform Act of 2017 has been introduced in Congress and is working its way through. He wants to be clear that it is his intention to preserve his claim that *McDonnell* (and *Universal Health* Services and the other cases cited herein apply across the board to all counts of conviction and his rights under the now proposed Mens Rea Reform Act of 2017 if and when it passes.
11

*Skelos,* The Second Circuit applied the holding in *McDonnell*, to charges brought under the federal bribery statute, 18 U.S.C. Sec. 666, as well – the statute under which Mr. Mazer was charged in Counts 5 and 6 of the Superseding Indictment – and the convictions under these counts must now be vacated. *See also United States v. Jefferson*, 2017 U.S. Dist. LEXIS 165824 at *37-38 (E.D. VA, October 4, 2017)(applying *McDonnell* to vacate bribery charges).

In *McDonnell*, the charges against former Virginia Governor Robert McDonnell included conspiracy to commit Hobbs Act extortion and Hobbs Act extortion, among other charges for honest services fraud and false statements. The Hobbs Act extortion charges against Governor *McDonnell (*as well as the honest services fraud charges) were based on the theory that he accepted payments in exchange for "performing official actions on as-needed basis." *McDonnell*, 136 S. Ct. at 2364-65. The alleged "official actions" set forth in the indictment "involved arranging meetings, hosting events, and contacting other Government officials.*" Id*. at 2366.

At the end of trial, the District Court instructed the Jury regarding "official act" by quoting the statutory definition contained in 18 U.S.C §201(a) (3) and "advising the Jury that the term encompassed 'acts that a public official customarily performs,' including acts 'in furtherance of longer term goals' or 'in a series of steps to exercise influence or achieve an end.'" *Id*. Based on this charge, the Jury convicted Governor McDonnell of the Hobbs Act extortion charges, as well as the honest services fraud charges. *Id*. He appealed to the Fourth Circuit based on the "official act" Jury instruction, and the Fourth Circuit affirmed. *United States v. McDonnell,* 792 F.3d 478 (4th Cir. 2015). The Supreme Court reversed.

The Supreme Court rejected the Government's broad, sweeping interpretation of "official act" – that the term includes "any decision or action, on any question or matter, that may at any time be pending, or which may by law be brought before any public official in such official's official capacity." *Id*. (emphasis in original). Instead, the Court "adopt[ed] a more bounded interpretation of 'official act.'" Id. At 2367-68. "Under this interpretation, setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act.'" *Id*. At 2368.

The Supreme Court identified two requirements for an "official act":

First, the Government must identify a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought" before a public official. Second, the Government must prove that the public official made a decision or took an action "on" that question, matter, cause, suit, proceeding, or controversy, or agreed to do so.

*Id*. With regard to the first requirement, the Court stated that "question, matter, cause, suit, proceeding or controversy" requires a "formal exercise of Governmental power." *Id*. At 2372 (emphasis added).

Additionally, it must be something specific and concrete that is pending before a public official. *Id*. As to the second requirement, the Court held that a "decision or action" on the specific "question, matter, cause, suit, proceeding or controversy" requires more than merely "hosting an event, meeting with other officials, or speaking with interested parties" *Id*. At 2370 (citing United States v. Sun-Diamond Growers of Cal, 526 U.S. 398 (1999)). Nor does expressing support at a meeting, event, or call qualify as a "decision or action." *Id* at 2371. Even when such support is expressed to another public official, it does not meet this requirement so long as the official does not intend to exert pressure on the other official. *Id*.

223

In light of its more exacting interpretation of "official act," the Court further held that Jury instructions regarding "official act" must include three important explanations. First, the District Court must "instruct the Jury that it must identify a 'question, matter, cause, audit, proceeding or controversy' involving the formal exercise of Governmental power." *Id*. at 2374 (emphasis added). Second, the District Court must "instruct the Jury that the pertinent 'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought before any public official." Id. Third, the District Court must "instruct the Jury that merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter." *Id*. at 2375.

Directly after the Supreme Court decision in *McDonnell* clarifying the above Jury instructions concerning bribery cases, the Second Circuit vacated Sheldon Silver's [a New York State Assembly legislator] bribery conviction based on the same erroneous Jury instructions that *McDonnell* had received. Soon thereafter, the Second Circuit vacated the conviction in *United States v. Skelos*, 2017 U.S. App. 18525 (2d Cir., Sept 26, 2017), on the same rationale that was applied in *McDonnell;* but this time it did so in the context of bribery charges under 18 U.S.C. Sec. 666. And for those very same reasons, Mr. Mazer's convictions under Sec. 666, (Counts 5 and 6), must be vacated as a matter of law.

The instructions given to the Jury at Mazer's trial regarding "official act" failed to meet the requirements articulated in *McDonnell*. Indeed, in Mr. Mazer's case, the jury instructions suffered from at least the same defect as the instructions in *McDonnell,* and in very real terms were even more constitutionally infirm. In *McDonnell*, the Supreme Court rejected a Jury charge that recited the statutory definition with the added description "that the term

224

encompassed" 'acts that a public official customarily performs,' 'including acts' in furtherance of longer term goals' or 'in a series of steps to exercise influence or achieve and end.'" 136 S. CT. at 2366.

According to *McDonnell*, the District Court was required to provide further explanation to prevent the Jury from convicting the defendant for conduct that is not unlawful. *Id*. at 2375, Specifically *McDonnell* stated three requirements for "official act" Jury instructions. As described above, the District Court must instruct the Jury that (1) it must identify something involving a *formal* exercise of Governmental power; (2) the pertinent matter must be something specific, focused and concrete "pending" before a public official; and (3) "merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter." *Id*. at 2374-2375.

In Mr. Mazer's case, this same sort of defect is found in this Court's jury instruction on honest services fraud – with specific reference to "bribery"[12] The instruction on the charges in Counts 5 and 6 – charges under the same statutory section at issue in *Skelos,* fail entirely to explain what kind of "official act" must be at issue.   This is a constitutional defect which simply cannot stand up after *Skelos*. (Tr.5350-5360 A1742-1752)

---

[12] This Court gave the following jury instruction: "in order to establish the quid pro quo essential to proving a bribe or kickback, the government need not show that the payments were intended to be tied to specific official acts. Rather such a scheme to defraud can be accomplished through an ongoing course of conduct so long as the evidence shows that the money paid to the employee is in exchange for a pattern of official actions favorable to the government."  (Tr.5342 A1734)  This is exactly the kind of constitutional defect the Supreme Court identified as such in *McDonnell,* and here the error is compounded because of the specific reference to "bribery" in this erroneous instruction.  Moreover, the Court in *Skelos,* expressly directed an examination of the instruction as a whole to see whether the erroneous instruction on the bribery charge were cleared up or somehow cured elsewhere in the overall instruction.  Here, the error was exacerbated in the portion of the instruction related to honest services fraud.

**THE JURY INSTRUCTIONS**

The Jury charge in Mazer's case failed to meet *McDonnell*'s requirements. When instructing the Jury as to the Bribery charges against Mazer, despite referring to "official acts" several times, the District Court <u>did not provide any instruction whatsoever</u> as to the definition of what constitutes an official act. The Jury was not instructed that it must find both that: (1) there was a matter that required the formal exercise of governmental power; and (2) Mr. Mazer made a decision or action on that matter, which could include "using his position to exert pressure on another official" or advising another official with the specific intent to influence his official action. Without any instruction at all about the definition of "official acts" required to convict under Bribery, the charge was "significantly over inclusive," <u>McDonnell</u>, 136 S. Ct. at 2373-74, and permitted the Jury to convict Mazer for conduct that is not unlawful-precisely the concern underlying the Supreme Court's opinion in *McDonnell*.

In the Instant Case, the Court instructed the Jury on the bribery charges as follows:

Thus, the Government doesn't have to prove that Defendant Mark Mazer received a bribe or that the bribe actually influenced the decision making. It is not even necessary that defendant Mark Mazer had authority to perform the act sought. (See Tr.5354 A1746).

The above instruction is clearly contrary to the Supreme Court holding in *McDonnell*, therefore Mazer's Bribery related convictions under Counts 5 and 6 must be vacated.  The problem is even more serious in the instant case; for Mr. Mazer has at all times contended that he lacked the authority as a matter of fact and law even to engage in or authorize any "official act."  In addition to failing to show that he had any such authority, the Court's instructions in the instant case never identified any official act at issue nor did it sufficiently limit the focus of the kind of official act that would bring the defendant's conduct within the ambit of the statute.

226

Specifically, the instruction failed per *McDonnell* to inform the Jury that it must be a specific and focused matter. This limitation is necessary to "avoid the misconception that a general policy is sufficient." The deficient jury instructions undoubtedly harmed Mr. Mazer. Without the necessary limiting instructions outlined in McDonnell, the Jury was free to convict Mr. Mazer based on conduct that the law does not deem criminal and their own faulty harmful interpretations - precisely the reason the Supreme Court found the similarly deficient jury instructions in McDonnell to be harmful. See Id. at 2375

As the *McDonnell* decision makes clear, where it references the need for a "formal exercise of Governmental power" it is referring to the question, matter, cause, proceedings or controversy that is subject to corrupt influence, but not the influence itself. (*McDonnell* 136 S. Ct. at 2369-2371). As the Supreme Court stated, the question matter, cause, suit, proceeding or controversy must be of the type that can be placed on the agenda, tracked for progress and checked off as complete and thus cannot be something as informal as arranging a meeting, placing a call, or hosting an event-this is what is meant by a formal exercise of Governmental power. *Id*. This is wholly separate from the act of influencing the formal exercise of Governmental power, as the *McDonnell* Court's discussion of its prior precedent in *United Sates v. Birdsall* 233 U.S. 233 (1914) clarified, *McDonnell* 136 S. Ct. at 2371.

On direct appeal, Mr. Mazer argued that the District Court erred in not including in its charge his proposed Jury instructions that would now present what defines "official act" by an agent of the City. The Second Circuit rejected Mr. Mazer's argument, stating in its opinion the following: "Mazer argues that the District Court error in not including in its charge a proposed Defense Instruction that he "contends he was not an agent of the City because he was not

authorized to act on behalf of the City." " While a Defendant is entitled to any legally accurate

Jury Instruction for which there is a foundation in the evidence, he does not have the right to

dictate the precise language of the instruction." *United States v. Banki*, 685 F.3d 99, 105 (2d

Cir.2012). Here the District Court instructed the Jury that Mazer "contends that, with regard to

the charge, he was not an agent of the City," (Trial Tr.5337:17-18 A1729:17-18), and that "a[n]

'agent' is a person authorized to act on behalf of another person, organization or Government,"

(Tr.5352:9-10 A1744:9-10).  "W[e] examined the charge [ ]as a whole, " *United States v.*

*Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006), and together, these two instructions satisfied the

District Court's obligation to include Mazer's defense theory.

 The above opinion is explicitly contrary to the recent Supreme Court decision in

*McDonnell* and this Circuit opinion in *Silver* and *Skelos*.

 Simply put, there is no question that Mazer "Informed the Court" of his objection to a

Jury instruction, or that the key issue here was the proper interpretation of the term, "official

act" in 666 (d)(1). See Rule 30(d), Fed. R. Crim. P. Nor is there any doubt that the McDonnell

case involved essentially this same issue: " The issue in this case is the proper interpretation of

the term, "official act" 136 S. Ct. at 2367. Accordingly, Mazer is not in procedural default and

may therefore avail himself of *McDonnell* on the instant 2255 Motion.

 Mr. Mazer's challenge clearly is properly brought here under Section 2255.  It is the

proper vehicle procedurally, *see e.g., United States v. Jefferson,* 2017 U.S. Dist. LEXIS 165824,

*28 (E.D. VA, October 4, 2017) ("… the Supreme Court's *McDonnell* decision is a new

'substantive' rule that applies on collateral review ….") and the new rule enunciated in

*McDonnell* establishes the substantive merit of this Section 2255 motion as well.

Where, as here, a defendant mounts a collateral attack on a Jury instruction that erroneously instructs on an element of an offense, the courts have applied a less stringent "harmless error" standard then the one applicable on direct appeal. Indeed, to uphold a Jury verdict on direct appeal, the reviewing Court must find an instructional error harmless beyond a reasonable doubt; but on habeas review, the Court evaluated "whether the error had a substantial and injurious effect or influence in determining the Jury's verdict." Nevertheless, under the "substantial and injurious effect" standard "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

Rather, if "one is left in grave doubt ...whether the error itself had substantial influence" on the Jury's verdict, then "the conviction cannot stand." *Id.* In other words, if "in the Judge's mind [] the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error," then there has been a substantial and injurious effect or influence" on the Jury's verdict and writ must be issued. *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). Ultimately, this question must be answered "in light of the evidence presented at trial. *Smith*, 723 F.3d at 517.

The Government further alleged that the official acts performed by Mark Mazer included "approving requests for payment (invoices) submitted to the City: (A94  19(b)). Mazer did not have the ability or authority to perform such act. Authority to approve spending within OPA clearly was not extended to outside consultants like Mazer. The CityTime project invoices reviews and payment approvals required multiple level signatures of actual OPA City officials. It

rested entirely with OPA executives Alexander Malave, Sarah Gurjal, Mohamed Hafeez and Joel Bondy.

The Fifth Amendment to the United States Constitution  provides that no person shall be "deprived of life, liberty or property without due process of law."   *The right to due process* entitles a criminal defendant to a Jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt. "*United States v. Gaudim*, 515 U. S. 506, 510 (1995). See also *In Re Winship*, 397 U.S. 358, 364 (1970); Gilmore v. Taylor, 508 U.S. 333, 343-44 (1993). Thus, if the Government fails to prove an element of the offense beyond a reasonable doubt, such a s a specific act of bribery, the conviction must be vacated *Deutsch v. United States*, 367 U.S. 456, 471 (1961).

In the instant case, there are many relevant facts that demonstrate why under the rationale of *McDonnell* the conviction must be vacated.  First, as Mazer has emphasized at all times, including in his defense theory requested jury instruction, it was impossible for Mazer to have engaged in an "official act" as defined in *McDonnell,* as he had no official position of power to "advocate" and "amend" to the current SAIC contract from a Fixed-Price contract to a Fixed-Price Level of Effort contract, if that was an "official act" purportedly at issue.  That authority fell to Bondy and Page.  Moreover, that change was originally agreed upon in 2003, Mazer had yet to be hired as a consultant.  Additionally, the Spherion contract with OPA that defined Mazer responsibilities on the City Time Project stated:

"It also understood that it is Spherion's [SME like Mazer] responsibilities to provide OPA with advice and recommendation based upon its expert analysis and that final decision regarding City Time shall be made by the City" (GX 125-1 Sec. 2.1 B76).

230

Based on all of the evidence adduced at trial, there is no indication that Mazer exerted

pressure or had any ability or authority to meaningfully exert pressure as required to make his

action official;

Mazer could at the very most, "[s]imply express support" for Amendment 6 in 2006. Id.

at 2371. That expression of support is not criminal act under *McDonnell*, and therefore Mazer's

action in advising the OPA could not support criminal liability.  *See also United States v.*

*Jefferson*, 2017 U.S. Dist. LEXIS 165824 at *37-38 (E.D. VA, October 4, 2017).

Additionally, the Government further alleged that other official acts performed by

Mazer included the signing of timesheets.  In truth, of course, Mazer's signature at most could

have only been  confirming that the employee's primary supervisor already  had approved the

timesheets.

Both of these alleged official acts were part of Mazer's normal daily responsibilities, that

were authorized through his contract with Spherion acting as an independent contractor.  More

to the point here, nothing in the Court's instructions would have informed the jury as to what

"official act" could even be at issue with respect to the bribery charges.

Without the Jury being properly instructed as to the new requirements under

*McDonnell*, it is impossible as a matter of law to conclude that the Jury found the kind of

"official act" element necessary to convict Mazer of the Bribery Statute.  Therefore, Mazer's

conviction can no longer stand, because Mazer's conduct did not amount to a criminal act

under the new standard in *McDonnell*.

Furthermore, while Mazer may have had managerial responsibilities with respect to

deployment and implementation of the OPA software project, he was removed from significant

OPA-Level management and policy decisions-rendering the argument that he could have performed an "official act" on behalf of the City Government as required on the new rule in *McDonnell* even more untenable.

It is directly relevant under *McDonnell's* new rule of law that Mazer did not have the power or authority to perform "official acts". Because Mazer was not even a NYC Employee or Elected Official as Governor *McDonnell* was, it is clear that Mazer did not have "final policy making authority" under the Rules of Procurement Policy Board or PPB rules. Specifically, special case contracts valued at over $5 million require the approval of the Mayor or Deputy Mayor prior to execution (See City Charter §317(b) MM 71 B1397) . Mazer could not have influenced Bondy or Page to approve the fixed prices level of effort contract that the City authorized within the meaning of *McDonnell*. In fact, neither Page nor Bondy, let alone Mazer for that matter, had the required position of power, pursuant to the PPB rules, since the City Time contract was well over $5 million. This is all directly relevant to the *McDonnell* analysis and rationale.

It is worth noting here, the specific relevant terms of the contract at issue: Mazer's contract with Spherion explicitly articulates the following terms:

8. Independent Contractor

(a) The company (Spherion) and the Contractor(MS Creative Technlogies) intend that an independent contractor relationship be created by this Agreement. Contractor represents that it is an independent duly organized for the purpose of providing to customers service of the nature of the Service, and acknowledge that this Agreement does not constitute or appoint Contractor as an employee or an agent of the Company. In no event shall Contractor represent or hold himself as an employee or agent of the Company." (GX 150-1 A877-878)

Additionally, the Terms and Conditions of the contract further stated:

Independent Contractor

(a) Subcontractor (MS Creative Technologies) shall act at all times as an independent contractor, and nothing contained herein shall be construed to create the relationship of principal and agent, or employer and employee, between Subcontractor (including Subcontractor Employee) and Client (NYC/OPA) or Subcontractor (including the Subcontractor Employees) and Spherion.  The Subcontractor Employee will be employee of the Subcontractor. (GX 150-3 A886)

Further the contract between OPA and Spherion explicitly sets out the following:

4.2 <u>INDEPENDENT CONTRACTOR STATUS</u>

The Company and the Department agree that the Contractor is an independent Contractor, and not an employee of the Department or the City of New York, and that in accordance with such status as independent contractor, the Contractor covenants and agrees that neither it nor its employees or agents will hold themselves out as, nor claim to be, officers or employees of the City of New York, or of any department agency or unit thereof (GX 125-1 Appendix A Sec. 4.2 B91).

The above contract agreement clearly shows that Mazer was an independent contractor and therefore not subject to being considered an agent or representative of the City as a matter of law.  This point is important and relevant to other arguments in this Section 2255 motion as well; but here the focus is on its relevance under *McDonnell.*  Mazer was explicitly prevented by contract and existing law – from acting as an official of Spherion, let alone New York City, with which he did not even have a contract.

Simply put, based on the terms of the above contract Mazer could not act or legally possess the authority to act on behalf of any entity which he was charged having an agency relationship as required for official power act under *McDonnell*.

Based on the standard for "official acts" articulated by the Supreme Court in *McDonnell*; Mazer's conviction and sentence on Counts 5 and 6 to the Bribery charges are clearly in

violation of the Constitution and laws of the United States, and must be vacated under the provisions set forth in Habeas proceedings.

Any charge that requires Mazer to be a public official having official authority fails. In the instant case, the Government did not prove the element of the "official act" as stated in *McDonnell*.

For similar reasons, the convictions in this case under Count One (Wire fraud conspiracy) and Count Two (Wire Fraud) must be vacated on the reasoning of *McDonnell* and on the recent decision in *Universal Health Servs. v. United States ex rel. Escobar*, -- U.S. --, 136 S. Ct. 1989; 195 L. Ed. 2d 348 (2016).

In *Universal Health Servs.*, 136 S. Ct. at 2002-2004, a case arising under the False Claims Act, the United States Supreme Court built on and altered the concept of "materiality" in such a way as to make it clear that, when applied to the instant case, given Mr. Mazer's lack of authority as discussed herein, the wire fraud related convictions must be set aside.

The Supreme Court recognized in *Neder v. United States*, 527 U.S. 1 (1999) that an absolutely required element of wire fraud (and other fraud) offenses is proof that the "fraud" at issue was "material" – that is, that it is something that has a "natural tendency to influence, or be capable of influencing the payment or receipt of money or property." *Neder*, 527 U.S. at 16.

In *Universal Health Servs.*, the Court rejected an "expansive" view of "materiality" in favor of a more subjective, fact-intensive concept. For example, the Court made clear that standing alone, it would not constitute a violation of the False Claims Act for a contractor to submit a claim for payment under a contract that requires that contractors buy American-made staplers when the party submitting the claim knew that it used foreign staplers. Rather, it

would be relevant to consider that the government regularly paid claims under the contract at issue, despite contractors' use of foreign staplers.

In the instant case, the Defendant made clear that his defense theory was that he did not make any "materially" false representations or promises in his dealings with the City and did not intend any harm. (A1772). Mr. Mazer knew and, indeed, it is beyond dispute, that there were layers of approval by people who actually had authority to act that would impact on any decision about which he opined and he knew that his actions could not as a matter of law actually influence any decision-making process because he had no such authority. Therefore, his statements or actions could not have been material within the meaning of that term under *Universal Health Servs.*

Indeed, courts since *Universal Health Servs.* have conceded that when the "victim" is a governmental entity, rather than a private entity, the "applicable materiality test verges toward a subjective standard" such as that adopted in *Universal Health Servs. See e.g. United States v. Raza*, 2017 U.S. App. LEXIS 23431, *41 (4th Cir., November 20, 2017)(declining to find *Universal Health Servs.*'s "materiality" standard applicable to wire fraud involving a private lender, but noting the difference when a governmental entity is involved).

The jury was not permitted to consider a "materiality" standard with respect to the wire fraud related counts that was consistent with the concept of "materiality" as articulated in *Universal Health Servs.* and therefore the convictions under Counts One and Two must be set aside.

Finally, along these same lines, Mr. Mazer respectfully asserts that his convictions under Counts One, Two, Five, and Six must be vacated on the authority of the decision in *Skilling v. United States*, 561 U.S. 358 (2010).

Based on his position vis a vis the City under the contract set-up at issue and especially given his consistent understanding (and theory of defense) that he was never in a position to make material misrepresentations and that he was never an agent of the City or otherwise authorized to act for the City, Mr. Mazer could not fairly have been expected to know that his conduct would violate the requisite elements under Counts One, Two, Five, or Six.

Mr. Mazer could not fairly or reasonably have been found to have believed that any thing he said or did could have affected an "official act"; nor he could fairly or reasonably have been found to have believed that his conduct could be "material" as those concepts have now been further defined in *McDonnell* and *Universal Health Servs.,* and the jury never was permitted to consider the same, thereby rendering its verdict unfair and requiring that it be vacated. *Skilling* contemplates "fair warning" that conduct is criminal before one can be charged and convicted of a crime and that was badly lacking here, given the uncertainty of the legal concepts at issue and the indisputable facts surrounding Mr. Mazer's role and authority under the controlling contract.

## GROUND V: THE CUMULATIVE EFFECT OF ALL ERRORS REQUIRES VACATING THE JUDGMENT

When considering this 2255 motion the cumulative effect of all error must be considered in the aggregate. The Second Circuit held in *United States v. Al-Moyad*, 545 F. 3d 139, 178 (2d Cir. 2008) that, "[A] new trial is therefore warranted as to all counts of the conviction when the cumulative effect of the trial court's errors denied Defendant's due

process of Law and a fundamentally fair trial. "*Id.*  See also, *See e.g. Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001)(reversing conviction based on cumulative effect of errors; must consider all claims in the aggregate); *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001)(same); *Bennett v. United States*, 2006 U.S. Dist. LEXIS 12395 at *45; 2006 WL 738162 (S.D.N.Y, March 22, 2006)("The case law in the Second Circuit is clear that the Court must consider claimed errors in the aggregate" - ineffective assistance of Counsel claims and all other Constitutional claims); *Kyles v. Whitley*, 514 U.S. 419 (1995)(Court must consider *Brady/Bagley* claims cumulatively).

## CONCLUSION

Each of the constitutional errors raised and discussed in this Motion and Addendum standing alone reflects a violation of Mr. Mazer's fundamental constitutional rights and calls for setting aside the judgment of conviction and sentence in this case.  When the Court considers these issues in the aggregate and weighs the cumulative effect they had on the conviction and sentence and the violation they reflect of these invaluable, fundamental constitutional rights, they absolutely demand, with all due respect, that Mr. Mazer's judgment of conviction and sentence be vacated.

Mr. Mazer respectfully submits that the constitutional errors and their overwhelming impact on the integrity of the judgment are clear from the papers alone.  Nevertheless, to the extent the Court has any question about that, he respectfully requests an evidentiary hearing on all of his claims.

Respectfully Submitted,

/s/ David I. Schoen (DS 0860)
Counsel for Mark Mazer

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of January, 2018, I caused a true and correct copy

of the foregoing Motion, Addendum, and Exhibit to be served on opposing counsel by filing the

same through the Court's ECF system in the underlying criminal case, S2 11 Cr. 121 (GBD).

/s/ David I. Schoen (DS 0860)
Counsel for Mark Mazer


David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama  36106
Tel.  334-395-6611
Fax:  917-591-7586
E-Mail:  DSchoen593@aol.com; Schoenlawfirm@gmail.com

EXHIBIT 1
TO MARK MAZER §2255 ADDENDUM



## Sentence Distribution for All $100+ Million Loss Cases
### Source: U.S. Sentencing Commission Datafiles 2006-2016 (n=227)
### LOSSHI>=100,000,000

Not reflected in maximum are five cases sentenced above 360 months.

Mazer 240-Month Sentence
86th Percentile

360.0

160.0

107.7

60.0

24.0

0.0



## Loss Distribution for all $100+ Million Loss Cases

Source: U.S. Sentencing Commission Datafiles 2006-2016 (n=227)
LOSSHI>=100,000,000



**Scatter Plot of $100+ Million Loss Sentences**

Source: U.S. Sentencing Commission Datafiles 2006-2016 (n=227)

LOSSHI>=100,000,000

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

UNITED STATES OF AMERICA,     :

         :

v.         :

         :         S2 11 Cr. 121 (GBD)

MARK MAZER,     :

         :

         Defendant.     :

------------------------------------------------- X

### DECLARATION OF CARY A. ELLIOTT, Ph. D.

1.       I, Cary A. Elliott, am of majority age, have personal knowledge of the following, and declare as follows:

2.       I am a senior economist with Resolution Economics LLC and serve as a consultant to Sentencing Stats, LLC.

3.       I hold a Ph.D. in Economics from Princeton University.  My c.v. is attached hereto.

4.       Sentencing Stats, LLC was hired by the defendant in this matter to provide sentencing data analyses to Mr. Mazer's counsel of record, David Schoen, Esq.

5.       The analyses in the exhibits denominated "Sentencing Distribution Chart," "Loss Distribution Chart," and "Scatter Plot of Sentences by Loss Amount" were obtained from the U.S. Sentencing Commission's publicly available datafiles published on the Commission's website.  Those same exhibits were created by Sentencing Stats, LLC.

6.     These U.S. Sentencing Commission's datafiles have been available to the public since well before 2014.

7.     Sentencing Stats, LLC identified all cases where there was a known loss amount of $100 million or greater by filtering on the LOSSHI variable in the datafiles.

8.     A total of 227 cases were identified, as set forth in the three exhibits.

9.     A data extract of these cases along with all pertinent variables was created in Excel.

10.     All statistical output was calculated by the native functions in the Excel software, e.g., mean, median, quartiles, etc.

11.     As reflected in Exhibit 1 (Sentencing Distribution), Mr. Mazer's 240-month sentence was in the 86th percentile.  Meaning it was greater than 86% of the 227 sentences in this group.  It also was 4 times greater than the median sentence of 60 months, and over twice the 107.7-month average.

12.     As reflected in Exhibit 2 (Loss Distribution), Mr. Mazer's loss amount of just over $100 million was significantly lower than the average loss amount of $523,408,883, and the median of $195,000,000.

13.     As reflected in Exhibit 3 (Scatter Plot), no other individual with a loss amount of just over $100 million (specifically, losses ranging from $100 million to just under $116 million) received a sentence of 240-months.  In fact, for such a loss amount, Mr. Mazer's sentence was the highest ever imposed between fiscal years 2006 and 2016.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

Executed on January 22, 2018.                                    /s/ Cary A. Elliot
                                                                Cary A. Elliot, Ph. D.



1155 Connecticut Ave, NW
Suite 900
Washington DC 20036
Direct: 202-899-4174
Mobile: 703-608-7851
celliott@resecon.com

# Cary Anthony Elliott, Ph.D.
## Senior Economist

Cary Anthony Elliott is a Senior Economist at Resolution Economics LLC, an economics and statistics consulting firm with offices in Los Angeles, Chicago, Washington, D.C. and New York. He holds a Ph.D. in economics from Princeton University. Prior to joining Resolution Economics, Dr. Elliott worked as a senior economist in the executive and legislative branches of the Federal Government; he provided statistical analysis and policy advice to top government executives and members of Congress and their staff. In addition to his years of government service, he has worked as a senior consultant and research manager on various litigation matters.

Dr. Elliott has a wide range of experience applying economic and statistical techniques in public policy and legal matters. He has worked as a consultant and supported expert testimony in labor and employment cases, major antitrust cases, asbestos liability claims matters, and in multidistrict litigation alleging fraud in pharmaceutical pricing. Throughout his career, Dr. Elliott has specialized in answering specific and non-routine empirical questions that arise in the context of complex litigation and public policy. His experience includes analyzing large public access government databases, and constructing analytical datasets from disparate sources within private firms including payroll data and other financial data. Dr. Elliott is experienced in analyzing potential liability and calculating damages in a wide variety of employment matters, including wrongful termination, compensation, hiring, promotions, and FLSA wage and hour claims.

## Education

Princeton University, Princeton, NJ
**Ph.D. in Economics**                                             **1998**
Areas of Concentration: Industrial Organization, Labor Economics, Econometrics

Princeton University, Princeton, NJ
**M.A. in Economics**                                             **1995**

Northeastern University, Boston, MA
**B.S. in Economics**                                             **1992**
Minor in mathematics



# Professional Experience

Resolution Economics, LLC, Washington, DC
**Senior Economist**                                     **2016 – Present**

Sentencing Stats, LLC, Los Angeles, CA
**Principal Economist**                                  **2016 – Present**

 Joint Economic Committee, US Congress, Washington, DC
**Senior Economist**                                     **2011 – 2016**

Office of Economic Policy, US Department of the Treasury, Washington, DC
**Senior Economist**                                     **2010 – 2011**

Bates White, LLC, Washington, DC
**Manager**                                              **2007 – 2009**

Congressional Budget Office, Washington, DC
**Principal Analyst**                                    **2002 – 2007**

National Economic Research Associates, Inc., Cambridge, MA
**Consultant**                                           **1998 – 2001**

Abt Associates, Inc., Cambridge, MA
**Research Assistant**                                   **1991 – 1993**

# Teaching Experience

Tufts University, Medford, MA
**Instructor – "Basic Econometrics"**                    **Spring, 2002**
**Instructor – "Statistics"**                            **Spring, 2002**

Babson College, Medford, MA
**Instructor – "Managerial Economics"**                  **Summer, 2001**

Princeton University, Princeton, NJ
**Preceptor (Teaching Assistant) – Microeconomics**      **Spring 1996**
**Preceptor (Teaching Assistant) – Industrial Organization** **Fall 1995**

# Overview of Consulting Engagements

*Discrimination Class Action,* Resolution Economics for Defendant
- Consultant for a major technology firm facing a class action lawsuit alleging disparate impact in performance evaluation, promotion and pay. Developing statistical models of the client's performance processes to test for differences in outcomes by protected group using internal performance data.



*FLSA Class-Action Case,* Resolution Economics for Defendant
- Prepared potential damages scenarios on behalf of a major product distributor facing multiple class-action cases alleging misclassification of workers as independent contractors.

*Cencast Services L.P. v. United States*, Bates White for Plaintiff
- Managed client engagement for landmark tax litigation concerning the appropriate base for calculation of payroll taxes (FICA and FUTA) for movie and television productions.
- Filed a declaration addressing the correct calculation of credits for payment of state unemployment taxes to be applied to FUTA assessments.
- Created stratified sample frames for survey-style court discovery on the proper classification of independent contractors and determination of the common-law employer for talent working on motion picture and television productions.
- Managed analysis of client payroll database. Constructed settlement workbook that estimated tax liability scenarios based on potential outcome of discovery.

*Average Wholesale Price for Pharmaceuticals Litigation*, Bates White for Defendants
- Managed various aspects of client engagements for nationwide litigation brought by state Attorneys General and the federal government alleging fraudulent inflation of the benchmark prices for pharmaceuticals leading to excess insurance reimbursement.
- Managed construction of an analytical database for subject drugs using large pharmaceutical wholesaler transaction datasets, Medicaid reimbursement data, and pricing compendia data.
- Managed preparation of settlement workbooks that presented ranges of potential damages using the known methodologies of plaintiff damages experts along with alternative methodologies.
- Managed construction of state-level Medicaid reimbursement policy database. Analyzed transaction-level state Medicaid reimbursement data and estimated payment bases, summarizing proportion of transactions by reimbursement formula by state for subject drugs in a number of client engagements.

*Asbestos-Related Product Liability Cases,* Bates White for Defendants
- Evaluated the reasonableness of claims on behalf of insurers of a former regional asbestos distributor and contractor. Managed the construction and analysis of a large asbestos claims database from various sources. Compared settlement amounts to publicly available information about other defendants considering product exposure differences and changes in the litigation environment.
- Evaluated potential future asbestos-related losses for an insurer of a large insulation contractor per the terms of a proposed coverage-in-place agreement. Calculated a range of future expenditure scenarios based on the asbestos defendant's historical claims experience, settlement amounts, and defense expenditures. Those scenarios accounted for different assumptions about how changes in the litigation environment will likely affect the defendant's future tort liability.
- Allocated historical and future asbestos-related losses to various insurance policies of an excess coverage carrier of an electrical parts manufacturer pursuant to a coverage-in-place agreement. Calculated a range of future expenditure scenarios based on the asbestos defendant's historical claims



experience, settlement amounts, and assumptions about defense spending ratios and the impact of changes in the litigation environment.

- Constructed scenario workbooks for insurer carriers negotiating coverage-in-place agreements for the allocation of long-tailed environmental claims between multiple insurance policies.

*Computer software litigation*, NERA for Defendant

- Provided in-depth research on network externalities and dynamic competition in computer software markets in *United States v. Microsoft and Caldera v. Microsoft*. Developed statistical models of pricing reaction to new product entry and new version releases in software markets. Researched the applicability of theoretical models of monopoly pricing to observed dynamics in software markets.

*Consultant on various wrongful termination cases*, NERA for Defendants

- Estimated economic damages in various wrongful termination cases.
- Drafted the reports of testify experts.
- Analyzed company personnel history data.

*Expert in Single-plaintiff wrongful termination case*, NERA for Plaintiff

- Estimated economic damages in wrongful termination case.
- Submitted expert report on behalf of plaintiff.

## Experience Working with Complex Data

*Current Population Survey – Bureau of Labor Statistics*

- Conducted comparative analysis of labor market experience and income by demographics for various reports and memorandums.
- Estimated insurance coverage among young adults as a result of the adult dependent care coverage provision of the affordable care act on insurance coverage among young people.
- Estimated number of workers hired under HIRE act eligibility.

*American Community Survey –  Census Bureau*

- Conducted comparative economic and labor market experience by demographic group for various reports and memorandums.

*Beginning Postsecondary Students Longitudinal Studies (1994, 2001 and 2009), National Center for Education Statistics*

- Analyzed trends in student borrowing by degree earned.

*American Time Use Survey – Bureau of Labor Statistics*

- Estimated job search intensity before and after extension of emergency unemployment insurance benefits in the wake of the great recession.

*Survey of Consumer Finances – Federal Reserve*

- Used in dissertation chapter to study credit card use and consumer debt servicing.

*Client Payroll Data*

- Analyzed allegations of discrimination in hiring, promotion and pay.
- Analyzed payroll records across various entertainment industry productions.
- Analyzed tax payment records.



*Survey Research Data Collection and Analysis*
- Stratified sample design in court discovery proceedings.
- Designed and fielded mail and telephone survey for Ph.D. Dissertation.
- Experienced in all phases of survey research, including questionnaire design, fielding, data coding and data analysis as a research assistant at Abt Associates, Inc.

*Central Personnel Data Files – U.S. Office of Personnel Management*
- Analysis of pay and benefits of federal employees.

## Authored Government Reports

United States. Cong. Joint Economic Committee. *Economic Challenges in the Black Community*. 114th Congr., 1st Sess. Washington:  April 2015.

United States. Cong. Joint Economic Committee. *The Millennials: Economic Challenges and Opportunities*. 113th Congr., 2nd Sess. Washington:  December 2014.

United States. Cong. Joint Economic Committee. *Gasoline Spikes and Their Impact on the Economy.* 113th Congr., 2nd Sess. Washington:  May 2014.

United States. Cong. Joint Economic Committee. *The Economic Case for Continuing Federal Unemployment Insurance.* 113th Congr., 2nd Sess. Washington:  January 2014.

United States. Cong. Joint Economic Committee. *The Causes and Consequences of Increasing Student Debt*. 113th Congr., 1st Sess. Washington:  June 2013.

United States. Cong. Joint Economic Committee. *Strengthening Military Households by Decreasing the Barriers to Work*. 112th Congr., 2nd Sess. Washington:  August 2012.

United States. Office of Economic Policy. Department of the Treasury. *Estimates of Newly Hired Employees Eligible for the Hire Act Tax Exemption*. Washington: July 12, 2010.

United States. Congressional Budget Office. *The Characteristics and Pay of Federal Employees*. 110th Congr. 1st Sess. Washington: March 2007.

United States. Congressional Budget Office. *Comparing the Pay of Federal and Nonfederal Law Enforcement Officers.* 19th Congr. 1st Sess. Washington: August 2005.

United States. Congressional Budget Office. *The Effects of Tort Reform: Evidence from the States.* 108th Congr. 2nd Sess. Washington: June 2004.

United States. Congressional Budget Office. *The Economics of U.S. Tort Liability: A Primer*. 108th Congr. 1st Sess. Washington: October 2003.



## Publications

Elliott, C., M. Musell and D. Torregrosa. 2008. "An Overview of Federal Retirement Benefits." In Christopher G. Reddick and Jerrell D Coggburn (Eds.) *Handbook of Employee Benefits and Administration*. London: CRC Press (Taylor and Francis)

Elliott, C., M. Musell and D. Torregrosa. 2008. "Comparing Federal Employee Benefits with Those in the Private Sector." In Christopher G. Reddick and Jerrell D Coggburn (Eds.) *Handbook of Employee Benefits and Administration*. London: CRC Press (Taylor and Francis)

Elliott, C., "Differences in Federal Civilian Employee Retention, by Retirement System," Unpublished Working Paper. August 2007. Available upon request.

Elliott, C. "The Effect of Suburban Education on Urban Students: Evidence from the 1989 NBER Boston Youth Labor Market Survey." *Three Essays in Applied Microeconomics*. Diss. Princeton University. 1998.

Elliott, C. "Get on the Bus? The Long Run Effect of METCO Suburban Education on Inner-city Students." *Three Essays in Applied Microeconomics*. Diss. Princeton University. 1998.

Elliott, C. "The Behavior of Credit Card Users: Evidence from Consumer Survey Data." *Three Essays in Applied Microeconomics.* Diss. Princeton University. 1998.

## Membership

- American Economic Association
- The National Economists Club
- American Bar Association (Associate Member)